1

1      IN THE UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF WYOMING

3 -------------------------------------------------------------

4 UNITED STATES OF AMERICA,

5     Plaintiff,   Case No. 2:11MJ100

6   vs.      Yellowstone National Park,

7          Wyoming
          December 14, 2011

8 JACK KANE PARRENT JR.,

9     Defendant.

10 -------------------------------------------------------------

11

12    TRANSCRIPT OF RECORDED MOTION, ARRAIGNMENT
       AND TRIAL PROCEEDINGS

13    BEFORE THE HONORABLE STEPHEN E. COLE
      UNITED STATES MAGISTRATE

14

15 APPEARANCES:

16 For the Plaintiff:  MR. LELAND F. PICO
        Assistant U. S. Attorney

17        Yellowstone Justice Center
        P. O. Box 703

18        Yellowstone National Park, WY  82190

19

20 For the Defendant:  MS. JAMI REBSOM
        Attorney at Law
        320 N. Main Street

21        Livingston, MT  59047

22

23 Proceedings recorded by electronic sound recording

24 Transcript produced by New Life Transcription Service,
 5023 East Villa Circle, Cheyenne, Wyoming, (307) 214-3912

25

U.S. v. PARRENT                                                    2:11MJ100

2

1                              I N D E X

2

     MOTIONS                                                      PAGE

3

     MOTION TO DISMISS

4

         Ms. Rebsom                                                6
5        Mr. Pico                                                 6
         Ms. Rebsom                                               7
6        Ruling of the Court                                      9

7

     ARRAIGNMENT                                                  10

8

9    PLAINTIFF'S WITNESSES:                                       PAGE

10   KEVIN LEON STARK
         Direct - Mr. Pico                                        12
11       Cross - Ms. Rebsom                                       31

12   GREGORY S. TODD
         Direct - Mr. Pico                                        44
13       Cross - Ms. Rebsom                                       52

14   CARLTON PAUL NEWMAN
         Direct - Mr. Pico                                        55
15       Cross - Ms. Rebsom                                       63

16   AMANDA WILSON
         Direct - Mr. Pico                                        66
17       Cross - Ms. Rebsom                                       81

18   BRIAN GEORGE CHAN
         Direct - Mr. Pico                                        90
19       Cross - Ms. Rebsom                                       100

20   RUSSELL A. MILLER
         Direct - Mr. Pico                                        108
21       Cross - Ms. Rebsom                                       122
         Redirect - Mr. Pico                                      124
22

23   DEFENDANT'S WITNESS:                                        PAGE

24   BRIAN GEORGE CHAN
         Direct - Ms. Rebsom                                      129
25       Cross - Mr. Pico                                         131

U.S. v. PARRENT                                                    2:11MJ100

3

1                          I N D E X (CONT.)

2       GOVERNMENT'S EXHIBITS                             RECEIVED

3       2                                                      112

4       3                                                      113

5       4                                                      114

6       5                                                      115

7       6                                                      118

8


9       CLOSING ARGUMENTS                                     PAGE

10      Mr. Pico                                               131
        Ms. Rebsom                                             133
11      Mr. Pico                                               136

12

13

14

15

16

17

18

19

20

21

22

23

24

25

U.S. v. PARRENT                                                    2:11MJ100

4

1                    P R O C E E D I N G S

2              COURTROOM CLERK:  All rise.  The United States

3    District Court for the District of Wyoming in Yellowstone

4    National Park is now in session.

5              THE COURT:  Please be seated.  Good morning.  This

6    case is the United States of America versus Jack Kane Parrent

7    Jr.  Mr. Parrent was charged by a Criminal Complaint, which was

8    subsequently amended so that now as we go to trial the charges

9    against Mr. Parrent are, Count I, knowingly operate a motor

10   vehicle while under the influence of alcohol to a degree that

11   rendered him incapable of safely operating a motor vehicle, a

12   violation of 36 Code of Federal Regulations Section 4.23(a)(1),

13   which is a class B misdemeanor;

14             Count II, knowingly operate a motor vehicle with a

15   blood alcohol content greater than 0.08 grams of alcohol per

16   210 liters of breath, to wit, driving a commercial tour bus

17   with passengers from Gardiner, Montana to Lamar Valley in

18   Yellowstone National Park while having a blood alcohol content

19   over 0.091 grams of alcohol per 210 liters of breath.  Also a

20   class B misdemeanor;

21             And Count III is knowingly operate a commercial

22   vehicle while on duty with a detectable amount of alcohol, to

23   wit, driving a commercial tour bus with passengers from

24   Gardiner, Montana to the Lamar Valley in Yellowstone National

25   Park with a blood alcohol content of 0.091 grams of alcohol per

5

1  210 liters of breath.  This is a violation of 36 CFR Section

2  4.2(b), which incorporates Wyoming Statute Section

3  31-18-303/Wyoming Statute Section 31-18-701, and 49 Code of

4  Federal Regulations Section 392.5(a)(2).  This is also a class

5  B misdemeanor.

6         Mr. Parrent was arrested on June the 3rd of 2011, and

7  he had an initial appearance on June the 6th.  He was advised

8  of his rights and advised of his charges and stated he

9  understood them.  He requested the Court to appoint counsel for

10 him, and the Court appointed Jami Rebsom of Livingston,

11 Montana, who is present in court today with the defendant.  The

12 Government is represented by Assistant United States Attorney

13 Lee Pico.

14         Mr. Parrent's arraignment was on June the 23rd of

15 2011, and he entered pleas of not guilty to all charges against

16 him.

17         Yesterday the Court received a motion to dismiss for

18 lack of speedy trial, which was a bit tardy, but we'll go ahead

19 and hear it.  We'll hear the motion to dismiss first.  Of

20 course, if the Court grants the motion, then the trial will be

21 vacated and the charges dismissed.  If the Court does not grant

22 the motion, then we will proceed immediately to trial.

23         Are both parties ready to proceed?

24         MR. PICO:  The United States is ready, Your Honor.

25         MS. REBSOM:  We're ready to proceed.

1          THE COURT:  All right.  Ms. Rebsom, it's your motion.

2   You may begin.

3          MS. REBSOM:  Thank you, Judge.  Judge, I filed the

4   motion under 18 United States Code annotated, Section 3161,

5   which indicates that any case in which a plea of not guilty is

6   entered for any criminal offense, that the defendant has a

7   right to trial within 70 days from either the date the charge

8   was charged or the date that the client appears in court.  And

9   clearly, Judge, over 70 days has elapsed since that time.

10          In addition, Mr. Parrent has been on pretrial

11   probation, and his constitutional rights to travel have been

12   prohibited.

13          Furthermore, there have been a couple of different

14   times that I indicated to the Court that we had not received

15   discovery.  At one certain point the Government indicated that

16   they had provided discovery.  A couple months later one of the

17   rangers had e-mailed me some supplementally -- supplemental

18   discovery, which caused me some concern.  So based on the fact

19   that this case has not been to trial from 70 days from the time

20   that Mr. Parrent appeared in court on these charges, I would

21   ask that the Court dismiss for lack of speedy trial.

22          THE COURT:  Mr. Pico.

23          MR. PICO:  Thank you, Your Honor.  The Speedy Trial

24   Act clearly provides an exclusion for class B misdemeanors

25   under its time computations.  The relevant section is found at

1   18 U.S.C. Section 3172, I believe it's (a)(2).  The -- in

2   defining what an offense is, the Speedy Trial Act and Congress

3   decided to specifically exclude class B misdemeanors, class C

4   misdemeanors and infractions.

5          There -- the United States has presented counsel and

6   the Court with two cases indicating that that is, in fact, the

7   case and interpreting that statute accordingly.  One of them is

8   a U. S. District Court case out of the District of Puerto Rico,

9   a 2000 case, where individuals were charged with class B

10  misdemeanors.  Unfortunately, the court decision does not

11  designate which class B misdemeanors, but clearly indicates in

12  the -- in the case that they were class B misdemeanors and

13  denies the motion to dismiss for the very reason that class B

14  misdemeanors are excluded from computation time periods under

15  the Speedy Trial Act.

16         The same thing is true with regard to a Ninth Circuit

17  case that the United States has submitted in 1981, which is the

18  case that the Court has before it, as well as in 2000, which is

19  actually referred to in the District of Puerto Rico case.  The

20  Ninth Circuit has, in fact, held that the class B offenses are

21  specifically excluded from time computation periods under the

22  Speedy Trial Act found at 18 U.S.C. Section 3161 and following.

23  Thank you, Your Honor.

24         THE COURT:  Ms. Rebsom.

25         MS. REBSOM:  And, Judge, while those cases are

1    possible persuasion for the Court to make a determination,

2    they're not binding on this Court, and I would also remind the

3    Court that initially Mr. Parrent was charged with a class A

4    misdemeanor, reckless endangerment.  At that time he had done a

5    demand for jury trial and requested jurisdiction be transferred

6    to the United States District Court of Wyoming.  At no time did

7    Mr. Parrent sign a consent form to have the case heard under

8    the magistrate court, and subsequently the Government dismissed

9    that class A misdemeanor restricting Mr. Parrent's right to

10   jury trial and apparently now the Government is saying speedy

11   trial.

12          However, I want the Court to consider that with these

13   charges Mr. Parrent is looking at up to six months in jail, and

14   I'd like the Court to consider that, because I don't consider

15   that petty offense.  That completely restricts his freedom for

16   up to six months, and I think that the Government should've

17   brought my client to trial within 70 days from the date of his

18   appearance.

19          THE COURT:  So you're saying that it's not a petty

20   offense even though the statutes say it is a petty offense?

21          MS. REBSOM:  Well, I think under Speedy Trial under

22   Section 3161 that you have a right to speedy trial 70 days from

23   the date that you appear, and that does not exclude petty

24   offenses.

25          THE COURT:  But then you're saying that the Government

U.S. v. PARRENT                    MOTION                    2:11MJ100

9

1   doesn't have the right to dismiss the class A?

2          MS. REBSOM:  No, they do, but I think that it's

3   somewhat vindictive of the Government to dismiss it to hinder

4   Mr. Parrent's rights.

5          THE COURT:  Well, I -- I have to say I disagree with

6   you, Ms. Rebsom.  It seems perfectly clear to me that the

7   Government has the absolute right to dismiss a more serious

8   charge against your client in lieu of -- or -- and have instead

9   three lesser charges.  He'd be looking at a year in prison, and

10  certainly, if there was a class A, he would have a right to a

11  jury trial and a right to appear before a district judge, and

12  the Speedy Trial Act would -- would apply, but there's -- you

13  presented me with nothing to say they don't have a right to.

14  There's no case law.  You know, as far as I'm concerned, they

15  can dismiss it and we go forward.

16          And, therefore, I'm going to not grant your motion to

17  dismiss, and we will proceed to trial.

18          Mr. Pico.

19          MR. PICO:  Thank you, Your Honor.  May it please the

20  Court and Counsel.  One other point, just a technical matter.

21  The Amended Complaint does contain all of the charges that --

22  that were in the original Complaint except those that the Court

23  has already noted were excluded.  Since we did not have an

24  arraignment on the Amended Complaint, I don't think it's

25  necessary because these charges were in the original Complaint.

U.S. v. PARRENT                    ARRAIGNMENT                    2:11MJ100

10

1   Mr. Kane -- Mr. Parrent, rather, did enter pleas of not guilty,

2   and I think those pleas are still before the Court.  Again, so

3   I don't think an arraignment is necessary, but if the Court

4   feels it's necessary out of an abundance of caution, we can

5   have him enter not guilty pleas and then proceed to trial.

6              THE COURT:  Ms. Rebsom, I think that's a point well

7   taken.

8              Mr. Parrent, would you please stand.  Mr. Parrent, I'm

9   just going to put on the record what you have previously done,

10  which is enter a plea of not guilty to the charges.  To the

11  charge of operating a motor vehicle under the influence of

12  alcohol to the degree that rendered you incapable of safely

13  operating that motor vehicle, do you plead guilty or not

14  guilty?

15             THE DEFENDANT:  Not guilty, Your Honor.

16             THE COURT:  To the charge of operating a motor vehicle

17  with a blood alcohol content of 0.08 percent or greater, to

18  wit, 0.091 percent, do you plead guilty or not guilty?

19             THE DEFENDANT:  Not guilty.

20             THE COURT:  And to the charge of operating a

21  commercial vehicle with a detectable amount of blood alcohol,

22  to wit, 0.091 percent, do you plead guilty or not guilty?

23             THE DEFENDANT:  Not guilty.

24             THE COURT:  You may be seated.

25             All right, Mr. Pico.  Anything --

page 11

1        MR. PICO:  Thank you, Your Honor.

2        THE COURT:  Is there anything else, any other

3   preliminary matters, Ms. Rebsom?

4        MS. REBSOM:  Judge, at this time I'd move to exclude

5   witnesses until they're on the stand under oath.

6        THE COURT:  Any objection?

7        MR. PICO:  I do, but I think the Court has to grant

8   the motion, very honestly.

9        THE COURT:  All right.  Would the parties please

10  exclude all of their witnesses except for the person who is

11  testifying.

12       MR. PICO:  Thank you, Your Honor.  At this time, Your

13  Honor, the United States would waive its opening.  I believe

14  the Court has a good grasp of the basic facts in this case, and

15  we are ready to proceed to present evidence.

16       THE COURT:  All right.  You may call your first

17  witness.

18       MR. PICO:  Thank you, Your Honor.  At this time the

19  United States calls Kevin Stark.

20       THE COURT:  Would you please come forward and stand

21  right there and raise your right hand.

22       COURTROOM CLERK:  Do you swear that the testimony

23  you're about to give in the case now before the Court will be

24  the truth, the whole truth and nothing but the truth, so help

25  you God?

1          THE WITNESS:  I do.

2          COURTROOM CLERK:  Thank you.

3          THE WITNESS:  Right here?

4          THE COURT:  Yes.

5          MR. PICO:  I assume Maya will let us know by hand

6    signals if she can't hear anything.

7          THE COURT:  Can you hear everything okay?

8          Okay.

9          MR. PICO:  May it please the Court, Counsel, and

10   Mr. Parrent.

11                          KEVIN LEON STARK,

12   called for examination by the Plaintiff, being first duly

13   sworn, on his oath testified as follows:

14                          DIRECT EXAMINATION

15   Q.  (BY MR. PICO)  Mr. Stark, could you state your full name

16   and spell your name for the record, please.

17   A.  Kevin Leon Stark, S-t-a-r-k.

18   Q.  And are you one of the codefendants in this case and you

19   have previously pled guilty?

20   A.  Yes, I have.

21   Q.  Okay.  Can you tell us, please, where are you employed?

22   A.  Currently?

23   Q.  Yes.

24   A.  I am employed with Terrell's Office Machines.

25   Q.  Okay.  And tell us a little bit about your background.

1  Where were you previously employed?

2  A.  Prior to that I was employed by Karst Stage.

3  Q.  Okay.  And before that?

4  A.  Bozeman Daily Chronicle.

5  Q.  And how long were you employed by the Bozeman Daily

6  Chronicle?

7  A.  Almost eight years.

8  Q.  Okay.  And before that?

9  A.  Before that I was -- lived in Denver and worked for Lewan &

10  Associates.

11  Q.  And Lewan & Associates is what?

12  A.  Copier repair technician.

13  Q.  Okay.  Do you know the defendant in this case, Jack Kane

14  Parrent Jr.?

15  A.  In a working relationship, yes.

16  Q.  Okay.  Is he in the courtroom today?

17  A.  Yes, he is.

18  Q.  Can you identify him, please?

19  A.  Yeah, he's sitting right here.

20        MR. PICO:  Okay.  Let the record reflect that the

21  witness has identified the defendant, Your Honor.

22  Q.  (BY MR. PICO)  Can you tell us, please, how you came to

23  know Mr. Parrent?

24  A.  Mr. Parrent was hired at Karst Stage after me, and I first

25  met him when I had to take him up to MSC sub to begin driving

1  with another driver to learn the Streamline route.

2  Q.  Okay.  And at -- and how long had you worked with Karst

3  Stage before June 2nd and June 3rd of this year?

4  A.  11 months.

5  Q.  Okay.  And doing what primarily?

6  A.  Primarily driving Streamline busses in town.

7  Q.  Okay.  Did you or do you have a commercial driver's

8  license, a CDL?

9  A.  Yes, I do.

10  Q.  Okay.  And when did you obtain that?

11  A.  I believe I obtained it back in 1998.

12  Q.  Okay.  And it was current in June of this year?

13  A.  Yes, sir.

14  Q.  Okay.  Can you tell us, please, do you remember being

15  employed by Karst Stage on June the 2nd of this year?

16  A.  Yes, I was.

17  Q.  And what specifically were your duties on that particular

18  day?

19  A.  Me and Mr. Parrent were to drive two busses with

20  approximately 90 students and four chaperones through

21  Yellowstone for two days.

22  Q.  And where were these students from?

23  A.  Sacagawea Middle School.

24  Q.  Where?

25  A.  In Bozeman, Montana.

1  Q.  Okay.  Tell us, please, when the day began with regard to

2  that particular trip and what you did and what Mr. Parrent did.

3  A.  I believe I showed up at the shop there at Karst in Bozeman

4  at around 12:00, 12:30 --

5  Q.  In the afternoon?

6  A.  Yes.

7  Q.  Okay.

8  A.  Proceeded to pretrip my bus, obtain any last-minute

9  information from Karst as to the responsibilities and the route

10  we were to take, and then once my bus was pretripped, I

11  proceeded out to Sacagawea Middle School.

12  Q.  When you say your bus was pretripped, can you explain to

13  the Court what you mean by pretripped?

14  A.  Pretrip we go through and inspect all aspects of the bus to

15  make sure it is in a safe and operating condition.

16  Q.  Okay.  What time were you at Sacagawea School?

17  A.  By 1 p.m.

18  Q.  Okay.  And was Mr. Parrent there as well?

19  A.  Mr. Parrent arrived shortly after I did.

20  Q.  Can you give the Court an idea of the size of these busses

21  that you were driving?

22  A.  They're approximately 47-passenger busses.

23  Q.  Okay.  Is it like the Streamline busses that are up in

24  Bozeman?

25  A.  No, these are full-size motor coaches.

1    Q.  Okay.  And did -- was there any distinction in the

2    passengers that you were carrying?

3    A.  We -- we had separated, per -- per the school's request,

4    boys on one bus and the girls on the other bus.

5    Q.  And which bus were you driving?

6    A.  I had all the boys.  Mr. Parrent had all the girls.

7    Q.  Okay.  And what happened next?

8    A.  Well, once we were fully loaded up, we proceeded to

9    Yellowstone National Park via Livingston and Gardiner.

10   Q.  Okay.  Now, in addition to the students, were there any

11   adults present?

12   A.  I had two chaperones on my bus.  I believe Mr. Parrent had

13   two on his as well.

14   Q.  Okay.  In addition, were there parents of the students that

15   were accompanying you as well?

16   A.  Not personally on the busses, to my knowledge, but there

17   were a couple of vehicles that I believe had either teachers

18   and/or parents.

19   Q.  Okay.  And did you eventually arrive in Yellowstone

20   National Park?

21   A.  Yes, we did.

22   Q.  And that was on June the 2nd?

23   A.  Correct.

24   Q.  And where did you go?

25   A.  We proceeded up here to Mammoth for about a two-hour tour

1  that the students had right here in Mammoth.

2  Q.  Okay.  Tell the Court what happened next.

3  A.  At about 6 p.m. when the tour was done, we loaded up the

4  kids and proceeded out to Arch Park where some staff and

5  parents had previously gone to and set up a dinner in the park.

6  Q.  And about what time was that?

7  A.  A little after 6:00.

8  Q.  Okay.  And how long did that dinner last?

9  A.  I want to say until a little after 7:00.  They had to wait

10  for somebody to open up either the church or the community

11  center or both.

12  Q.  Okay.  And tell us about the church and community center.

13  How did those buildings come into play?

14  A.  They were prearranged by the school for the students.  The

15  girls were going to stay in the church, and the boys were

16  staying in the community center.

17  Q.  Okay.  And did you drop the students off there?

18  A.  I dropped my students off at the community center, and

19  Mr. Parrent dropped his kids off at the church.

20  Q.  Okay.  And what did you do next?

21  A.  Once both busses were unloaded, we -- I stayed around for a

22  few minutes trying to determine the exact time that they wanted

23  us there the next morning.

24  Q.  Okay.  And tell the Court what happened next, then.

25  A.  Mr. Parrent pulled up and got out of his bus and indicated

1    that we were instructed to be there to load the kids at a

2    quarter till 6:00 in the morning.

3    Q.   Okay.  And then what?

4    A.   Then me and Mr. Parrent proceeded to the Super 8 Hotel in

5    Gardiner and parked our busses on the east side parking lot and

6    proceeded to check into our individual rooms.

7    Q.   Okay.  And about what time was this?

8    A.   Shortly around 8:00.

9    Q.   Okay.  What happened next?

10   A.   Once we were checked into our rooms, I wanted to go get

11   some dinner.  Mr. Parrent joined me, and we went to Outlaw's

12   Pizza.

13   Q.   Okay.  And did you eat there?

14   A.   Yes.

15   Q.   Did you have any alcoholic beverages there?

16   A.   Me and Mr. Parrent ordered a pitcher of beer.

17   Q.   Okay.  And tell us how much each of you drank.

18   A.   I drank at least I'd say about a half a beer.  Mr. Parrent

19   drank probably a glass of beer.

20   Q.   Okay.  And what -- when you left, had the whole pitcher

21   been consumed?

22   A.   No, there was about a third of a pitcher left.

23   Q.   Okay.  And where -- where did you go next?

24   A.   We proceeded across the street to the rusty nail.

25   Q.   And what is the rusty nail?

1   A.  A bar/gambling facility.

2   Q.  Okay.  Is that part of the Best Western complex in downtown

3   Gardiner?

4   A.  Part of the Yellowstone restaurant or something.

5   Q.  Okay.

6           THE COURT:  Excuse me, I think the name of it is Rusty

7   Rail.

8           THE WITNESS:  That -- you're correct, sir, Rusty Rail.

9   Q.  (BY MR. PICO)  Okay.  Is that correct?

10  A.  Yes.

11  Q.  Okay.  And what happened there at the Rusty Rail?

12  A.  We went in and I ordered me and Mr. Parrent a glass of

13  vodka Red Bull for each of us and a shot of Jäger for each of

14  us.

15  Q.  When you say "Jäger," what do you mean?

16  A.  Jägermeister, it's an alcohol.

17  Q.  Okay.  Is it whiskey?

18  A.  I -- I don't know what it's classified as.

19  Q.  Okay.  And how many drinks did you have there?

20  A.  To my recollection, me personally, I had four vodka Red

21  Bulls and two shots of Jäger.

22  Q.  And who was -- was Mr. Parrent drinking with you?

23  A.  Yes, he was.

24  Q.  And who was buying?

25  A.  Essentially I was.

1  Q.  And how were you buying?

2  A.  With my credit card.

3  Q.  And did Mr. Parrent match you for drinks that evening?

4  A.  No.

5  Q.  What do you mean?

6  A.  He is essentially borrowing money from me from my credit

7  card, and in order to, I guess, get the money, he was -- we

8  would charge the drinks and then add a hundred dollars onto it

9  so that he could borrow the money to gamble.

10  Q.  Okay.  Now, when I say "match drinks," what I meant was was

11  he drinking the same amount and the same thing as you were at

12  the bar?

13  A.  In the beginning he was, yes.

14  Q.  Okay.  And did he continue?

15  A.  At some point in time he -- he changed to I want to say a

16  cranberry vodka drink.

17  Q.  Okay.  And do you know how many he had at that point?

18  A.  I don't know the exact amount he had, no.

19  Q.  Okay.  Did you watch him consume alcohol that evening?

20  A.  I had, yes.

21  Q.  Okay.  Were you together that entire time?

22  A.  We were in the same facility, but we were usually at two

23  different gaming areas.

24  Q.  Okay.  And with respect to your buying the credit card --

25  or the drinks with your credit card, were you always the one

1   who tendered the credit card to the bartender or how did that

2   work?

3   A.  No, just the first two times I was.  After that Mr. Parrent

4   used my credit card.

5   Q.  Okay.  And I think you indicated that you were lending him

6   some money?

7   A.  Correct.

8   Q.  And he was obtaining that by means of getting cash from

9   your credit card?

10  A.  Correct.

11  Q.  And how much did he borrow from you that evening?

12  A.  I had authorized him a total of $400.  I later found out

13  that on the final charge he had charged an additional hundred

14  on it, so rather than a hundred dollars, there was a $200-plus

15  charge on my credit card.

16  Q.  Okay.  So how much money had you given him that evening?

17  A.  $500.

18  Q.  Okay.  Now, with respect to the drinks that you had that

19  evening, can you tell us, please, what effect they had on you?

20  A.  I was drunk.

21  Q.  Okay.  What time did you leave?

22  A.  A little after 11:00 p.m.

23  Q.  And what time did you arrive back at the Super 8 Hotel?

24  A.  It was before midnight, around 11:30.

25  Q.  And how did you get back to the hotel?

1    A.  Walked.

2    Q.  Okay.  Did Mr. Parrent go with you?

3    A.  To the hotel, yes.

4    Q.  Okay.  And what happened next?

5    A.  At the -- when we got to the parking lot of the hotel, I

6    indicated that I was going to my room and going to bed.

7    Mr. Parrent indicated that he was gonna run downtown real

8    quick.

9    Q.  Okay.  Did he tell you what he was gonna do?

10   A.  No, he did not.

11   Q.  Now, when you went to sleep, did you have anything else

12   to -- or before you went to sleep, did you have anything else

13   to drink at the hotel after you left the Rusty Rail bar?

14   A.  Nothing alcoholic, no, sir.

15   Q.  Okay.  When you -- did you get up later that morning?

16   A.  The preceding (sic) morning, June 3rd?

17   Q.  Yes.

18   A.  I got up -- received my wake-up call at 4:45 a.m.

19   Q.  Okay.  And that was the morning of June 3rd, 2011?

20   A.  Yes, sir.

21   Q.  Okay.  How far, by the way, was the bar, the Rusty Rail

22   bar, from the Super 8?  How far a distance is it?

23   A.  Block and a half, two blocks.

24   Q.  When you got up the next morning, what did you do?

25   A.  Got in the shower, took a couple ibuprofen and packed up my

1   stuff, got dressed and proceeded out to towards my bus.  I

2   stopped at Mr. Parrent's room and knocked on the door.  He

3   answered the door.  I told him it was time to get ready.  He

4   said he was, you know, up and gonna get ready.

5        I proceeded out to my bus, pretripped and started it.

6   Once I had my bus started, I proceeded into the hotel.  There

7   was no one at the front desk, so I just laid my card, my key

8   card for my room on there and then proceeded out to my bus and

9   left.

10  Q.  Okay.  Now, let's talk a little bit about what you've just

11  indicated.  You said that you took a couple of ibuprofen.  Why

12  did you take some ibuprofen?

13  A.  I had a pretty bad headache.

14  Q.  Were you hung over?

15  A.  Yes.

16  Q.  And you said that you went next door to Mr. Parrent's room?

17  A.  Correct.

18  Q.  He was in the room next to yours?

19  A.  Correct.

20  Q.  Okay.  And did he -- when you knocked on his door, did he

21  actually come to the door?

22  A.  Yes, he did.

23  Q.  Okay.  Did he open the door?

24  A.  Yes, he did.

25  Q.  And can you tell us how he was dressed?

1   A.  He was still dressed in the same clothes he was wearing the

2   previous evening.

3   Q.  Did that strike you as odd?

4   A.  I didn't really think about it at the time.

5   Q.  Why?  Because you had a hangover?

6   A.  That and, you know, trying to get my bus going and . . .

7   Q.  Okay.  When -- when he opened the door, did you note the

8   odor of alcohol at all?

9   A.  I did not.

10  Q.  Did you ask him what time he got in that evening?

11  A.  No, I did not.

12  Q.  Now, you indicated that you left the hotel and went to

13  which facility, the school or --

14  A.  The community center.

15  Q.  The community center.  That's where the boys were staying?

16  A.  Correct.

17  Q.  Okay.  Was Mr. Parrent with you?

18  A.  No, he was not.

19  Q.  Did he show up?

20  A.  No, he did not.

21  Q.  What happened next?

22  A.  After several attempts to get him on the radio, I asked one

23  of the parents if they could drive me back to the hotel, which

24  one did.  He dropped me off at the hotel.  I was unable to get

25  Mr. Parrent to come to the door.  I proceeded --

1   Q.  What did you do to get Mr. Parrent to come to the door?

2   A.  Pounded on his door.

3   Q.  How loud?

4   A.  Pretty loud.  I was afraid I was gonna disturb the other

5   residents.

6   Q.  Okay.  And you did not rouse him with the pounding?

7   A.  No.

8   Q.  What happened next?

9   A.  I proceeded down to the front desk and requested a key card

10  for his room.

11  Q.  And did you get one?

12  A.  Yes, I did.

13  Q.  What happened next?

14  A.  I proceeded up to his room, opened his door, and

15  Mr. Parrent was asleep on the bed.

16  Q.  Okay.  And what was he wearing?

17  A.  Same clothes he was wearing the previous evening.

18  Q.  What happened next?

19  A.  As soon as I came into the room and -- and said his name,

20  he woke up.  I told him he was late.  He indicated that he had

21  plenty of time, and then he looked over at the clock and saw

22  what time it was and sort of panicked, "Oh, well, gotta go."

23  Q.  Okay.  Now, when you walked into his room, did you notice

24  the odor of alcohol?

25  A.  I did not.

1   Q.   When you saw him on the bed, can you describe his position

2   on the bed?

3   A.   He was laying on his back on top of the blankets fully

4   clothed.

5   Q.   Shoes still on?

6   A.   I -- I don't recall if he had his shoes on or not.

7   Q.   Okay.  What happened next?

8   A.   Proceeded -- once I saw that he was up out of bed, I told

9   him to hurry up and get ready, and I went out and pretripped

10  and started his bus.

11  Q.   Did you express any concern to him that he might be under

12  the influence of alcohol or anything like that?

13  A.   No.  At that time I simply assumed he had overslept.

14  Q.   Okay.  Did you ask him about a hangover --

15  A.   I did --

16  Q.   -- like you had?

17  A.   I did not.

18  Q.   Okay.  What happened next?

19  A.   Mr. Parrent came out a few minutes later, and I asked him

20  if he wanted me to drive the bus over to the church to give him

21  time to wake up.  He said he was good.

22  Q.   Okay.  And did he drive?

23  A.   Yes.

24  Q.   Okay.  And did you get to the church?

25  A.   He dropped me off in front of my bus at the community

1   center and then proceeded on down to the church.

2   Q.  Okay.  What happened next?

3   A.  About 15 minutes later, once the busses were loaded up, we

4   proceeded into the park.

5   Q.  Into Yellowstone National Park?

6   A.  Yes.

7   Q.  Okay.  And what happened next?

8   A.  We came through Mammoth and proceeded east.  At some point

9   we started having a couple kids who were feeling ill from car

10  sickness, pulled over.  I had one of the students get out of my

11  bus and get into a parent or teacher's car.

12  Q.  What happened next?

13  A.  We then proceeded north.  At some point we were -- we

14  pulled over for a wildlife viewing.  There was some sort of

15  kill and predator activity, and the bus -- students all exited

16  the bus to -- to observe that.

17  Q.  Okay.  Tell the judge what happened next.

18  A.  We were approached by two ran -- park rangers.  I had the

19  male gentleman came up to me and asked me what was going on.

20  We had just had a student get sick on my bus, and I indicated

21  this to him.  He asked if he could board my bus and take a look

22  around, and I told him he could.  At the same time Mr. Parrent

23  was talking with another female ranger at which point in time

24  both rangers pulled Mr. Parrent across the road to talk to him.

25  Q.  Okay.  What happened next?  What did you see?

1   A.  After, you know, I saw him -- I couldn't really see much

2   because he was on the other side of the vehicle, but after a

3   little while I was approached by a ranger and asked to come

4   over and talk to 'em.  When I got --

5   Q.  And did you?

6   A.  Yes.  When I got over there, I was asked if I had consumed

7   any alcohol the previous evening, and I indicated yes.

8   Q.  And what happened next?

9   A.  They asked if I would blow into a Breathalyzer test, and I

10   said yes.

11   Q.  And did you?

12   A.  I did.

13   Q.  And what was the result?

14   A.  The first result was a .0 --

15       MS. REBSOM:  I'm going to object as to foundation.

16   Q.  (BY MR. PICO)  Did you -- after you blew into the portable

17   test, did you -- did they show you the results?

18   A.  I don't -- I don't recall if they showed them to me or they

19   told them to me.

20   Q.  Okay.  What was the result?

21       MS. REBSOM:  Objection, hearsay and foundation.

22       THE COURT:  Overruled.

23   A.  The initial reading was .050.

24   Q.  (BY MR. PICO)  Okay.  And did they give you a second test?

25   A.  Yes, they did.  They got a whole different machine --

1  Q.  Okay.

2  A.  -- tester and had me blow into it, and I believe it was a

3  .030 or something.

4  Q.  Did you see the test or how did you know that?

5  A.  I don't recall if I was shown it or simply told.

6  Q.  Okay.  What happened next?

7  A.  I was notified that I was being placed under arrest for a

8  zero tolerance to having alcohol in your system.

9  Q.  As a commercial driver?

10  A.  Yes.

11  Q.  Did you know that was the rule?

12  A.  Yes.

13  Q.  What happened next?

14  A.  We proceeded -- they handcuffed both of us and put us in

15  the back of the unit, and we proceeded to head towards Mammoth.

16  Q.  What happened at Mammoth?

17  A.  I was the first removed from the vehicle and taken in and

18  booked and given a Breathalyzer.

19  Q.  And what -- did you -- were you shown the results of the

20  Breathalyzer test?

21  A.  Again, I don't know if I was shown or told the results.

22  Q.  Okay.  What was the result?

23  A.  .032.

24  Q.  And were you released at that time?

25  A.  I was not.

1    Q.   Okay.  What happened?

2    A.   I was detained and a few hours later told that I had a

3    $1,000 bond to get out.

4    Q.   Okay.  And did you eventually get out on bond?

5    A.   Not until Monday when the judge released me on my own

6    recognizance.

7    Q.   Okay.  Now, with respect to your driving and where the

8    rangers had made contact with you at this pullout, did all of

9    that occur within the exterior boundaries of Yellowstone

10   National Park?

11   A.   Yes, I believe so.

12   Q.   Okay.  Have you had any contact with Mr. Parrent since June

13   the 3rd?

14   A.   At the arraignment on June the 6th.

15   Q.   Okay.  What did you say to him and what did he say to you?

16   A.   I asked him at the end if he planned on paying me back, and

17   he told me he didn't want to discuss it.

18   Q.   Paying back what?

19   A.   The money he had borrowed.

20   Q.   You mean on the 2nd?

21   A.   On the evening of the 2nd, yes.

22   Q.   At the Rusty Rail?

23   A.   Correct.

24   Q.   Now, last week you came to court and pled guilty; is that

25   correct?

1    A.  Yes, sir.

2    Q.  What did you plead guilty to?

3    A.  I pled guilty to driving a commercial vehicle with a

4    detectable amount of alcohol.

5    Q.  And what is the plea agreement that you entered into?

6    A.  The other two charges would be dismissed.  I don't

7    understand the exact question.

8    Q.  What was the United States recommending by way of a

9    sentence for you?

10   A.  30 days in jail, a $750 fine, one year unsupervised

11   probation and a one-year ban from Yellowstone Park.

12   Q.  Have you been sentenced yet?

13   A.  I have not.

14   Q.  When is sentence scheduled?

15   A.  January 11th.

16          MR. PICO:  May I have a moment, Your Honor?

17          THE COURT:  Yes.

18          MR. PICO:  No further questions, Your Honor.

19          THE COURT:  Ms. Rebsom.

20                    CROSS-EXAMINATION

21   Q.  (BY MS. REBSOM)  Good morning, Mr. Stark.

22   A.  Morning.

23   Q.  My name is Jami Rebsom, and I represent Mr. Parrent.  This

24   plea agreement that you entered into with the Government, when

25   did they first offer that plea agreement to you, 30 days in

1   jail?

2   A.  I don't exactly recall.

3   Q.  Was it the first plea agreement the Government had offered

4   to you?

5   A.  Yes.

6   Q.  And is part of your plea agreement that you testify against

7   Mr. Parrent today?

8   A.  I -- I don't believe it's in the actual thing that I have

9   to, no.

10  Q.  Did you have any discussions with the Government about

11  testifying against Mr. Parrent today?

12  A.  As -- I don't understand the question.

13  Q.  You indicated that you didn't think that it was in the

14  written plea agreement that you be required to testify against

15  Mr. Parrent today; is that correct?

16  A.  Correct.

17  Q.  Okay.  Did you have any discussions with the Government or

18  did your attorney have any discussions with the Government that

19  you were aware of that the Government wanted you to testify

20  against Mr. Parrent today?

21  A.  Yes, I knew they wanted me to, yes.

22  Q.  And you indicated that on June 2nd and June 3rd of this

23  year that when you and Mr. Parrent were driving these Karst

24  Stage busses that you had chaperones on the busses?

25  A.  Correct.

1   Q.  How many chaperones were on each bus?

2   A.  I believe -- I had two.  I'm not exactly sure how many he

3   had, but I think two.

4   Q.  You're aware that Mr. Parrent had chaperones on his bus as

5   well?

6   A.  Yes.

7   Q.  And were these chaperones on Mr. Parrent's bus adults?

8   A.  Yes.

9   Q.  How old were the children that were on the busses?

10  A.  They were all junior high kids.

11  Q.  So around 13, 14 and 15 possibly?

12  A.  Correct.

13  Q.  And these are 47-passenger busses.  Approximately how long

14  are the busses in length?

15  A.  I want to say they're approximately 50, 60 feet.

16  Q.  And how wide are the busses?

17  A.  About 13 feet wide.

18          THE COURT:  Excuse me.  How long were they?

19          THE WITNESS:  Up to 60 feet.

20          THE COURT:  And your bus was -- how long was it?

21          THE WITNESS:  The same.  We were both driving

22  identical busses.

23          THE COURT:  But up to 60 feet.

24          THE WITNESS:  Correct.

25          THE COURT:  It could've been shorter?

1          THE WITNESS:  Correct.  It might have been like 57

2    feet.

3          THE COURT:  And 13 feet -- or 13 --

4          THE WITNESS:  Approximately 12 to 13 feet wide.

5          THE COURT:  Thank you.

6    Q.  (BY MS. REBSOM)  And, Mr. Stark, you drove your bus on the

7    highway through Yellowstone National Park?

8    A.  On the highway, what do you mean?

9    Q.  On the two-lane highway through the park.

10   A.  Yes.

11   Q.  And were there times that you would have to possibly cross

12   the center line because of the size of the bus?

13   A.  Occasionally if you're uncomfortable with the shoulder or

14   whatnot, you might hug the center line.

15   Q.  And are these Karst Stage busses equipped with video

16   cameras?

17   A.  They are equipped with SmartDrive.

18   Q.  SmartDrive.  And is that a video recording device?

19   A.  It only records certain events.

20   Q.  Okay.  Does it record the road when you're operating the

21   bus, driving it?

22   A.  If an event is triggered, yes.

23   Q.  Okay.  What kind of events could be triggered?

24   A.  G forces, sharp braking, impacts, quick acceleration.

25   Q.  Mr. Stark, did you contact your boss at Karst Stages on the

1   evening of June 2nd and ask him permission to consume alcohol

2   that evening?

3   A.  No.

4   Q.  What time did you and Mr. Parrent go to dinner?

5   A.  It was between -- around 8:30 p.m.

6   Q.  And had you been with Mr. Parrent before 8:30 p.m. that

7   day?

8   A.  On the route itself.

9   Q.  Okay.  And after you have dropped the kids off, you were

10  with Mr. Parrent, then you guys went to dinner together?

11  A.  Correct.

12  Q.  And you didn't see Mr. Parrent consume any alcohol before

13  you guys went to dinner?

14  A.  No.

15  Q.  Where was it you said you went to dinner?

16  A.  Outlaw's Pizza.

17  Q.  And did Mr. Parrent eat dinner?

18  A.  Yes, he did.

19  Q.  And did he consume pizza as well?

20  A.  Yes.

21  Q.  And you testified that Mr. Parrent only had one beer, glass

22  of beer, correct?

23  A.  One glass of beer that I'm aware of, yes.

24  Q.  And how much alcohol did you consume there?

25  A.  About a half a glass of beer.

1   Q.   How big were the glasses?

2   A.   Approximately 16-ounce glasses.

3   Q.   And what time did you leave that facility and go to the

4   Rusty Rail?

5   A.   I do not know the exact time.

6   Q.   Do you recall about what time you arrived at the Rusty

7   Rail?

8   A.   Around 9 p.m.

9   Q.   So it only took 30 minutes to order, eat dinner?

10  A.   You know, I don't recall the exact time.  I was not paying

11  attention at the time at that point.

12  Q.   Could it have been later than 9 p.m.?

13  A.   It could've been, yes.

14  Q.   And you've said at the Rusty Rail that you had -- you

15  ordered a Red Bull and vodka, correct?

16  A.   Correct.

17  Q.   And the alcohol in that beverage is vodka, correct?

18  A.   Correct.

19  Q.   And when you ordered them, were you ordering them with just

20  one shot of vodka?

21  A.   I believe -- yeah, I did not indicate anything special on

22  it, so I assume it was just one shot.

23  Q.   And Red Bull is an energy drink that you mix with the

24  vodka, correct?

25  A.   Correct.

1    Q.   And Red Bull doesn't have any alcohol in it, correct?

2    A.   Correct.

3    Q.   And what else did you say you ordered with your Red Bull

4    vodka?

5    A.   A shot of Jäger.

6    Q.   And I saw in your statement when you were being interviewed

7    by the park ranger that you indicated that you had four Red

8    Bull vodkas.  Did you have four Jäger shots?

9    A.   No, only two Jäger shots.

10   Q.   Okay.  And you had indicated to the rangers that you had

11   not finished all of your Red Bull vodkas; is that correct?

12   A.   I do not recall finishing all of them, no.

13   Q.   So while you didn't finish one, you continued to order

14   another one?

15   A.   If I didn't finish one, it would've probably been my last

16   one.

17   Q.   But you recall that you had told the ranger that you

18   didn't -- you didn't think you could finish any of them?

19   A.   I do not recall making that statement.  I recall stating

20   that -- that I -- I knew -- thought that there was a couple

21   that I did not finish.

22   Q.   And so it's your testimony that that evening -- well, what

23   time did you leave the Rusty Rail?

24   A.   It was after 11 p.m.

25   Q.   And you indicated that you had approximately, maybe not all

1   of your four Red Bull vodkas, two Jäger shots and a glass of

2   beer?

3   A.  Correct.

4   Q.  And you began drinking around 8:30 p.m.?

5   A.  Correct.

6   Q.  And you had an alcohol test about what time, 9:00 the next

7   morning?

8   A.  The first one at the arrest site was I don't know, around

9   8:30, 8:00 --

10  Q.  8:30?

11  A.  -- I'm not sure of the exact time.

12  Q.  So it's your testimony that you only had seven drinks

13  approximately, depending on whether or not you finished them,

14  in the 12 hours?

15  A.  Yes.

16  Q.  And you and Mr. Parrent were both gambling at the Rusty

17  Rail?

18  A.  Yes.

19  Q.  And you guys were -- were you guys sitting at gambling

20  machines that were next to each other?

21  A.  We started sitting at gambling machines that were next to

22  each other.  We eventually separated.

23  Q.  So you didn't observe Mr. Parrent the entire time you were

24  at the Rusty Rail, correct?

25  A.  Correct.

1    Q.  And so you don't know how many alcoholic beverages

2    Mr. Parrent may or may not have consumed that evening, correct?

3    A.  Correct.

4    Q.  And you did not observe any bartender mixing the drinks for

5    Mr. Parrent, did you?

6    A.  I did not.

7    Q.  And did you keep a tab open?  Did you give the bartender

8    your credit card?

9    A.  No, they -- my credit card was used on each individual

10   order.

11   Q.  And Mr. Parrent gave you receipts for each of the orders

12   that he may have put in for gambling?

13   A.  He did not.

14   Q.  Did you provide any receipts from your credit card to the

15   Government?

16   A.  I have my statement with me.

17   Q.  Were there other people at the Rusty Rail?

18   A.  There were a few other patrons, yes.

19   Q.  How many people do you think were at the Rusty Rail that

20   night?

21   A.  I believe I saw four or five people at the bar itself.

22   Q.  And you said you gave money to Mr. Parrent.  That was for

23   gambling purposes?

24   A.  Yes.  He asked to borrow money.

25   Q.  And you said that you left for the hotel around 11:30 p.m.?

1    A.  Correct.

2    Q.  How far was the Rusty Rail from the Super 8 where you were

3    staying?

4    A.  Like I said earlier, a block and a half, two blocks.

5    Q.  And you didn't see Mr. Parrent again after 11:30 p.m.?

6    A.  Not until the following morning, no.

7    Q.  Mr. Stark, do you recall how long you guys were at the

8    pullout viewing the wildlife with the children on June 3rd

9    before any law enforcement officer arrived on scene?

10   A.  I remember they were pretty much standing out there before

11   I even got off of my bus.

12   Q.  So pretty much right after you had stopped the busses law

13   enforcement was present on the scene?

14   A.  Correct.

15   Q.  Were they present when you guys had stopped previously to

16   let one or more of the children off the bus?

17   A.  I did not observe any.

18   Q.  What was the time difference from the time you stopped your

19   bus to let the children off because they were feeling motion

20   sick and the time that you stopped to view the wildlife?

21   A.  15 minutes.

22   Q.  Do you recall approximately what time you and Mr. Parrent

23   stopped the busses to view the wildlife?

24   A.  I do not recall the exact time, no.

25   Q.  Do you recall if at all possible that it was after 7 a.m.

U.S. v. PARRENT                    STARK - CROSS                    2:11MJ100

41

1    that morning on the 3rd?

2    A.  I would assume it was, yes.

3    Q.  And you said that you were handcuffed.  Did law enforcement

4    handcuff you on the scene in front of the children?

5    A.  We were sort of sheltered by the ranger vehicle when we

6    were handcuffed.

7    Q.  And you said you -- did you see Mr. Parrent handcuffed at

8    that time?

9    A.  Yes.

10   Q.  Were you asked, Mr. Stark, to perform any other tasks for

11   the officers at the scene, like did they ask you to walk a line

12   or do any kind of physical maneuvers?

13   A.  No.

14   Q.  And you didn't hear any officers requesting Mr. Parrent to

15   do any physical maneuvers at the scene, did you?

16   A.  No.

17   Q.  When law enforcement was speaking with you at the scene,

18   how far away from you was Mr. Parrent?

19   A.  I believe he was sitting in the vehicle.

20   Q.  In the bus?

21   A.  In the ranger's vehicle.

22   Q.  And when you indicated that you had to submit to two breath

23   samples, were these both on a small portable device?

24   A.  Yes.

25   Q.  And you observed that your results were two separate

1  results, correct?

2  A.  I did not personally observe that I recall.  I believe I

3  was told.

4  Q.  Were you aware why the officers had you submit to a second

5  test on a different machine?

6  A.  I'm not aware, no.

7  Q.  And the next time you saw Mr. Parrent, was it at

8  approximately 5:50 a.m. on the 3rd after you had left him at

9  11:30 on the 2nd?

10  A.  I saw him a little bit after 5 a.m. when I first woke him

11  up.

12  Q.  And at that time you didn't detect or smell any alcoholic

13  beverage?

14  A.  No, I did not.

15  Q.  Are you familiar with the smell of an alcoholic beverage?

16  A.  Yes.

17  Q.  And have you ever had an opportunity to speak or be around

18  an individual that had been consuming alcohol?

19  A.  I have.

20  Q.  And during those times were you able to detect an odor of

21  alcoholic beverage coming from that person?

22  A.  I would say yes, I guess.

23  Q.  And you did not see any alcohol in Mr. Parrent's hotel

24  room, did you?

25  A.  I did not.

1  Q.  And at that time you did not have any indication that

2  Mr. Parrent was under the influence of alcohol, correct?

3  A.  No, other than my own personal condition.

4  Q.  But you weren't under the influence of alcohol at that

5  time, were you?

6  A.  I did not consider myself to be, no.

7  Q.  And you had just assumed and believed that Mr. Parrent

8  overslept?

9  A.  Correct.

10         MS. REBSOM:  I don't have any other questions.  Thank

11  you.

12         THE COURT:  Redirect, Mr. Pico?

13         MR. PICO:  No further questions, Your Honor.  We don't

14  want to excuse any of the witnesses just in case we may need

15  them for rebuttal.

16         THE COURT:  All right.  You may step down, Mr. Stark,

17  and would you step outside, please.

18         Call your next witness.

19         MR. PICO:  Thank you, Your Honor.  The United States

20  calls Deputy Sheriff Greg Todd.

21         Deputy Todd, step right over here and be prepared to

22  take an oath, please.

23         COURTROOM CLERK:  Do you swear that the testimony

24  you're about to give in the case now before the Court will be

25  the truth, the whole truth and nothing but the truth, so help

1    you God?

2            THE WITNESS:  I swear.

3            COURTROOM CLERK:  Thank you.

4                        <u>GREGORY S. TODD,</u>

5    called for examination by the Plaintiff, being first duly

6    sworn, on his oath testified as follows:

7                        DIRECT EXAMINATION

8    Q.  (BY MR. PICO)  Deputy Todd, would you state your full name

9    and spell your name for the record, please.

10   A.  Full name is Gregory S. Todd, G-r-e-g-o-r-y, middle initial

11   S, T-o-d-d.

12   Q.  And what do you do for a living?

13   A.  I'm a corporal with the Park County Sheriff's Office.

14   Q.  And how long have you been with the Park County Sheriff's

15   Office as a deputy sheriff?

16   A.  I'll be five years in April.

17   Q.  Okay.  Any prior law enforcement experience?

18   A.  I worked for the Lewis & Clark County Sheriff's Office for

19   two years, graduated from Montana State Law Enforcement

20   Academy.

21   Q.  And were you a deputy sheriff for Park County on June the

22   3rd of this year?

23   A.  I was.

24   Q.  And were you on duty at that time?

25   A.  Yes, sir.

1  Q.  Can you tell us, please, what your duties were and where

2  you were patrolling?

3  A.  That particular evening we -- my partner, my trainee --

4  patrolled Gardiner.  At the time we were stationary at the

5  intersection of Scott Street and Park Street.  It's a -- it's a

6  very good vantage point for running radar.  It's also a good

7  vantage point to keep an eye on the four bars immediately in

8  the area.

9  Q.  Okay.  And let me take you specifically to about 2:00 in

10 the morning.  Do you remember at that time coming into contact

11 with a gentleman by the name of Jack Kane Parrent Jr.?

12 A.  I do.

13 Q.  Okay.  And is Mr. Parrent in the courtroom?

14 A.  He is.

15 Q.  Can you point him out, please?

16 A.  This gentleman on the left.

17        MR. PICO:  May the record reflect that the witness has

18 identified the defendant, Your Honor?

19        THE COURT:  Yes.

20 Q.  (BY MR. PICO)  Can you tell us, please, where you saw

21 Mr. Parrent and what he was doing?

22 A.  We were -- we were watching Scott Street facing northbound,

23 and we observed a male individual exit the bar, the Two Bit

24 Bar, and as he exited the bar, we observed him throw what

25 appeared to be a beer can out into the middle of the street.

1    Q.  Okay.  And what happened next?  Tell the Court.

2    A.  My trainee and I responded, made contact with the

3    individual, at the time requested him pick up the beer can and

4    place it in a garbage container, and at the time he was a

5    little confrontational.  We -- he was talking loudly, speaking

6    very incoherently.  I again asked him to pick up the beer can

7    and place it in the garbage.  He eventually did so.

8    Q.  Okay.  What was Mr. Parrent's condition when you saw him at

9    2 a.m. that evening?

10   A.  Very -- very intoxicated.  He was -- his gait -- he was

11   staggering, he was stumbling.  As we spoke to him, he was

12   having a hard time completing a sentence, very slurred.

13   Q.  What else?

14   A.  His -- his mannerism, he altered between giving me answers

15   and then claiming to be a law enforcement official and starting

16   to walk away, then turning and coming back.  Very, very -- I'm

17   not sure what the word would be.  It's -- incoherent.

18   Q.  Okay.  You indicated that he was claiming to be a law

19   enforcement official.  Did he tell you who he worked for as a

20   law enforcement officer?

21   A.  He stated he was a deputy out of Flathead County.

22   Q.  Montana?

23   A.  Montana.

24   Q.  Okay.  Now, what happened next during your contact with

25   Mr. Parrent?

1  A.  He -- eventually he complied, he picked up the beer can and

2  progressed to the Sinclair gas station where he threw the can

3  away.  So my partner and I drove our patrol car back around the

4  block and reparked back in the parking area by -- by the

5  intersection.

6        We had a lot of people leaving the other bars at that

7  time, so we were watching the other bars and kind of keeping an

8  eye on him to make sure, you know, he was okay and that he was

9  headed in a direction that -- a motel.  He had indicated that

10  he was staying in a motel in the area, so he left in the

11  general direction towards -- towards a motel on Park Street.

12  So we repositioned so that we could watch him leave and watch

13  the bars close at the same time.

14  Q.  What happened next?

15  A.  The bars -- the patrons eventually worked themselves out.

16  The street started to get quiet, so we had lost visual contact

17  with -- with the gentleman, and --

18  Q.  When you say "the gentleman," you mean Mr. Parrent --

19  A.  Mr. Parrent.

20  Q.  -- the defendant?

21  A.  Correct.

22  Q.  Okay.

23  A.  We lost contact or lost visual contact with him at that

24  time.  A short time later he reappeared in another direction

25  going away from the motel that we assumed he was headed to.

1   Q.   What hotel did you assume he was headed to?

2   A.   Yellowstone River Motel on Park Street.

3   Q.   Which is east of the Sinclair station --

4   A.   Correct.

5   Q.   -- in Gardiner?

6   A.   Correct.

7   Q.   Okay.  What happened next?

8   A.   We -- we saw that he was headed in another direction, so

9   we -- you know, he was still -- had a staggered gait,

10  stumbling.  We wanted to make sure that we knew where -- he

11  knew where he was -- he needed to be, so we -- we recontacted

12  him again at the Sinclair station, and he proceeded to -- I

13  asked him for identification, and he proceeded to hand me -- he

14  pulled out his wallet and proceeded to hand me a stack of

15  cards.  I asked him --

16  Q.   What was in the -- what cards were they?

17  A.   Various credit cards, all types of cards.  I asked him

18  specifically to retrieve his driver's license, his

19  identification, if he had Flathead County law enforcement

20  credentials to provide those as well.

21  Q.   Okay.  And did he do that?

22  A.   Eventually he was able to thumb through the cards and hand

23  me his driver's license, yes.

24  Q.   Okay.  What happened next?

25  A.   We -- as per -- as per officer safety, we -- we always run

49

1    an individual, we check contact on the street, so we had

2    dispatch check him, and he came back without a warrant.  I

3    could never validate whether he was affiliated with Flathead

4    County or not at that -- at that particular time.

5              So while in the process of -- of him handing me the

6    cards, I noticed there was a motel key card for Super 8 and

7    asked him if by chance that was his motel, and he nodded his

8    head and said, "Yeah, that's where I'm staying."

9    Q.  Okay.  Did he know before that where he was staying?

10   A.  He told me originally that he thought his hotel had the

11   name Yellowstone in it.

12   Q.  Okay.  And that was not the case?

13   A.  No.

14   Q.  Now, with respect to his answers to you, did he continue to

15   remain incoherent?

16   A.  For the most part, yes.  We -- once we determined that he

17   most likely was staying at the Super 8 Motel, we -- we gave him

18   a ride --

19   Q.  Why did you give him a ride?

20   A.  Well, Gardiner at 2:00 in the morning is not the place we

21   want people that are not familiar with the area to be just out

22   walking around.

23   Q.  Why not?

24   A.  There's a general crime issue, there's bears in the area.

25   We try to ensure their safety to make sure they get home at

1   least to where they're staying.

2   Q.  Okay.  Given the extent of his intoxication, why didn't you

3   arrest him?

4   A.  The nature of Gardiner in the summertime with the number of

5   bars, the number of tourists, there's -- there's a definite

6   criminal element.  If we take ourselves out of the loop for a

7   relatively minor infraction, it opens the door -- with our lack

8   of presence, it opens the door for other more serious crimes to

9   occur.

10  Q.  Okay.  What happened next, then?

11  A.  We provided him a ride to Super 8, and before -- before we

12  took him inside, I actually went in and made contact with the

13  motel manager, the night manager, and asked him if he had a

14  gentleman by that name registered, and initially he said he did

15  not.  After speaking to Mr. Parrent a little while longer, we

16  determined that he was actually there under a reservation that

17  his boss had made, and so once he provided us with that name,

18  the night manager recognized the name, and we ended up getting

19  him to his motel room.

20  Q.  What happened next?

21  A.  That was -- that was pretty much it.  We --

22  Q.  Well, did you allow him to just walk into the hotel, then?

23  A.  Well, we escorted him to his room, and he was --

24  Q.  Why did you have to escort him to his room?

25  A.  He was -- there again, we weren't sure if he was gonna make

1    it up the stairs in a quiet manner so he wasn't gonna disrupt

2    other guests in the motel.  That was one of the conditions of

3    being allowed back to the motel is that he had to calm down and

4    be quiet, and that would be the end of it for the evening.

5    Q.  Okay.  What about his ability to walk by himself?

6    A.  Still obviously intoxicated, still stumbling.  We didn't

7    necessarily have to assist him, but he was -- I was concerned

8    that he might not make it up the stairs on his own.

9    Q.  What happened next?

10   A.  We cleared the motel and continued our patrol functions.

11   Q.  Did you have any further contact with Mr. Parrent that

12   evening?

13   A.  No.

14   Q.  How about since then?

15   A.  No.

16   Q.  And what time did you get Mr. Parrent back to the hotel?

17   A.  It was shortly before 2:30 a.m.

18          MR. PICO:  May I have a moment, Your Honor?

19          THE COURT:  Yes.

20   Q.  (BY MR. PICO)  With respect to Mr. Parrent's condition, did

21   you detect the odor of alcohol about his person?

22   A.  I did.

23   Q.  Okay.  And in terms of its strength, low, medium, high?

24   A.  From the initial contact in -- we responded from the

25   intersection in our patrol car, I could -- I could smell his

1   breath at the time of contact from my patrol car to a distance

2   of maybe 4 feet, and he proceeded to come to the window, leaned

3   on the window.  I could smell it further at that point.

4   Subsequently when we recontacted him, we were out on foot at

5   the Sinclair asking him for his ID, I could -- I could detect

6   it then again.

7   Q.  With respect to again your not arresting him or looking

8   into this more, what was your primary concern that evening once

9   you got him back to the hotel?

10  A.  Once we left his presence?

11  Q.  Yes.

12  A.  Resuming patrol functions, ensuring the bars -- that the

13  rest of the patrons were home safe and the bars were closed.

14          MR. PICO:  No further questions, Your Honor.  Thank

15  you.

16          THE COURT:  Ms. Rebsom.

17                    CROSS-EXAMINATION

18  Q.  (BY MS. REBSOM)  Deputy Todd, what did you say your

19  position is with the Park County Sheriff's Office?

20  A.  I'm a corporal.

21  Q.  Corporal.  So do you like to be called Corporal Todd?

22  A.  That's fine.

23  Q.  Okay.  Corporal Todd, on June -- well, I guess it was the

24  early morning hours of June 3rd, 2011, when you confronted this

25  individual you believed to be Mr. Parrent, did you have a

1   vehicle around with operating recording devices, video cameras?

2   A.  At the time we -- we -- the patrol car had a recording

3   device, yes.

4   Q.  And did you record this encounter that you had with this

5   individual?

6   A.  We did not.

7   Q.  Did you have your audio recording with you at that time?

8   A.  I did not, no.

9   Q.  And why didn't you have your audio recording with you?

10  A.  Because at the time I had a trainee and was -- he was

11  instructed to do so, but he did not.

12  Q.  Okay.  So he -- your trainee didn't have his audio

13  recording?

14  A.  Correct.

15  Q.  And how did you identify the individual?

16  A.  Our subsequent contact at the -- at the Sinclair gas

17  station he provided me with his driver's license.

18  Q.  And at any time did you have the individual submit to a

19  blood or breath test?

20  A.  No.

21  Q.  So you would have no idea what his alcohol concentration

22  would've been, if any, correct?

23  A.  Correct.

24  Q.  Are you familiar with diabetes and the effects that it may

25  cause?

1   A.  I am.

2   Q.  And are you aware that the effects may cause a similar

3   condition as someone who may be under the influence of alcohol?

4   A.  I am.

5   Q.  And you weren't aware if Mr. Parrent had any kind of

6   medical condition at the time that could be causing any of his

7   symptoms that night?

8   A.  No.

9   Q.  Correct?

10  A.  Correct.

11  Q.  And isn't it true that, based on just the odor of alcohol,

12  you can't determine how much alcohol a person has consumed,

13  correct?

14  A.  By --

15  Q.  The smell.

16  A.  No.  Correct.

17          MS. REBSOM:  I don't have any other questions.

18          THE COURT:  Redirect?

19          MR. PICO:  Nothing further, Your Honor.  Thank you.

20  And the same thing with respect to Deputy Todd.

21          THE COURT:  You may be excused.

22          And do you want him to stick around?

23          MR. PICO:  Please.  And I apologize to him for that.

24          The United States calls Carlton Newman, Your Honor.

25          Mr. Newman, right here, and the oath will be

1   administered to you.

2            THE WITNESS:  Okay.

3            COURTROOM CLERK:  Do you swear that the testimony

4   you're about to give in the case now before the Court will be

5   the truth, the whole truth and nothing but the truth, so help

6   you God?

7            THE WITNESS:  I do.

8            COURTROOM CLERK:  Thank you.

9                        CARLTON PAUL NEWMAN,

10  called for examination by the Plaintiff, being first duly

11  sworn, on his oath testified as follows:

12                       DIRECT EXAMINATION

13  Q.  (BY MR. PICO)  Mr. Newman, would you state your full name,

14  please, and spell your last name.

15  A.  Carlton Paul Newman, N-e-w-m-a-n.

16  Q.  First name and middle name, please, if you would, for the

17  record.

18  A.  Oh, Carlton, C-a-r-l-t-o-n, Paul, P-a-u-l, Newman,

19  N-e-w-m-a-n.

20  Q.  Okay.  What do you do?

21  A.  I'm a desk clerk at Super 8, night auditor.

22  Q.  And were you so employed on the days of June 3rd and June

23  2nd of this year?

24  A.  Yes, I was.

25  Q.  Okay.  Now, just briefly, can you tell us your educational

1   background?  Do you have a college degree?

2   A.  I have a BS degree in finance and about 15 quarter units

3   towards a master's degree.

4   Q.  Okay.  And how long have you been working for the Super 8?

5   A.  About three years.

6   Q.  Now, do you remember an incident involving a fellow by the

7   name of Parrent, Jack Parrent?

8   A.  Yes, sir.

9   Q.  Okay.  And how do you remember that?

10  A.  I was the night clerk on duty that night, and two sheriffs

11  brought in a very drunk person.

12  Q.  Okay.

13  A.  And we were trying to find his room.

14  Q.  Did you find his room?

15  A.  Eventually.  He was incoherent.  We had trouble finding out

16  what room he was in because he didn't -- it wasn't in his name,

17  it was in his boss's name, and it took a while to get all of

18  that information out of him and find out where he was staying

19  and finally got him to his room.

20  Q.  Okay.  And is that individual in the courtroom today?

21  A.  Yes, sir.

22  Q.  Can you point him out, please?

23  A.  Yes, sir.

24          MR. PICO:  Let the record reflect the witness has

25  identified the defendant, Your Honor.

1          THE COURT:  It will so reflect.

2     Q.  (BY MR. PICO)  Mr. Newman, can you tell us, please, after

3     the contact that you had with Mr. Parrent and seeing the

4     deputies, what happened?  What did the deputies do with him?

5     A.  Well, we had the -- I heard -- I was first alerted of them

6     coming because they were stumbling up the steps.  We have a big

7     porch, and they were stumbling up the steps, and I heard them

8     coming up, and the two sheriffs brought him in and they were,

9     you know, escorting him, holding him up, kind of helping him

10    keep upright, help us find the room.  It took us a while to

11    figure out where -- what room he was in, you know, then they --

12    once we figured that out, they escorted him to his room and

13    helped him up the stairs.  He was on the third floor apparently

14    is where he was.

15    Q.  Now, immediately after that did you have any more contact

16    with Mr. Parrent?

17    A.  No.  He was in his room, and it was just the normal night

18    after that.

19    Q.  Okay.  Now, the -- early the next morning did you have

20    occasion to see Mr. Parrent?

21    A.  I didn't see Mr. Parrent again.

22    Q.  Okay.  What happened the next morning that -- that you can

23    recall as it relates to Mr. Parrent going into the park?

24    A.  Well, Mr. Stark came to the front desk 'cause Mr. Parrent

25    hadn't gone to the bus to warm up the busses, and he was

1   concerned that, you know, he hadn't gotten woken up, so he

2   asked for a key to go to his room.  I gave him a key to go to

3   his room to wake up because he wouldn't respond to a telephone.

4   He had a wake-up call and didn't respond to that, and he tried

5   to call the room, and he didn't respond to that.  So we finally

6   gave him -- I gave him a key to go to the room.  He got the

7   key, and I didn't see him after that except for they were -- I

8   heard the busses warming up outside.  My security check at 3:30

9   a.m. I heard the TV going on in his room pretty loud.

10  Q.  Whose TV?

11  A.  The room that Mr. Parent was in, the TV was blaring in his

12  room.

13  Q.  Okay.

14  A.  It was pretty loud, but not loud enough to be really

15  concerned about.  I didn't want to disturb any other people, so

16  I was aware that the TV was on.  And then when Mr. Stark came

17  to get the, you know, the key, you know, to find out where

18  Mr. Parent was at, then I helped him get a key and go to his

19  room, and he woke him up.  But I didn't see either one of them

20  after that.

21  Q.  Now, with respect to when Mr. Stark comes to get the key to

22  Mr. Parent's room, did you immediately know what -- what was

23  going on and associate Mr. Stark's request and con -- make

24  contact in your mind that this was Mr. Parent, the guy --

25  A.  Yeah.

1   Q.  -- who had been brought in?

2   A.  Yeah, well, I knew they were both -- at that point I knew

3   they were both bus drivers and that the busses were the ones

4   that were warming up out in the parking lot, and that's when it

5   finally dawned on me who they were.  I mean, when they first

6   brought him in, he had a Karst Stage hat on, and they talked

7   about Karst Stage, but it didn't really dawn on me that it was

8   anything serious or anything going on, just like another

9   incident.

10          I just logged it in my log book that the sheriffs

11  brought in a drunk person.  In case something happens, we had a

12  reference of a time and stuff like that.  And then I noted in

13  my security log that at 3:30 or so in the morning I heard the

14  TV still on in his room, and then when Stark came in, I made a

15  note that Stark came and got the key.

16  Q.  What time was that?

17  A.  I wrote -- I made a copy of the log.  We have a ring binder

18  log that we keep track of things that just -- you know, for

19  incidentals.  That was 5:45 a.m. Mr. Stark came down to room --

20  he was in Room 312.  He checked out and came back at 6:00 to

21  get the key to 310, which was the room -- they were next door

22  to each other, to wake his friend Jack Parrent up.  And I noted

23  the 2:40 incident up above.  They were both Karst Stage

24  drivers.

25          And I called -- I noted that I called Karst Stage and

1   let them know that they probably have a problem with one of

2   their drivers, and then I notified Yellowstone National Park

3   dispatch of the same incident.

4   Q.  Okay.  Let's -- let's step back a bit, then.  You just

5   indicated that you contacted Karst Stage?

6   A.  Right.

7   Q.  Okay.  What time was that?

8   A.  That was 5:40 -- 6:00 after -- let's see, 5:45 is when he

9   came.  6:00 is when he came back to get the key, so it was

10  after 6:00, around between 6:00 and 6:15.  You know, I was

11  getting concerned because it just didn't seem right that as --

12  as -- as inebriated as this person was that he could be

13  possibly able to drive a bus, and so I was concerned.  So I

14  wanted to let them know that they had a potential problem, and

15  I let the also dispatch know they had a potential problem just,

16  you know, that they could be aware of it.

17  Q.  Okay.  Now, let's -- let's walk through this a little more

18  slowly, if we can.  You indicated initially that you didn't

19  really make the connections as to who Mr. Parrent was and --

20  A.  Yeah.

21  Q.  -- that sort of thing.  When Mr. Stark came to the hotel

22  and asked you for his key and any contact that you had with

23  Stark that morning, did you tell Mr. Stark that his coworker

24  had been brought in by deputy sheriffs that night in a highly

25  intoxicated state?

1   A.   Yes, sir, I did let him know.

2   Q.   You did?

3   A.   Yeah.

4   Q.   Okay.  What did Mr. Stark say?

5   A.   He didn't say much.  He just -- he just, you know, asked

6   for the key and went to the -- went to take -- went to wake up

7   Mr. Parrent.  That's -- I didn't have much of a conversation

8   with him.

9   Q.   Okay.  What did you tell Mr. Stark, do you remember?

10  A.   I just let him know that Mr. -- he's probably not

11  responding because he came in very drunk last night, and that's

12  probably why he's not responding.  He wouldn't answer the

13  phone.  We tried to call his room.  He didn't answer the phone.

14  I said it's probably because he's still drunk, you know.

15  Q.   Okay.

16  A.   So --

17  Q.   What happened -- now, you say you called Karst.  What did

18  you tell Karst exactly?

19  A.   I had to leave a message on their answering machine, just

20  told them that we had -- he was staying at the hotel and that

21  he came in very drunk, that he was escorted by the police and

22  that he's probably still very drunk, and you might need to get

23  another bus driver to replace him, kind of a -- just, you know,

24  on the voice mail letting them know without having -- being

25  able to talk to somebody, just trying to give them some general

U.S. v. PARRENT                NEWMAN - DIRECT                2:11MJ100

62

1   idea of what was going on.

2   Q.  Okay.  And when you called Yellowstone dispatch, tell the

3   judge what you told them.

4   A.  I told Yellowstone dispatch that I had serious concerns

5   about one of our guests that was a Karst Stage driver.  He was

6   driving a bus, and at that point it was about 15 minutes since

7   they had left the hotel, so I said I didn't know if they were

8   going north or south, but 15 minutes he couldn't get far, so

9   try and head -- you know, head them off and see if you can

10  observe his behavior and, you know, do what you feel right.

11  But I just let them know that they might have a situation on

12  their hands that was very serious.

13  Q.  Okay.  Now, did you eventually have a phone conversation

14  later that morning with one of the rangers?

15  A.  With Amy, yes.  Mm-hmm.

16  Q.  Okay.  Do you remember having a phone conversation with

17  Ranger Brian Chan?

18  A.  I don't remember all the -- the people I talked to since

19  then.  I know I talked with Amy.  They called back and wanted

20  more information that I could give them to help let them

21  understand the situation better, and so I told them what I --

22  pretty much what I told you, that he came in with the sheriffs'

23  escort last -- the night before and that he was very drunk at

24  that point and incoherent and that, you know, my feeling was in

25  my heart that there was something wrong.  So I let them know

1  that there was something potentially wrong, and that's pretty

2  much -- you know, just background information.  My part of it

3  is just, you know, letting them know that there was a potential

4  problem, you know.  I observed that he came in very drunk.  And

5  there's no way I felt that in two hours -- what, about three

6  hours from the time he came back that night, three and a half

7  hours there was -- I couldn't under -- I couldn't comprehend

8  that he could be sober, so . . .

9          MR. PICO:  Okay.  May I have a moment, Your Honor?

10          THE COURT:  Yes.

11          MR. PICO:  No further questions of this witness.

12  Thank you, Your Honor.

13          THE COURT:  Ms. Rebsom.

14                        CROSS-EXAMINATION

15  Q.  (BY MS. REBSOM)  Good morning, Mr. Newman.

16  A.  Morning.

17  Q.  My name is Jami Rebsom.  And I represent Mr. Parrent today.

18  A.  Okay.

19  Q.  Mr. Newman, are there any video recording devices in the

20  Super 8 Motel?

21  A.  No, ma'am, there are not.

22  Q.  And you have a finance background.  Do you have any

23  training in the medical field or law enforcement?

24  A.  I was a drill instructor in the Army.  I was a first aid

25  instruct -- a first aid NCO of our company.  Any problems after

64

1    hours I was the go-to man, my first aid background training and

2    stuff like that, so I've had -- I'm a trained observer, you

3    know.  What a drill instructor is, you have to be able to

4    detect and correct any error of a trainee's behavior or, you

5    know, whatever.  So I'm -- in that respect, I'm a trained

6    observer of people.

7    Q.  Okay.  And when you observed Mr. Parrent, you didn't have

8    any idea of what his alcohol concentration would be, if any?

9    A.  At that point when he came in he was just another guest.

10   The sheriffs were helping him out, and that's about all I can,

11   you know -- the only reason I noted it down is because anytime

12   when a sheriff comes in, we need to note down that there was,

13   you know, the sheriffs had some incident, you know, just in

14   case there's some follow-up that needs to be done.  But

15   otherwise, other than that, you know, everything was fine.  I

16   mean, he got back to his room, he just went to bed, and that

17   was fine with me, you know.

18   Q.  And, Mr. Newman, after Mr. Parrent was escorted to his

19   room, you didn't see him after that at all, did you?

20   A.  No, ma'am, I didn't see him again.

21   Q.  So you didn't see him that morning at all?

22   A.  No.

23   Q.  And you didn't see him go through the lobby or get in a

24   vehicle?

25   A.  No, ma'am.

U.S. v. PARRENT                    NEWMAN - CROSS                    2:11MJ100

65

1    Q.  And you said that you contacted dispatch about 6:15; is

2    that correct?

3    A.  Around between 6:00 and 6:15.

4    Q.  And you waited approximately 15 minutes to call dispatch

5    before the drivers (inaudible)?

6    A.  I was mulling over the whole thing in my mind, you know,

7    the, you know, ramifications, what I should do, what I

8    shouldn't do, you know, who I should call, what I, you know,

9    what I should say about it, if anything, and it just -- I had

10   to -- I just felt I had to say something to somebody, you know,

11   get beyond myself because I couldn't make a decision what was

12   going on, so I had to let somebody else know.

13          MS. REBSOM:  I don't have any other questions.

14          THE WITNESS:  Okay.

15          THE COURT:  Redirect?

16          MR. PICO:  No redirect at this time, Your Honor.

17          THE COURT:  You may be excused, Mr. Newman, but please

18   stick around until you're finally excused to leave.

19          THE WITNESS:  Okay.

20          MR. PICO:  Your Honor, did you want to take a brief

21   recess or did you want to continue?

22          THE COURT:  Oh, we can take a recess until -- let's

23   say 10 minutes -- 20 till 11:00.

24          MR. PICO:  Thank you, Your Honor.

25          COURTROOM CLERK:  All rise.

1        (Recess taken.)

2              COURTROOM CLERK:  All rise.

3              THE COURT:  Please be seated.

4              Mr. Pico.

5              MR. PICO:  Thank you, Your Honor.  May it please the

6    Court, Counsel, Mr. Parrent.

7              Your Honor, do you want to proceed without Maya?  Want

8    to give her a quick call?

9              THE COURT:  Can you have Beth call her?

10             MR. PICO:  We can get the witness on the stand.  The

11   United States calls Ranger Amanda Wilson, Your Honor.

12             COURTROOM CLERK:  Do you swear that the testimony

13   you're about to give in the case now before the Court will be

14   the truth, the whole truth and nothing but the truth, so help

15   you God?

16             THE WITNESS:  I do.

17             COURTROOM CLERK:  Thank you.

18             THE COURT:  Okay.  There she is.

19             MR. PICO:  Ranger Amanda Wilson, Maya.

20                          AMANDA WILSON,

21   called for examination by the Plaintiff, being first duly

22   sworn, on her oath testified as follows:

23                          DIRECT EXAMINATION

24   Q.  (BY MR. PICO)  Would you state your full name and spell

25   your name, first and last name, for the Court, please.

67

1   A.   My name is Amanda Wilson, A-m-a-n-d-a, W-i-l-s-o-n.

2   Q.   Ranger Wilson, do you work as a seasonal ranger during the

3   essentially what we call the summer season here in Yellowstone

4   National Park?

5   A.   I do.

6   Q.   And how long have you been a seasonal ranger in Yellowstone

7   National Park?

8   A.   For three seasons.

9   Q.   And can you just briefly describe your training to the

10   Court, please?

11   A.   It's under the Seasonal Law Enforcement Academy in North

12   Carolina that lasted about three and a half months, and we did

13   about 60 or 70 hours of training per week, and then every year

14   that we come back we do a 40-hour law enforcement refresher.

15   Q.   Okay.  Were you on duty on the morning of Friday, June 3rd,

16   2011?

17   A.   I was.

18   Q.   And what were you doing?

19   A.   I was doing my normal patrol duties, patrolling the roads,

20   looking for wildlife jams and running radar.

21   Q.   Now, before you actually started that evening -- that

22   morning, did you have contact from the dispatch center or

23   communications center?

24   A.   I did.

25   Q.   Can you tell us, please, what the nature of the

1   communication that you had was?

2   A.   Amy in the communications center called before I came on.

3   It was about 6:22 in the morning, and she told me that the

4   Super 8 had reported that he suspected a commercial bus driver

5   might be under the influence and could be headed into the park

6   and towards Lamar Valley.

7   Q.   And did you get any more description than that?

8   A.   I got a description that it was two Karst Stage busses, and

9   she had spoke with the people operating the north entrance and

10  that the busses had come through the gate five minutes prior to

11  her call to me and that the driver was about 5-9 and 200

12  pounds.

13  Q.   Okay.  Did you -- now, were you on duty at that point?

14  A.   I was not on duty yet.  I was preparing to come on duty at

15  7:00.

16  Q.   Okay.  And why did they choose to call you?

17  A.   I was the first ranger in our district to come on that day.

18  Q.   Okay.  And did you do anything after you got the call from

19  the communications center or dispatch?

20  A.   Yes, I called Ranger Chan.  He was the day shift supervisor

21  for the day.  He was scheduled to come on at 8:00.  I called

22  him and told him the situation and asked if he could assist me

23  in contacting the bus drivers.

24  Q.   Okay.  Did you advise him of the situation, at least the

25  information that had been passed on to you at that time?

1   A.  I did.

2   Q.  Okay.  Now, what happened next?

3   A.  I finished getting dressed for work.  I went to the ranger

4   station to check my radar and kept an eye on the road out in

5   front of the ranger station.  At about 7:05 I saw the busses go

6   past Tower Ranger Station.

7   Q.  Okay.  And what -- could you describe the busses, please?

8   A.  They're two full-size commercial busses.  They both said

9   Karst Stage on them.  The -- the patterns on the busses were

10  slightly different, but they were both Karst Stage busses.

11  Q.  Okay.  And at that point did you believe that you now had

12  seen the busses that you had been advised of by the dispatch

13  center?

14  A.  I did.  The time pretty much matched from when they

15  should've gotten to Tower from the time that they left the

16  north entrance.

17  Q.  Okay.  Where were the busses when you first saw them,

18  please?

19  A.  I saw them drive down the hill past Tower Ranger Station,

20  then they pulled into the parking lot with the recycling area

21  at Tower Junction.

22  Q.  And how long were they -- did they pull in and stop there?

23  A.  I would say less than five minutes.

24  Q.  Okay.  And where were you at that time?

25  A.  I was pulling out of Tower Ranger Station and driving past

1    the recycling area to try to get a visual on what the drivers

2    looked like to see if they matched the description.

3    Q.   Okay.  Were you in a ranger patrol car at that time?

4    A.   I was, a Crown Vic.

5    Q.   Okay.  And when you say "a Crown Vic," you mean a Ford

6    Crown Victoria?

7    A.   That's correct.

8    Q.   Okay.  Tell us what happened next, then.

9    A.   I drove past to see if I could identify the drivers and see

10   if it might be a good time to talk to them, but it didn't

11   appear that either driver got out of the bus.  So I turned

12   around again, and the lead bus, which Parrent was driving,

13   pulled out, and the second bus stayed in the parking lot.  So I

14   followed the lead bus to Specimen Ridge Trailhead where he

15   pulled over to wait for the second bus.

16   Q.   Okay.  And how far is Specimen Ridge Trailhead from when

17   you first saw them?

18   A.   I believe it's about 2 miles.

19   Q.   What happened next?

20   A.   Well, between Tower Junction and Specimen Ridge Trailhead I

21   observed the bus cross the -- the center line three times.

22   Q.   Okay.  And how far did it cross the center line?

23   A.   Probably a few inches with the driver's side tires.

24   Q.   Both tires?

25   A.   Yes.

71

1   Q.   And by both tires I mean rear and front.

2   A.   Correct.

3   Q.   Okay.  Now, is that a violation of law?

4   A.   Yes.

5   Q.   And did you stop them at that time?

6   A.   I did not.

7   Q.   Okay.  Did you eventually find out who was driving the bus

8   that was -- that you saw cross the center line?

9   A.   Yeah, I -- I observed the driver through his window both

10  times that I saw him.

11  Q.   Okay.  And is that driver here in court today?

12  A.   Yes.

13  Q.   And can you identify him, please?

14  A.   Yes.  He's the man sitting right there.

15  Q.   Okay.  And did you come to know his name?

16  A.   Yes.

17  Q.   His name?

18  A.   Jack Parrent.

19        MR. PICO:  Okay.  May the record reflect that the

20  witness has pointed to the defendant, Your Honor?

21        THE COURT:  The record will so reflect.

22  Q.   (BY MR. PICO)  Now, you had a violation of law by the bus

23  driver, Mr. Parrent, crossing over the center line.  Did you

24  effect a stop at that time, a traffic stop?

25  A.   I did not.

1    Q.   Why not?

2    A.   I wanted to observe the driving behavior for the second bus

3    as well, and I also wanted to wait for backup from Ranger Chan.

4    Q.   Okay.  And so what happened next, then?

5    A.   I drove on up the road a couple of miles and then turned

6    around hoping that the second bus would've caught up by then,

7    which it had, so while I was driving back west the two busses

8    were in formation again driving east.  That's when I observed

9    Parrent drift onto the fog line in my sideview mirror.

10   Q.   Okay.  And how many times did you see Mr. Parrent cross the

11   fog line?

12   A.   One time.

13   Q.   Okay.  And how far did the tires of the bus go off the fog

14   line or cross the fog line?

15   A.   Not more than a couple of inches, but there wasn't more

16   than a couple of inches of shoulder there, so . . .

17   Q.   So that -- did that concern you?

18   A.   Yes.

19   Q.   Okay.  What happened next?

20   A.   I turned around again at Specimen Ridge Trailhead.  At this

21   point there was a convoy of cars behind the busses, so I was

22   following the convoy east, and a couple of cars would pull off

23   at a time to look at wildlife, so eventually I got behind the

24   second bus, which was Stark's bus, and I followed them to where

25   they stopped at the east wildlife overlook.

U.S. v. PARRENT                 WILSON - DIRECT                    2:11MJ100

73

1   Q.  And what happened next, then?

2   A.  The busses unloaded.  Ranger Chan and I pulled up right

3   around the same time.  We parked.  We didn't use any lights or,

4   you know, make a traffic stop at all.  We just -- we met, made

5   a plan.  I -- I went and talked to some of the children and

6   adult chaperones, and Ranger Chan went to talk to Stark.

7   Q.  Okay.  Now, at that point in time, from the time you saw

8   the busses until the time you began approaching the drivers,

9   were the busses and drivers within the exterior boundaries of

10  Yellowstone National Park?

11  A.  Definitely.

12  Q.  What happened next, then?

13  A.  Ranger Chan talked to Stark and deduced that Parrent was

14  the driver that had woken up late, so he pulled Parrent aside

15  and asked him if -- if he would mind talking to him, asked him

16  if he had had anything to drink, and Parrent said yes.  So he

17  asked him to talk to him further away from the students.  They

18  moved to Chan's patrol car, and I followed them over there, and

19  that's when Ranger Chan asked if he would mind doing the SFSTs,

20  which he said no.

21  Q.  Okay.  Tell the Court, please, what SFSTs are.

22  A.  Standardized field sobriety tests.

23  Q.  Okay.  And when Mr. Parrent said he would not do them, did

24  he explain why?

25  A.  Yeah, he said he'd rather not do them in front of the --

1   the schoolchildren.

2   Q.  Okay.  What happened next?

3   A.  Ranger Chan asked if he would blow into a preliminary

4   breath tester, and he agreed to do that.

5   Q.  Okay.  And were you present for that?

6   A.  Yes.

7   Q.  And what did Mr. Parrent blow at that time?

8   A.  It was a --

9         MS. REBSOM:  Your Honor, I'm going to object as to

10   foundation.

11        THE COURT:  Can you add any more?

12        MR. PICO:  I'll -- I'll ask some --

13   Q.  (BY MR. PICO)  Did you see Mr. Parrent blow into the

14   portable breath test?

15   A.  I did.

16   Q.  Okay.  And the portable breath test, are you familiar with

17   that?

18   A.  Yes.

19   Q.  Did you have training in it?

20   A.  Yes.

21   Q.  And who administered the portable breath test?

22   A.  Ranger Chan.

23   Q.  Did you watch as the portable breath test was administered?

24   A.  Yes.

25   Q.  And did you see the readout on the portable breath test?

1   A.  I did.

2   Q.  What was the reading?

3   A.  .12.

4   Q.  What happened next?

5   A.  After he did the fourth breath test, we informed him that

6   he was above the legal limit of zero for commercial bus

7   drivers, and Ranger Chan told him that he would have to go into

8   Mammoth to blow into the Intoxilyzer.  Parent explained that

9   he didn't feel comfortable with his child, his son riding on

10  Stark's bus because Stark had consumed alcohol with him the

11  night before.

12  Q.  So Parent explained to Ranger Chan that his child, his

13  son, was on the bus?

14  A.  On Stark's bus, yes.

15  Q.  On Stark's bus?

16  A.  Mm-hmm.

17  Q.  Okay.  Now, with respect to Mr. -- Mr. Parrent, did he say

18  anything else about going -- going to Mammoth or with respect

19  to what he was going to do or what he wanted to do?

20  A.  Yeah.  He -- on several occasions he explained that he was

21  a professional and that he was good to drive, he had slept the

22  night before, but if we didn't want him to drive, then he

23  wouldn't, and he would quit his job if he wanted us -- if we

24  wanted him to.

25  Q.  Okay.  What happened next?

1  A.  I went to Stark's bus, and he was in the driver's seat, and

2  I told him that we were worried that he might have alcohol in

3  his system still and asked him if he would come talk to us, and

4  he agreed.  So he came across to Ranger Chan's vehicle where

5  Chan was waiting with Parrent, and Chan administered the PBT,

6  preliminary breath tester, with his own device and got a

7  reading of .05.

8  Q.  What happened next?

9  A.  We wanted to verify the reading, so we used the PBT from my

10 vehicle.  Chan again administered the test and got a reading of

11 .03, and we explained to Stark that he also would have to go

12 into Mammoth.

13 Q.  Okay.  Now, let's back up a little bit.  You indicated that

14 Mr. Parrent, I think, blew four times into the portable breath

15 test, the PBT.  Would you explain to the Court what happened

16 and why he had to blow four times?

17 A.  Ranger Chan explained the instructions about taking a deep,

18 long breath and to keep blowing until he told him to stop, but

19 each time Parrent blew a short burst of air, and he said that

20 that's the way he administered it when he was a deputy.

21 Q.  I'm sorry, would you explain what you just said.  And I

22 didn't quite hear you.

23 A.  Each -- each time -- the first three times Parrent didn't

24 blow enough air.  He was blowing short bursts of air, and he

25 said that that's the way he administered the test when he was a

1  sheriff's deputy.

2  Q.  Okay.  Parrent told Ranger Chan that?

3  A.  Yes.

4  Q.  Okay.  What happened next?

5  A.  Ranger Chan just kept emphasizing that he needed to keep

6  blowing until Ranger Chan told him to stop, and finally on the

7  fourth blow he got a valid reading.

8  Q.  Now, after both Parrent and Stark had blown into the

9  portable breath test, what happened?

10  A.  We made a few final arrangements for getting the children

11  where they needed to go.  We got some other rangers on the way

12  to get that organized, allowed them to get a few things out of

13  the bus, like cell phones.

14  Q.  Allowed who?

15  A.  Parrent and Stark.

16  Q.  Okay.

17  A.  We did not handcuff them.  We frisked them, put them in

18  Ranger Chan's vehicle and drove them down to Fisherman's

19  Pullout where --

20  Q.  Which is how far from where you initially contacted them?

21  A.  I think it's less than a mile.

22  Q.  Okay.  Why did you stop there?

23  A.  It's just a large pullout that's away from the

24  schoolchildren where they wouldn't be subjected to having all

25  the kids watch them being handcuffed.

U.S. v. PARRENT                WILSON - DIRECT                2:11MJ100

78

1   Q.   Okay.  And so it's at that point that you handcuffed them,

2   then?

3   A.   That's correct.

4   Q.   Okay.  What happened next?

5   A.   Both were handcuffed and driven to Mammoth to the jail, and

6   Ranger Miller administered the Intoxilyzer test, and they were

7   booked into jail.

8   Q.   And did they register on the Intoxilyzer test?

9   A.   Yes.

10  Q.   Were you present for both of those Intoxilyzer tests?

11  A.   No, only Parrent's test.

12  Q.   Okay.  Tell us what happened during Parrent's test.  Tests,

13  rather.

14  A.   Parrent followed Ranger Miller's directions and came up

15  with the reading of --

16          MS. REBSOM:  I'm going to object as to the reading,

17  the foundation for the Intoxilyzer.  I don't believe under

18  Mont -- or Wyoming law that the State of Wyoming accepts

19  Intoxilyzer 8000 results, only the Intoxilyzer 5000.

20          THE COURT:  We're not in a Wyoming court.

21          MS. REBSOM:  No, but I would argue that Wyoming law

22  applies because that's where the stop and breath test were

23  submitted.

24          THE COURT:  Mr. Pico.

25          MR. PICO:  It's federal law that applies, Your Honor.

1   I haven't heard this objection before, but I believe the Court

2   actually has a brief in some of its files where this very

3   objection was made, and it was in the Byers (phonetic) case

4   which we did a few weeks ago, you may remember, the same

5   objection was made.  And in effect, the courts have clearly

6   said that it's federal law that applies, and they have

7   accepted -- federal courts have accepted in several of the

8   circuits the Intoxilyzer 8000 which we use here on the park.

9   Ranger Miller will be testifying, so I -- I think this is just

10  a -- something we don't need to be concerned with at this point

11  anyway.

12          THE COURT:  Well, I would agree with Mr. Pico.  This

13  is -- the charges are under federal law.  They're under the

14  Code of Federal Regulations, and so federal law controls, and

15  you know, if it was an Assimilative Crimes Act case, you might

16  have an argument, but I don't think you do in this particular

17  case, so I'll overrule the objection.

18          Go ahead, Mr. Pico.

19          MR. PICO:  Thank you, Your Honor.

20  Q.  (BY MR. PICO)  Did you observe as Mr. Parrent did the

21  Intoxilyzer test?

22  A.  I did.

23  Q.  Okay.  And did he blow into the Intoxilyzer?

24  A.  Yes.

25  Q.  Okay.  Was that pursuant to following instructions from

1    Ranger Miller?

2    A.  I believe so.

3    Q.  Okay.  And did you eventually see the reading that came

4    from the Intoxilyzer 8000 for Mr. Parrent?

5    A.  I did.

6    Q.  What was it?

7    A.  .091.

8    Q.  What happened next?

9    A.  Parrent was booked into jail without incident, and Stark

10   was brought back out to be booked into jail.

11   Q.  Okay.  And you were not present for Mr. Stark's

12   Intoxilyzer?

13   A.  I wasn't.

14   Q.  Okay.  What happened next?

15   A.  That was all for the moment, and then we came back at 2:00

16   to conduct DUI interviews with Parrent and Stark.

17   Q.  And -- okay.

18        MR. PICO:  May I have a moment, Your Honor?

19        THE COURT:  Go ahead.

20   Q.  (BY MR. PICO)  During the course of your contact with

21   Mr. Parrent out at the -- at the scene in Lamar Valley at the

22   pullout there before he was under arrest and did he -- did

23   you -- did he say anything about the amount he had to drink

24   that evening or the night before?

25   A.  At first he said that he had a couple of drinks with Stark

1  at 8:30 when they had dinner, and that was the last time he had

2  anything to eat or drink, and then later he said that he had

3  finished drinking at 11:30.  He didn't say exactly how much he

4  had.  He said he was -- he was good to drive and that he had

5  slept the night before.

6  Q.  Did he ever admit that he -- or did he say anything about

7  having had too -- that he may have had too much to drink?

8  A.  He did.  I believe it was after the PBT was administered,

9  he was wondering who might've turned him in, and he suspected

10  that the -- the bar might've turned him in because he might've

11  had too much to drink.

12          MR. PICO:  No further questions, Your Honor.

13          THE COURT:  Ms. Rebsom.

14                    CROSS-EXAMINATION

15  Q.  (BY MS. REBSOM)  Ranger Wilson, you said you had three and

16  a half months of ranger law enforcement training?

17  A.  That's correct.

18  Q.  Where was that at?

19  A.  Franklin, North Carolina.

20  Q.  And how many -- during your law enforcement career as a

21  ranger in the park, how many DUI arrests have you made?

22  A.  I've been involved with three or four other DUI arrests.

23  Q.  And isn't it true that dispatch called you at 6:22 a.m.?

24  A.  That's correct.

25  Q.  And when -- when did you talk to the people at the gate

1    that the busses entered the park through, what time?

2    A.  I did not speak with the people at the gate.  The dispatch

3    center talked to them.

4    Q.  Okay.  But did you testify that the busses had gone through

5    the main gate with other rangers there about five minutes after

6    the dispatch had gotten a call?

7    A.  The busses -- dispatch told me that the busses went through

8    the gate five minutes before dispatch called me, so it would've

9    been about 6:17.

10   Q.  And so when the busses would've gone through that gate,

11   were there other rangers that are at the gate?

12   A.  Not commissioned rangers, no.

13   Q.  But park employees?

14   A.  Yes.

15   Q.  Do they have any law enforcement training?

16   A.  No.

17   Q.  And would the bus drivers, would they have had to speak

18   with the park employees at the gate?

19   A.  I'm not sure.

20   Q.  And are you aware if there's videos at the gate?

21   A.  I believe there are.

22   Q.  And do those videos record the traffic coming through the

23   gate?

24   A.  Yeah, I think that just started this year, but I think they

25   do.

83

1   Q.  And where were you when you got the call from dispatch?

2   A.  In my residence at Tower.

3   Q.  And how far is Tower from the gate that the busses would've

4   gone through?

5   A.  It's 23 miles, I think.

6   Q.  And then you said you went to the ranger station.  Where is

7   that located at?

8   A.  It's directly behind my house.

9   Q.  And you didn't travel down the road to try to meet the

10  busses; you went to the ranger station, correct?

11  A.  I went to the ranger station to get my patrol car ready.

12  Q.  And how long were you at the ranger station before you saw

13  the busses drive by?

14  A.  Probably 10 or 15 minutes.

15  Q.  So when you got the call from dispatch, you didn't attempt

16  to locate the busses?

17  A.  I finished getting dressed, I was still in my pajamas, and

18  put my breakfast things away and went to the ranger station.  I

19  was on the phone off and on with Ranger Chan and dispatch to

20  try to find out exactly what was going on, and while getting my

21  patrol car ready I was keeping an eye on the road to try to

22  locate those busses.

23  Q.  And from the ranger station, when was it that you first saw

24  the busses?

25  A.  It was about 7:05.

U.S. v. PARRENT                    WILSON - CROSS                    2:11MJ100

84

1  Q.  And how far were the busses from the actual ranger station

2  that you were in?

3  A.  It's about maybe 2 or 300 yards.

4  Q.  And when you observed the busses go by, is that when you

5  got in your patrol car and headed down the road?

6  A.  That's correct.

7  Q.  But you didn't initiate the stop of the busses at that

8  time, correct?

9  A.  I did not.

10  Q.  And you said that Mr. Parrent was driving the lead bus.

11  How did you know that he was operating the lead bus?

12  A.  At the time I didn't know that that was his name, but I had

13  observed -- when he left the Tower Junction, that's when I

14  observed he was the one driving, and again when they were

15  leaving from Specimen Ridge Trailhead traveling east I saw him

16  in the front bus again.

17  Q.  And as the busses were traveling to the Specimen Ridge

18  Trail approximately 2 miles from the station that you left

19  from, how far were you behind the busses at that time?

20  A.  It was only Parrent's bus, and I was probably between an --

21  maybe an eighth of a mile or less.

22  Q.  Could you see the bus in front of you?

23  A.  Yeah, clearly.

24  Q.  Was there other vehicles in between you and Parrent's bus?

25  A.  No.

1   Q.  And you didn't initiate a traffic stop at that time?

2   A.  I did not.

3   Q.  And at that time the other bus driven by Mr. Stark was

4   behind you?

5   A.  I couldn't see it.  I think it was still parked at the

6   parking lot at Tower Junction.

7   Q.  And you testified that you saw Mr. Parrent's bus touch the

8   center line by a couple of inches or actually cross over it by

9   a couple of inches?

10  A.  It crossed the center line.

11  Q.  And you're aware that the bus was approximately 60 feet

12  long?

13  A.  Yes.

14  Q.  And approximately 12 to 13 feet wide?

15  A.  Yes.

16  Q.  And you didn't stop the bus at that time, correct?

17  A.  Correct.

18  Q.  Even though you had heard dispatch reports indicate that

19  you had a possible DUI driver of young children and he crossed

20  the center line?

21  A.  That's correct.

22  Q.  And the bus was not speeding at that time?

23  A.  No.

24  Q.  And the bus never went off the shoulder of the road?

25  A.  Didn't go off the shoulder.  It went pretty close to going

1   off the shoulder, though.

2   Q.  And did you see the busses stop?  Where were they stopped

3   that first time you saw them stop where they were there for

4   about five minutes?

5   A.  That's at Tower Junction.  It's the junction between the

6   road that goes between Mammoth and Canyon and the road that

7   goes to the northeast entrance.  There's a recycling area

8   there.

9   Q.  And how far is that from the ranger station that you

10  initially left from?

11  A.  Probably about another 300 yards.

12  Q.  Okay.  And when the busses stopped at that area for a few

13  minutes, you didn't make a traffic stop at that time?

14  A.  I did not.

15  Q.  And at that time you actually drove past the busses?

16  A.  Yes.

17  Q.  How far did you travel past the busses before you turned

18  back around?

19  A.  Less than a quarter of a mile.  I believe I turned around

20  at the Roosevelt corrals, which are just down the road a short

21  piece.

22  Q.  Okay.  And when you met up with the busses again, had they

23  already gotten back on the road?

24  A.  Parrent was leaving the parking lot.

25  Q.  But you didn't stop him at that time?

1   A.   Nope.

2   Q.   And how much further down the road was it that they had

3   stopped to view the wildlife and let the kids out?

4   A.   In Lamar Valley I believe it's around 9 miles.

5   Q.   And you followed the busses for those 9 miles?

6   A.   Yes.

7   Q.   And didn't make a traffic stop?

8   A.   Nope.

9   Q.   Now, you said that once you approached the buses, you made

10  contact with the adult chaperones on the bus?

11  A.   I believe I talked to one or two adults with the -- with

12  the group.

13  Q.   And they were the adults that were on Mr. Parrent's bus?

14  A.   I'm not sure.

15  Q.   But you never heard an adult chaperone indicate any concern

16  about Parrent's driving or his condition, correct?

17  A.   No, I -- I mostly talked to them about how their morning

18  was going, if they were seeing any wildlife.  I didn't directly

19  ask them how the drivers were driving.

20  Q.   But they didn't state any concerns to you, correct?

21  A.   No, they didn't.

22  Q.   And isn't it true that you actually did not ask Mr. Parrent

23  to perform any physical maneuvers, FSTs, at the side of the

24  road?

25  A.   I did not, but Ranger Chan did.

1   Q.  Did you ever have any contact with Stark and ask him to do

2   any field sobriety maneuvers on the side of the road?

3   A.  I believe we directly asked him about the PBT and not the

4   SFSTs.

5   Q.  So whose PBT did you use to administer a test on

6   Mr. Parrent?

7   A.  Ranger Chan used his own PBT from his vehicle.

8   Q.  Are you aware if that PBT is calibrated?

9   A.  I'm not aware.  You can ask him.

10  Q.  Do you know what the reliability is of the PBT?

11  A.  I am not.

12  Q.  Are you aware of the validity of the PBT?

13  A.  I am not.  And we're allowed to use them for our job, so I

14  assume that they're reliable and valid.  They are calibrated I

15  think once a month, and it's written on a piece of paper inside

16  the PBT holder.

17  Q.  You said that you had -- either you or Officer Chan had

18  verified Stark's PBT result, but you did not with Mr. Parrent,

19  correct?

20  A.  That's correct.

21  Q.  And it's true that you guys did not cuff Mr. Stark or

22  Mr. Parrent until you guys got down the road, correct?

23  A.  That's correct.  We were trying to spare them the

24  embarrassment.

25  Q.  And when you guys were asking Mr. Parrent to submit to an

89

1   Intoxilyzer test, which Intoxilyzer machine was used to

2   administer that test, do you know?

3   A.   The Intoxilyzer 8000.

4   Q.   Are you certified on that machine?

5   A.   No, ma'am.

6   Q.   And do you recall if Mr. Parrent had been provided his

7   advisory consent?

8   A.   I do not recall.

9   Q.   Is there a video in the area where the Intoxilyzer 8000 is?

10  A.   I believe it's -- there's a video, but it's not kept on

11  tape.

12  Q.   So you guys record, but you don't keep those videos?

13  A.   That's my understanding.

14  Q.   When -- you never asked Mr. Parrent to do any of the FSTs

15  once you got him down to Gardiner, correct, or Mammoth?

16  A.   That's correct.

17          MS. REBSOM:   I don't have any other questions.   Thank

18  you.

19          THE WITNESS:   Thank you.

20          THE COURT:   Redirect?

21          MR. PICO:   No redirect of this witness, Your Honor.

22          THE COURT:   You may be excused, Officer Wilson, but if

23  you will stick around in case somebody wants to recall you to

24  the stand.

25          THE WITNESS:   Okay.   Thank you.

1        MR. PICO:  The United States calls Ranger Brian Chan,

2    Your Honor.

3        COURTROOM CLERK:  Do you swear that the testimony

4    you're about to give in the case now before the Court will be

5    the truth, the whole truth and nothing but the truth, so help

6    you God?

7        THE WITNESS:  I do.

8        COURTROOM CLERK:  Thank you.

9                        BRIAN GEORGE CHAN,

10   called for examination by the Plaintiff, being first duly

11   sworn, on his oath testified as follows:

12                       DIRECT EXAMINATION

13   Q.  (BY MR. PICO)  Ranger Chan, would you state your full name

14   and spell both your first and last name for the record.

15   A.  Brian George Chan, spelled B-r-i-a-n.  Last Chan, C-h-a-n.

16   Q.  Why don't you spell George as well.

17   A.  George, G-e-o-r-g-e.

18   Q.  What do you do for a living?

19   A.  Park ranger, Yellowstone National Park.

20   Q.  How long have you been employed as a park ranger?

21   A.  Since 1984.

22   Q.  Okay.  And have you been since that time a law enforcement

23   park ranger?

24   A.  No.  In '84 I was a general ranger.  I got my commission in

25   1987.

1    Q.   Could you tell us, please, what training you've had?

2    A.   I attended the Federal Law Enforcement Training Center in

3    Glynco, Georgia in 1987.

4    Q.   Any other training that you had specifically with respect

5    to DUI stops and alcohol-related cases?

6    A.   In 1997 I attended the standardized field sobriety maneuver

7    training from the Department of Transportation.

8    Q.   Okay.  Any other training?

9    A.   Not specifically to DUI.  Field training ranger, I trained

10   the seasonal staff on general patrol procedures.

11   Q.   Okay.  How about training with respect to using the

12   portable breath tests?

13   A.   Yes, that was part of our initial training, both at the

14   academy and in '97.

15   Q.   Okay.  Now, were you on duty on June the 3rd of this year?

16   A.   Yes, I was.

17   Q.   And did you come into contact with the defendant Jack Kane

18   Parrent Jr.?

19   A.   Yes, I did.

20   Q.   Tell us how you came into contact with him, please.

21   A.   Ranger Amanda Wilson called me that morning and advised me

22   that she had received a call from the communications center

23   that the Super 8 had informed them that they had a driver of a

24   Karst Stage bus that he suspected might have been intoxicated,

25   and she advised me that the bus was now en route to our

U.S. v. PARRENT                CHAN - DIRECT                2:11MJ100

92

1   location in Lamar Valley, and she asked for my assistance.

2   Q.  What did you do next?

3   A.  I then called the Super 8 to talk to Mr. Carlton Newman,

4   who was the night security person at Super 8, to talk to him

5   exactly on what he had seen that morning.  And in that

6   conversation he explained to me that the Park County deputies

7   had brought an individual to -- to the Super 8 earlier that

8   morning, and he said that the individual was extremely

9   intoxicated, and the deputies had to assist him into the

10  facility there, into the hotel and that he couldn't remember

11  where he was staying at the hotel.  So he said it took a while

12  for them to determine where he was actually staying in the

13  motel.

14          Once they figured out what room he was staying in,

15  Newman said that they had to assist Mr. Parrent up to his room

16  for the evening.

17          I asked Mr. Newman how he knew that the individual was

18  intoxicated, and he said that he was just obviously very drunk.

19  He wasn't making sense with his -- his statements.  He said

20  that the deputies had to help him up into the hotel itself and

21  actually escort him towards his room.  I asked him if they

22  physically had to hold him up, and he said no, he was able to

23  stand on his own, but the deputies did have to direct him to --

24  to his room.

25          And then he said that he notified the communications

1    center that he was concerned that he was -- the driver was

2    probably still intoxicated and that he may be heading towards

3    the park.

4    Q.  Okay.  What happened next after you talked to Mr. Newman,

5    then?

6    A.  Ranger Wilson then radioed me -- during that time she

7    radioed me and told me that she had seen the busses pass Tower

8    Junction and that they were heading out towards the -- towards

9    the buffalo ranch in Lamar Valley, so I went out to -- to meet

10   up with her and the busses.

11        As I was pulling up to the pullout, which is a paved

12   pullout west of the buffalo ranch, that pullout was full of

13   wildlife watchers, including two Karst Stage busses, and I was

14   arriving -- I arrived there about the same time that Ranger

15   Wilson was pulling up.

16        The paved pullout was -- it was full with other

17   vehicles, and they were extending actually beyond the paved

18   portion on the south side of the road, so I pulled off the road

19   on the north side of the road and then met up with Ranger

20   Wilson for a brief period of time and then went over and

21   engaged in conversation with the bus drivers.

22   Q.  What happened next?

23   A.  The first bus driver that I spoke to was Mr. Stark, and I

24   just engaged in conversation with him, saw how they were doing,

25   and in the process of conversation I asked him if they had

1   gotten off to a late start that morning, and he said that the

2   other bus driver had some problems that morning, but they were

3   now back on schedule.

4           So then I went over and talked to the other bus

5   driver, who was Mr. Parrent, and engaged in conversation with

6   him.  And he explained to me that his son was actually on that

7   bus that he was standing by, which was Mr. Stark's bus, and he

8   said that his son had become carsick on the journey, and he was

9   trying to clean him up after that.  I asked if his son was

10  okay, and he said yeah, he felt that he was fine.

11          And I then went on the bus to make sure that his son

12  was doing all right.  I went in and talked to his son on the

13  bus, and he was a little embarrassed and -- his son was

14  embarrassed, and -- but said that he was feeling fine now.

15  Q.  Why was he embarrassed?

16  A.  Because he had become sick on the bus.

17  Q.  Did he throw up?

18  A.  He did.  He threw up.  Sorry.  He threw up, and he said

19  that he was feeling fine now.

20  Q.  All right.  What happened next, then?

21  A.  So then I continued to talk to Mr. Parrent and asked him if

22  he had had any drinks the night before, and he said that he had

23  gone out with Mr. Stark to celebrate his birthday, and they had

24  a few drinks with dinner and after dinner, but he had had

25  several hours of sleep, and he felt fine now, and he didn't

1   think that there was any concerns with him driving.

2   Q.  What happened next?

3   A.  I told him that I was concerned that he may still have

4   alcohol in his system.  I asked him if he would mind coming

5   away from the crowd of people there and talk to me over at my

6   patrol vehicle and if he would mind doing some field sobriety

7   maneuvers just to make sure that he was okay to drive, and he

8   said that he would do that, and I asked him if he had had any

9   breakfast that morning, and he said no.  I asked him if he had

10  anything to drink or eat since that time driving on the bus,

11  and he said no.  I said, "Okay.  Let's go over to my vehicle."

12        And he told me that he would prefer not to do field

13  sobriety maneuvers because of all the kids and the crowd that

14  were there next to the bus, but he'd be happy to blow into the

15  breath tester, the preliminary breath tester.

16        So I -- I got that ready and explained to him the

17  instructions on providing a breath sample.  I asked him to take

18  a large, deep breath, blow slowly into the tube on the tester

19  and to continue to blow into the breath tester until I asked

20  him to stop.

21        On the first try he -- he took a breath, and he blew a

22  short breath in there, and I was not able to get a reading on

23  the PBT.  So I asked him to submit another test, allowed the

24  unit to recalibrate, and he provided a second test, and the

25  same thing, he just had a short breath that I was not able to

1    get a reading on.  So I allowed the unit to reset again and

2    administered a third test of which the same thing happened.  I

3    reexplained the instructions, and on the fourth attempt he

4    provided a long sample where I was able to get a reading of

5    .12.

6    Q.  And with the reading of .12 did you advise Mr. Parrent what

7    it was?

8    A.  I don't remember telling him specifically what the reading

9    was.

10   Q.  Okay.

11   A.  But that he had -- that it indicated that he had alcohol in

12   his system.

13   Q.  Okay.  And what happened next?  Did he say anything else to

14   you at that time?

15   A.  He said that he -- he was being very cooperative the whole

16   time, and he said, you know, "If you want, I'll just give you

17   the keys, I promise not to drive anymore.  I won't drive the

18   busses.  I'll even quit my job now.  I don't want to harm the

19   students.  I don't want to put them in danger.  So if we can

20   just do that, I -- I won't drive anymore."  And I advised him

21   that no, that was not -- we weren't going to let him drive, but

22   that he would have to come with us to Mammoth where he would be

23   required to blow into our Intoxilyzer to get a final reading on

24   his alcohol content.

25           He kept telling me that he was -- he was very

1   professional and that he would do whatever it was that -- that

2   he needed to do, and he remained very cooperative through that

3   contact.

4           When we were making arrangements for transporting the

5   students in the other busses, he said, "Well, you know, if

6   you're concerned about me driving, my son is on Stark's bus,

7   and Mr. Stark was out drinking with me the night before, and I

8   don't feel comfortable with my son on that bus, so I think you

9   should test Mr. Stark as well."

10          So at that time I asked Ranger Wilson to go over and

11  talk to Mr. Stark and see if he would come join us, and that's

12  when Mr. Stark came over to my vehicle, and I explained to him

13  that we understood that he had been drinking the night before,

14  and we were concerned that he might have alcohol in his system.

15  And he agreed to provide a breath sample as well.

16          So I administered a PBT on Mr. Stark using the same

17  unit that I administered the PBT to Mr. Parrent, and he blew

18  into that and provided a -- got a reading of .05.

19          At that time I was thinking, well, because I just

20  tested Stark -- or Mr. Parrent as well, I thought I would use

21  Ranger Wilson's PBT as well just to get another reading on a

22  different Intoxilyzer for him or portable breath test, so we

23  used her portable breath tester.  I administered another one to

24  Mr. Stark and got a reading of .03, I believe, on that one.

25          Advised him that he did have alcohol in his system and

1   that he was not permitted to operate a commercial vehicle with

2   any amount of alcohol in his system and that we would take him

3   to Mammoth where he would need to provide a breath sample in

4   the Intoxilyzer.

5          They were both being very cooperative, so we patted

6   them down for weapons behind the vehicle, and I explained to

7   them that I'd like to take them to an area away from all the

8   crowds of where the busses were, and we would search them,

9   handcuff them and take them to jail from there.

10         So loaded them up into my vehicle, and we moved to the

11  pullout further to the west, and at that -- once we got there,

12  then we searched both individuals, put them in handcuffs and

13  transported them to Mammoth.

14  Q.  Now, during the time of your stop from the time you

15  became -- or pulled up to the two busses to the time that you

16  had placed them under arrest in handcuffs in your vehicle as

17  you've just described, where did all of that occur?

18  A.  From the -- when I pulled up --

19  Q.  Actually, let me ask it this way :  Did all of that occur

20  within the exterior boundaries of Yellowstone National Park?

21  A.  Yes, it did.

22  Q.  Okay.  With regard to your discussions with Mr. Parrent and

23  Mr. Stark, did you detect the odor of alcohol on their persons

24  at all?

25  A.  I did not detect any alcohol or alcoholic beverage on

99

1   Mr. Stark when I was talking to him.  When I was conversing

2   with Mr. Parrent, I could smell a definite odor of cologne, and

3   then when I got close enough to him when he was helping his --

4   his son, I could smell on his breath what I'd describe as a

5   stale fruity odor that is what you smell on individuals that

6   have been drinking an alcoholic beverage within the last few

7   hours, a distinct stale fruity odor.

8   Q.  Okay.  What happened next, then?

9   A.  Once we arrived at Mammoth, took Mr. Stark into the holding

10  facility where Ranger Miller administered the Intoxilyzer to

11  Mr. Stark.

12  Q.  What happened next?

13  A.  Then we brought Mr. Parrent into the holding facility, and

14  I went up to the communications center -- communications center

15  and started working on the charging documents.

16  Q.  Did you -- were you present for Mr. Parrent's Intoxilyzer

17  test?

18  A.  I don't believe I was there.

19  Q.  When did you later -- strike that, please.

20          When did you find or talk to the deputy sheriff who

21  had contact with Mr. Parrent earlier that evening or earlier

22  that day, I should say, around 2:00 in the morning?

23  A.  I didn't talk to the deputies till several days later.

24          MR. PICO:  May I have a moment, Your Honor?

25          THE COURT:  Mm-hmm.

1          MR. PICO:  No further questions of this witness, Your

2    Honor.

3          THE COURT:  Ms. Rebsom.

4                         CROSS-EXAMINATION

5    Q.  (BY MS. REBSOM)  So, Ranger Chan, you were trained on the

6    FSTs in 1997?

7    A.  Yes.

8    Q.  Have any training on them since?

9    A.  Just during our incidental trainings on our annual

10   trainings.

11   Q.  And where were you when you first got the call about the

12   Karst Stage busses?

13   A.  I was at my residence --

14   Q.  Which is --

15   A.  -- at Lamar Valley.

16   Q.  Lamar Valley.  How far from Mammoth is that?

17   A.  Approximately 30 miles.

18   Q.  Okay.  Who contacted you about the Karst busses?

19   A.  Ranger Wilson was the first to call me.

20   Q.  And what time was that?

21   A.  It was around 6:30 or so.

22   Q.  So what did you do?  Did you leave Lamar Valley and head

23   toward the direction?

24   A.  No.  When -- when she called me, that's when I called

25   Mr. Newman at the Super 8.

1   Q.  Okay.  After you talked to Mr. Newman at the Super 8, did

2   you leave Lamar Valley and travel toward the area the busses

3   were coming from?

4   A.  Yes, I did, when Ranger Wilson called me on the radio.

5   Q.  Wait.  So when did you travel toward the busses, when

6   Ranger Wilson called you or after you talked to Mr. Newman?

7   A.  Both.  I spoke to Mr. Newman, and Ranger Wilson then called

8   me on the radio and asked me to assist her.

9   Q.  Okay.  Were you in communications with Ranger Wilson as she

10  was following the Karst busses for over 10 miles?

11  A.  Off and on.  She called me, I think, when she first saw

12  them, and I was on the phone with Mr. Newman at that time.

13  Q.  Were you her supervisor at that time?

14  A.  Yes.

15  Q.  And you did not instruct her to make a stop of the busses

16  at that time?

17  A.  No, I did not.

18  Q.  At any time did you ever instruct Ranger Wilson to make a

19  stop of the busses?

20  A.  No, I did not.

21  Q.  And so you said that you got to the busses -- you arrived

22  on scene about the same time that Ranger Wilson did?

23  A.  That's correct.

24  Q.  What time was that?

25  A.  Before 8:00, a quarter till or so.

U.S. v. PARRENT                CHAN - CROSS                    2:11MJ100

102

1   Q.  And how long did it take you to get from where you were at

2   Lamar to where the busses were stopped?

3   A.  Just a couple minutes.  It's just over half a mile.

4   Q.  So when you first got the call, you were 30 miles away from

5   the busses?

6   A.  That's correct.

7   Q.  And from the point where the busses stopped to where you

8   initially started out was about a mile and a half?

9   A.  Less than a mile and a half.

10  Q.  Did you have any audio or video recording devices in your

11  vehicle at that time?

12  A.  No, I did not.

13  Q.  Is it equipped with recording or audio devices?

14  A.  No, it's not.

15  Q.  Did you have any kind of portable audio device that you

16  could record communications with people?

17  A.  No, I did not.

18  Q.  And isn't it true that you didn't ask Mr. Parrent to do the

19  FSTs when you had stopped to cuff him down the road after you

20  had arrested them?

21  A.  That is correct, I did not.

22  Q.  And you didn't ask him to do the FSTs at Mammoth?

23  A.  No, I did not.

24  Q.  But there is a location there that you could've done the

25  FSTs either when you stopped to cuff them or at the Mammoth

1    jail, correct?

2    A.  That's correct, at the -- where we stopped at the second

3    pullout before Mammoth.

4    Q.  And have you learned in your training that the portable

5    breath test machines, the PBTs, are not as valid as any other

6    testing device?

7    A.  They're not as valid as the Intoxilyzer, that's correct.

8    Q.  Do you know what the margin of error is on a PBT?

9    A.  I don't.

10   Q.  You don't.  What time did you administer the PBT to

11   Mr. Parrent?

12   A.  It was around 8:00.  I don't know the exact time, though.

13   Q.  And you're aware that there's a 20-minute deprivation

14   period that you should be waiting before you make contact with

15   somebody and then ask them to submit to a breath test?

16   A.  I am aware.

17   Q.  So if you had him submit at 8:00 and you arrived on scene

18   about 8:40 -- or 7:45, you didn't wait the 20-minute

19   deprivation period, then, correct?

20   A.  I don't know the exact time, no.

21   Q.  What time did Mr. Parrent submit to the Intoxilyzer test?

22   A.  I don't have the exact time.

23   Q.  Isn't it true that a PBT result can be hindered or impaired

24   if an officer doesn't wait that 20-minute deprivation period?

25   A.  Explain that again.

1  Q.  Okay.  Why is it important for you to wait that 20-minute

2  deprivation period between the time you have contact with an

3  individual and you ask them to provide a breath sample in a

4  PBT?

5           MR. PICO:  Excuse me, Your Honor, I think we're

6  getting confused about the Intoxilyzer and the portable breath

7  test.  There is no deprivation period, as I understand it, for

8  a portable breath test.  There is for an Intoxilyzer or an

9  Intoximeter.

10          THE COURT:  Well, I understand that there is for the

11 Intoxilyzer.

12          MS. REBSOM:  There is a 20 minute, and the witness

13 testified to that.

14 Q.  (BY MS. REBSOM)  You do recall in your training that

15 there's a 20-minute deprivation period for a PBT?

16 A.  15 to 20 minutes.  I think ours is actually 15 minutes, but

17 yes --

18          THE COURT:  And that's for the preliminary --

19 A.  -- it's recommended.

20          THE COURT:  -- breath test.  That's not for the

21 Breathalyzer or the --

22          THE WITNESS:  For the preliminary breath test we ask

23 if they have had anything in their mouth, and we wait 15

24 minutes before we administer the test.

25          I asked Mr. Parent if he had anything to eat or drink

1   while we were at the bus, and I waited a time period until I

2   got the breath test ready to have him blow into it, but I don't

3   know what time -- what the exact time limit was from the time

4   that I asked him if he had anything in his mouth to the time

5   that I administered the portable breath test.  I don't know the

6   exact time that it was.

7   Q.  (BY MS. REBSOM)  It could've been less than 15 minutes?

8   A.  It could've been.

9   Q.  And what time did you guys leave the scene and take Parrent

10  and Stark from the scene?  Do you recall?

11  A.  From when we left where the busses were?

12  Q.  Mm-hmm.

13  A.  I'm not recalling exact time right now.  From -- from the

14  bus location, I don't remember the time.

15  Q.  Okay.  What time do you think you had Mr. Stark submit to a

16  test on the PBT?

17  A.  I don't have the exact time that I had Mr. Stark blow in

18  the PBT.

19  Q.  Can you take a guess about approximately when you had

20  Mr. Stark blow into the PBT?

21  A.  Yeah, it was after 8:00.

22  Q.  So between the time that Mr. Parrent blew into the PBT and

23  Mr. Stark blew into the PBT, you didn't wait a 15-minute

24  deprivation period, then?

25  A.  Rephrase that.

1   Q.  Okay.  So you pretty much had Mr. Stark provide a breath

2   sample of the PBT just a few minutes after you had Mr. Parrent

3   provide a PBT breath test in that same instrument?

4   A.  It was several minutes after that, but yes, I did have him

5   provide that.

6   Q.  What do you mean several minutes?  How many?

7   A.  I don't -- I don't know the exact time.  I had Ranger

8   Wilson go over and get Mr. Stark and have him come over to the

9   patrol vehicle and then explained to him the instructions on it

10  and then administered the portable breath test to him.  But I

11  don't know the exact amount of time.

12  Q.  Okay.  But that could've taken maybe two to three minutes,

13  correct?

14  A.  Yes, it was two to three minutes.

15  Q.  And so at that point did you realize that you had not

16  waited the deprivation period and that you were concerned about

17  both men blowing into the same PBT within a short amount of

18  time that you had Mr. Stark provide a second breath test?

19  A.  No.  That was not the reason that I had him blow into the

20  second machine if that's what you're asking.

21  Q.  So you didn't have a concern that Mr. Parrent and Mr. Stark

22  had both submitted to a test, a breath test on that PBT within

23  minutes of each other?

24  A.  No, because I allowed the PBT to reset itself, and I used a

25  different tube to administer the test.

1   Q.  And you indicated that Mr. Parrent was extremely

2   cooperative with you?

3   A.  Yes, he was.

4   Q.  Now, when you guys were at the Mammoth station, you said

5   that Ranger Miller administered the Intoxilyzer to Mr. Parrent?

6   A.  That's correct.

7   Q.  Okay.  And you heard her testify that she's not certified

8   on the Intoxilyzer, correct?

9   A.  Ranger Miller?

10  Q.  Yes.

11  A.  Or Ranger Wilson?

12  Q.  Ranger Wilson.

13  A.  Ranger Wilson is not, Amanda Wilson is not certified.

14  Q.  Okay.  Who administered the Intox to Mr. Parrent?

15  A.  Russ Miller, Ranger Russ Miller.

16  Q.  Were you present when he submitted to a test on the

17  Intoxilyzer?

18  A.  Mr. Parrent?

19  Q.  Yes.

20  A.  I don't believe so.

21  Q.  Okay.  So you're not aware if anybody had read him his

22  consent advisory form?

23  A.  I'm not aware.

24  Q.  And Mr. Parrent had told you that he was okay to drive?

25  A.  He did.

1          MS. REBSOM:  I don't have any other questions.

2          THE COURT:  Mr. Pico.

3          MR. PICO:  Nothing further of this witness, Your

4   Honor.

5          THE COURT:  You may step down, Ranger Chan, but -- and

6   you'll be sitting at the counsel table, correct?

7          MR. PICO:  Thank you, Your Honor.  At this time the

8   United States calls Ranger Russ Miller.

9          THE COURT:  All right.

10         COURTROOM CLERK:  Do you swear that the testimony

11  you're about to give in the case now before the Court will be

12  the truth, the whole truth and nothing but the truth, so help

13  you God?

14         THE WITNESS:  I do.

15         COURTROOM CLERK:  Thank you.

16                    RUSSELL A. MILLER,

17  called for examination by the Plaintiff, being first duly

18  sworn, on his oath testified as follows:

19                    DIRECT EXAMINATION

20  Q.  (BY MR. PICO)  State your name and spell your full name,

21  please.

22  A.  Russell A. Miller, R-u-s-s-e-l-l, middle initial A, last

23  name Miller, M-i-l-l-e-r.

24  Q.  And what do you do for a living?

25  A.  I'm a park ranger.

1  Q.  How long have you been employed as a park ranger?

2  A.  32 years.

3  Q.  And is that as a law enforcement park ranger?

4  A.  Most of that time.  A few years before I started working

5  law enforcement I was not law enforcement.

6  Q.  Okay.  Was -- your training, please, could you briefly

7  describe that to the Court.

8  A.  My initial law enforcement training was after I obtained my

9  college degree in forest resource conservation I attended the

10  Florida State POST academy in Tallahassee, Florida.

11  Q.  When you say "POST," do you mean Peace Officers -- what --

12  A.  Standards Training, yeah.

13  Q.  Standards Training?

14  A.  Mm-hmm.

15  Q.  Okay.  Thank you.

16  A.  I worked as a seasonal law enforcement ranger for a number

17  of years and attended a 40-hour refresher training every year

18  since I started doing that.  I then, after I became a permanent

19  ranger, I attended the academy at FLETC, the nine-week basic

20  land management law enforcement training course there.  I've,

21  like I say, I've had 40-hour refreshers every year since that.

22  I've had some other training courses.  I've returned to FLETC

23  for the drivers' instructor's training program and the advanced

24  technical equipment investigative training courses there.

25  That's my basic training.

U.S. v. PARRENT                    MILLER - DIRECT                    2:11MJ100

110

1   Q.   Okay.  And have you been trained in the use of the

2   Intoxilyzer 8000?

3   A.   Yes, I have.

4   Q.   What is the Intoxilyzer 8000?

5   A.   It's an instrument that measures alcohol in a breath sample

6   and provides reading on the -- the alcohol of a subject's

7   breath.

8   Q.   Okay.  Showing you what's been marked as Government Exhibit

9   No. 2, can you identify that, please?

10              MR. PICO:  I believe the Court has copies of my

11   exhibits.  I've given copies to the defendant previously.

12   A.   This is my current certification as a breath test

13   specialist.

14   Q.   (BY MR. PICO)  And when did that occur?

15   A.   Certification date is January of 2011.

16              MR. PICO:  Offer Government Exhibit No. 2 into

17   evidence, Your Honor.

18              THE COURT:  Any objection?

19              MS. REBSOM:  Judge, just a continuing objection that I

20   stated earlier about the foundation and Wyoming's law about the

21   Intoxilyzer 8000 that we don't need to rehash.

22              THE COURT:  But do you have any objection to the

23   admission of this exhibit specifically?

24              MS. REBSOM:  Just that it's not the required

25   foundation in my mind.

1          THE COURT:  Well, why not?

2          MS. REBSOM:  Well, because I don't think that -- based

3    on my prior objection when I objected to the result of the

4    Intoxilyzer the first time the Government attempted to

5    introduce it, I think that even though we're in federal court,

6    it's my opinion that Wyoming law would apply and that the State

7    of Wyoming has not accepted the Intoxilyzer 8000.

8          THE COURT:  Do you have any case law to this?

9          MS. REBSOM:  Well, I think it's up to the Government

10   to prove that the State of Wyoming would accept an Intoxilyzer

11   8000, because they --

12         THE COURT:  We're in federal court.  Again, we're --

13         MS. REBSOM:  I know.  So that's why I didn't want to

14   have to go through this because I know what your ruling is

15   going to be.  I just want to make the objection for the record.

16         THE COURT:  Well, if you've got any case law that says

17   otherwise, I'd sure listen to it, but in the absence of that, I

18   can't -- I can't deny the admission of it.

19         MS. REBSOM:  Yeah, it's just my understanding that the

20   State of Wyoming, which I think that state law controls because

21   the stop was made in Wyoming, the test was done in Wyoming and

22   that Wyoming only accepts --

23         THE COURT:  No, no.

24         MS. REBSOM:  -- the Intoxilyzer 5000.

25         THE COURT:  The stop was done in Yellowstone National

1   Park, an area of exclusive federal jurisdiction, and when the

2   charge is under federal law, then federal law controls.  As I

3   said before, if it had been an Assimilative Crimes Act charge,

4   maybe you have an argument, but I'm going to overrule the

5   objection.

6            Go ahead, Mr. Pico.

7            MR. PICO:  Thank you, Your Honor.  Has the item been

8   admitted into evidence, then?

9            THE COURT:  Yes.

10           MR. PICO:  Thank you.

11       (Government's Exhibit 2 received in evidence.)

12  Q.  (BY MR. PICO)  Ranger Miller, were you on duty on June the

13  3rd of this year?

14  A.  Yes.

15  Q.  And at that time did you administer an Intoxilyzer 8000

16  test to an individual by the name of Jack Kane Parrent Jr.?

17  A.  Yes, I did.

18  Q.  Is Mr. Parrent in the courtroom today?

19  A.  Yes, sir.

20  Q.  Can you point him out, please.

21  A.  He's right there at the defendant's table.

22           MR. PICO:  May the record reflect that the witness has

23  identified the defendant, Your Honor?

24           THE COURT:  The record will so reflect.

25  Q.  (BY MR. PICO)  The machine, the Intoxilyzer 8000 that you

1   used on Mr. Parrent on June the 3rd of 2011, was that certified

2   annually or has it been certified annually?

3   A.  Yes.

4   Q.  Showing you what's been marked as Government Exhibit No. 3,

5   can you identify that?

6   A.  This would be the annual laboratory certification of the

7   instrument that's conducted to -- to ensure that it's operating

8   within standards.

9          MR. PICO:  Offer Government Exhibit No. 3.

10         THE COURT:  Any objection?

11         MS. REBSOM:  Objection, hearsay.

12         THE COURT:  Overruled.  It will be admitted.

13     (Government's Exhibit 3 received in evidence.)

14         MR. PICO:  Thank you, Your Honor.

15  Q.  (BY MR. PICO)  In addition to an annual test, are the -- is

16  the machine that you used on Mr. Parrent tested on a monthly

17  basis as well?

18  A.  Yes, it is.

19  Q.  And are records maintained with regard to those monthly

20  tests?

21  A.  Yes, sir.

22  Q.  Showing you what's been marked as Government Exhibit No. 4,

23  can you identify that, please?

24  A.  This is the field certification report form dated May 26th,

25  2011.

1  Q.  And does it show that the Intoxilyzer that you used on

2  Mr. Parrent was working properly at that time?

3  A.  Yes, it does.

4  Q.  And are you one of the custodians of records for the

5  certifications?

6  A.  Yes.

7  Q.  And was that document, the field certification report,

8  Government Exhibit No. 4, prepared at or around the time of the

9  certification test that was done on the Intoxilyzer 8000?

10 A.  Yes.

11 Q.  And were the numbers that were entered in there noted at or

12 around the same time as the certification that was done?

13 A.  Yes.

14       MR. PICO:  Offer Government Exhibit No. 4, Your Honor.

15       THE COURT:  Any objection, Ms. Rebsom?

16       MS. REBSOM:  Objection, hearsay.

17       THE COURT:  Overruled.  The Government's Exhibit 4 is

18 admitted into evidence.

19    (Government's Exhibit 4 received in evidence.)

20 Q.  (BY MR. PICO)  Showing you what's been marked as Government

21 Exhibit No. 5, can you identify that?

22 A.  Yes, this is the field certification report form for the

23 same instrument, serial numberwise it's the same, dated June

24 4th, 2011.

25 Q.  Would that have been the monthly test?

1   A.  Yes.

2   Q.  Okay.  And that was actually done, performed one day after

3   the test that was done on Mr. Parrent?

4   A.  That's correct.

5   Q.  Okay.  And are you one of the custodians of that particular

6   record?

7   A.  Yes.

8   Q.  Was that document prepared at or around the time of the

9   test indicated in the report?

10  A.  Yes.

11  Q.  And were the -- was the information contained in that

12  report placed in that report at or around the same time as the

13  test was done?

14  A.  Yes.

15          MR. PICO:  Offer Government Exhibit No. 5, Your Honor.

16          THE COURT:  Ms. Rebsom.

17          MS. REBSOM:  No objection.

18          THE COURT:  Government's No. 5 is admitted into

19  evidence.

20      (Government's Exhibit 5 received in evidence.)

21  Q.  (BY MR. PICO)  With respect to the test of Mr. Parrent, can

22  you tell us exactly what you did, please.

23  A.  When Mr. Parrent was brought in, we -- I informed him that

24  we were requesting that he provide a sample of his breath, and

25  I initiated the -- the test with the instrument so that it

1    would start going through its warmup procedure and

2    self-calibration.

3    Q.  Did you make some sort of attempt at determining whether or

4    not there was a deprivation period that was involved?

5    A.  Yes, I asked the rangers who had brought him to the Mammoth

6    jail when they first started observing him and observed

7    deprivation of anything by mouth.

8    Q.  Okay.  And what time was that?

9    A.  The time was given to me as 0800.

10   Q.  Okay.  And do you remember what time you administered the

11   test to Mr. Parrent?

12   A.  To be precise, I'd have to look at the form, but I think it

13   was around 9:40ish, 9:50.

14   Q.  Showing you what's been marked as Government Exhibit No. 6,

15   can you identify that, please?

16   A.  It's a breath analysis report form for Mr. Jack Kane

17   Parrent dated June 3rd, 2011, and the time is 0951.

18   Q.  Okay.  When you say "the time is 0951," what does that

19   mean?

20   A.  That's the final time that was printed on the form as far

21   as the sequence of events that happened during the testing

22   procedure.

23   Q.  Okay.  Before I offer that into evidence, let's talk a

24   little bit about the testing procedure.  Could you explain to

25   the Court exactly what you did, please.

1  A.  To start the test you push the start test button.  It then

2  prompts you to -- to enter your own identifiers, and we have a

3  card that it scans for your identity, and then I enter my PIN

4  number.  It then starts going through its calibration and

5  cycles of making sure the instrument is working correctly.

6         It -- during that procedure I take a new sterile

7  mouthpiece out of its plastic container and attach it to the

8  hose on the instrument, and when it gets to the stage of the

9  test where it's ready for the subject to deliver the breath

10  sample, I read off the instructions to the -- the suspect,

11  which we have printed on the wall, and they can read them at

12  the same time I'm reading them off to them, about blowing with

13  sufficient force to initiate and maintain a tone and keep

14  blowing until they're told to stop blowing, and then ask them

15  if they understand, and Mr. Parrent indicated that he did

16  understand.

17         At that point I then ask them to deliver a breath

18  sample, and he did.  At that -- after the breath sample is

19  administered, I remove the mouthpiece.  It goes through more

20  cycles and -- and then -- of air blanks and things like that

21  and calibration.

22         I then put a new -- a completely new mouthpiece out of

23  its sterile wrapping paper onto the tube, and the subject

24  delivers a second breath test.  There's -- there's two tests

25  administered with the -- with the same procedure.  Then the

1   mouthpiece is removed, and it goes through the -- the -- the

2   final air blanks and calibrations and then reports on the

3   findings of the tests.

4   Q.  Okay.  Now, when you say it "reports on the findings of the

5   tests," do you get a light emitting diode readout as well as a

6   printed readout?

7   A.  Yes, but not until after the final breath sample is

8   delivered.  You get both, you get a reading on the instrument

9   and then the printout.

10  Q.  Okay.  With regard to the printout, is that Government

11  Exhibit No. 6?

12  A.  Yes.

13  Q.  Okay.  And so that was contemporaneous with the test that

14  you had just performed?

15  A.  Yes.

16          MR. PICO:  Offer Government Exhibit No. 6 into

17  evidence, Your Honor.

18          THE COURT:  Ms. Rebsom.

19          MS. REBSOM:  Objection, foundation.

20          THE COURT:  Overruled.  Government Exhibit 6 is hereby

21  admitted into evidence.

22      (Government's Exhibit 6 received in evidence.)

23  Q.  (BY MR. PICO)  Can you tell us, please, what the result of

24  the first breath test was?

25  A.  The first subject test at 0947 hours is 0.091 grams of

1    alcohol per 2,000 -- or 210 liters of breath.

2    Q.  And the second test?

3    A.  The second subject test at 0950 hours is 0.093.

4    Q.  A difference of what?

5    A.  .002.

6    Q.  And I think you've already indicated it's the practice to

7    accept the lower of the two figures.

8    A.  That's -- yeah, the -- and it's printed on the form the

9    reported alcohol concentration is the lower number, .091.

10   Q.  What happened next?

11   A.  Then I printed out and signed the forms.  We proceeded from

12   there -- from that point into the booking procedures in the

13   jail cell to book Mr. Parrent into the facility.

14   Q.  Are you satisfied that, based on your training and

15   experience and use of that particular machine, that the machine

16   was operating properly on that day?

17   A.  I am.

18   Q.  And that you followed all proper procedures?

19   A.  Yes, sir.

20   Q.  And that you got a valid readout?

21   A.  Yes.

22        MR. PICO:  May I have a moment, Your Honor?

23        THE COURT:  Yes.  Do you have the originals?

24        MR. PICO:  I believe those are all I have.  The

25   originals may be here to the extent that we have them.  I

1    believe these are copies, and copies are permitted under the

2    Federal Rules of Evidence.

3              THE COURT:  Well, I know, but at some point I'm going

4    to need the originals in the file.

5              MR. PICO:  We can -- we can get them for you, Your

6    Honor.  I do not have the originals.  I -- I prefer to keep

7    those with the National Park Service or the original

8    custodians, but we can get them for you.

9              THE COURT:  But we may need them.

10             MR. PICO:  Okay.

11             THE COURT:  I just -- I just want to make sure that we

12   have them.

13             MR. PICO:  I will get them for you.  May I have a

14   moment, Your Honor?

15             THE COURT:  Yes.

16             MR. PICO:  No further questions, Your Honor.

17             THE COURT:  Do you have any other witnesses after

18   Mr. Miller?

19             MR. PICO:  No, we'll be resting.

20             THE COURT:  And do you have any witnesses, Ms. Rebsom?

21             MS. REBSOM:  No witnesses.

22             THE COURT:  Why don't we take a lunch break now and

23   reconvene at let's say 1:15.

24             MS. REBSOM:  Okay.

25             THE COURT:  Do you want to have some time or do you

1    want to cross-examine him now or do you want to wait?  I would

2    just as soon wait, but that's --

3              MS. REBSOM:  It's whatever the Court wants to do.  I

4    can -- we can take a lunch hour and be back at 1:15.

5              THE COURT:  Okay.

6              MS. REBSOM:  I don't believe my cross will be too

7    long, but . . .

8              THE COURT:  Okay.

9              MS. REBSOM:  Okay.

10             MR. PICO:  Your Honor, based on counsel's

11   representations, the witnesses can all be excused since the

12   defendant will not be calling any witnesses.

13             THE COURT:  Is that correct, Ms. Rebsom?

14             MS. REBSOM:  Correct.

15             THE COURT:  All right.  They can be excused.

16             MR. PICO:  Thank you, Your Honor.

17             THE COURT:  And we will adjourn until 1:15.

18             COURTROOM CLERK:  All rise.

19        (Recess taken.)

20             COURTROOM CLERK:  All rise.  The United States

21   District Court for the District of Wyoming in Yellowstone

22   National Park is now in session.

23             THE COURT:  Be seated, please.  We are back on the

24   record in the U. S. versus Jack Parrent.  Ranger Russell Miller

25   is on the stand, and Ms. Rebsom, you may examine the witness.

1          MS. REBSOM:  Thank you.

2                        CROSS-EXAMINATION

3    Q.  (BY MS. REBSOM)  So, Ranger Miller, can you tell me what

4    Henry's law is and how that relates to the Intoxilyzer?

5          THE COURT:  I'm sorry, what was -- what law?

6          MS. REBSOM:  Henry's law.

7    A.  I just -- I cannot answer that in completeness.  I know it

8    has to do with the exchanges of gases and stuff, but no, I

9    cannot.

10   Q.  (BY MS. REBSOM)  Do you know how the Intoxilyzer 8000

11   measures blood alcohol?

12   A.  I do not know the intricacies of the instrumentation, no.

13   Q.  Do you know when the Intoxilyzer 8000 was created?

14   A.  No.

15   Q.  How long have you been utilizing the Intoxilyzer 8000?

16   A.  About four or five years.

17   Q.  Now, when Mr. Parrent was in the Mammoth station, did you

18   read him his consent advisory?

19   A.  No.

20   Q.  So you didn't tell Mr. Parrent that he had a right to

21   refuse the Intoxilyzer?

22   A.  No.

23   Q.  And with the Intoxilyzer 8000 is there a solution used for

24   calibrating that on a monthly basis?

25   A.  No.

1   Q.  So how is it calibrated on a monthly basis?

2   A.  It's a dry gas calibration.  It's a gas that's contained in

3   a compressed bottle.

4   Q.  And what -- what gas is used?

5   A.  It's a -- it's a standardized gas that has a known

6   concentration.

7   Q.  And what is the known concentration?

8   A.  .08.

9   Q.  And where do you order that dry gas from?

10  A.  From CMI.

11  Q.  What's CMI?

12  A.  It's the name of the company that manufactures the

13  Intoxilyzer 8000 and -- and sells the support supplies for it.

14  Q.  Do you know if that gas is tested by any laboratory before

15  it's shipped out for testing?

16  A.  I -- I don't know.

17  Q.  Do you know what the margin of error on the Intoxilyzer

18  8000 is?

19  A.  No.

20  Q.  Do you know how the Intoxilyzer 8000 differs from the

21  Intoxilyzer 5000?

22  A.  It -- mechanically and instrumentally -- I've used both,

23  but --

24  Q.  Okay.  So how do they operate differently?

25  A.  They have different menu systems and things like that to

1   follow, but the procedure is similar.

2   Q.  And why is it that there's two breath samples provided on

3   an Intoxilyzer 8000?

4   A.  That's due to the Montana state protocol.

5   Q.  What's the federal protocol?

6   A.  I don't know that there is one.

7   Q.  And who did the monthly calibration tests on this

8   Intoxilyzer?

9   A.  Mostly Joe Bueter.

10  Q.  Do you ever do the monthly tests on the Intoxilyzer?

11  A.  Yes.

12  Q.  Now, you had mentioned something on direct examination,

13  Ranger Miller.  You had said that Ranger Shan (sic) had told

14  you that he started his deprivation time at 8:00 that morning;

15  is that correct?

16  A.  That's my memory of it, yes.

17  Q.  Were you aware that Mr. Parrent had been given water to

18  drink between the time he was taken from the bus area where he

19  was arrested until -- between the time he left there and got to

20  Mammoth to you?

21  A.  No.

22          MS. REBSOM:  Judge, I don't have any other questions.

23          THE COURT:  Any redirect, Mr. Pico?

24                       REDIRECT EXAMINATION

25  Q.  (BY MR. PICO)  What's the deprivation time?

1  A.  Deprivation time is 20 minutes.

2  Q.  And when was the first time of the two tests administered?

3  A.  0947.

4  Q.  So 0920 -- at 9:27 would've been the start of the

5  deprivation period?

6  A.  Yes.

7  Q.  Was he in your presence during that period of time?

8  A.  I believe he -- at that time he would've been outside in

9  the patrol car while I was conducting the test on the other

10 subject.

11       MR. PICO:  Okay.  Good enough.  No further questions,

12 Your Honor.

13       THE COURT:  Recross?

14       MS. REBSOM:  No cross, Judge.  However, I did talk to

15 the Government that I was going to call Ranger Shan (sic) back

16 to the stand and ask him just a couple of questions after

17 Mr. -- Ranger Miller is excused.

18       THE COURT:  You may be excused.  Counsel want him to

19 hang around to be recalled?

20       MR. PICO:  That's not necessary for me.

21       MS. REBSOM:  No, Judge.  That's fine.

22       THE COURT:  All right.  You may be excused, Ranger

23 Miller.

24       THE WITNESS:  Thank you.

25       MR. PICO:  Judge, I want to make sure all of our

1   exhibits, I believe, have been admitted into evidence, Exhibit

2   2 -- Government Exhibit 2, 3, 4, 5 and 6, and if that is the

3   case, the United States rests.

4           THE COURT:  2, 3, 4, 5 and 6 have been admitted.  The

5   Government's rested its case.  Ms. Rebsom, it's your turn.

6           MS. REBSOM:  Thank you, Judge.  One small point at

7   this juncture, Judge.  Because Ranger Miller testified that he

8   did not read Mr. Parrent the Implied Consent Advisory with his

9   right to refuse the Intoxilyzer, I would ask the Court to

10  disregard any blood alcohol level from the Intoxilyzer 8000.

11          THE COURT:  Mr. Pico.

12          MR. PICO:  Thank you, Your Honor.  As the Court is

13  aware and this Court has held on previous occasions, when a

14  individual comes into the Yellowstone National Park, by statute

15  Congress has indicated that they consent to do a blood, breath,

16  urine, whatever kind of test is appropriate in a drug -- a drug

17  or an alcohol kind of case for drunk driving or driving while

18  under the influence of narcotics.  That statute is found at

19  Title 18 United States Code Section 3118.  They have consented,

20  and there is no need for them to be told that they have a right

21  to refuse because they have consented by virtue of their

22  presence being in Yellowstone National Park or any other area

23  of federal jurisdiction.

24          THE COURT:  Ms. Rebsom.

25          MS. REBSOM:  Thank you, Judge.  While it is true that

1   people that have a driver's license do consent to have their

2   blood or breath taken upon request of an officer; however, that

3   Implied Consent Advisory must be given to the suspect before a

4   test is administered.  That advisory indicates to the suspect

5   that they have a -- that if they do refuse that their license

6   is suspended, and if they want to fight that action in a

7   district court, then they can do so.  And so it's pretty clear

8   that officers are required to read that Implied Consent

9   Advisory and let the person know that if they refuse, their

10  license is suspended, but they can petition that action in a

11  district court or they can provide the breath sample.  That

12  right has to be given to individuals before they submit to a

13  breath test.

14          MR. PICO:  That's Wyoming law, Judge.  It's not

15  federal law.  I believe Subsection (b), 18 U.S.C. Section 3118

16  provides that if an individual refuses to give, then his

17  driving privileges are suspended in the federal enclave.  For

18  example, if he had refused, he would've been suspended here in

19  Yellowstone National Park.

20      (Pause.)

21          THE COURT:  I see absolutely nothing in 3118 which

22  says that an officer must give the consent warning or obtain

23  consent from a defendant.  "Whoever operates a motor vehicle in

24  the special maritime and territorial jurisdiction of the United

25  States consents thereby to a chemical test or tests of such

1   person's blood, breath or urine if arrested for any offense

2   arising from such person's driving while under the influence of

3   drugs or alcohol in such jurisdiction."

4            MS. REBSOM:  Yes, Judge, and I guess I would argue

5   that it indicates that a person that consents can be used in

6   that jurisdiction the result indicating that the Implied

7   Consent Advisory has to be read to that person for them to

8   provide consent.

9            THE COURT:  What implied consent?

10           MS. REBSOM:  The Implied Consent Advisory that goes

11  with the Intoxilyzer 8000 that officers read to every suspect

12  before they have them provide a breath sample.

13           THE COURT:  That's not what the law says.

14           MS. REBSOM:  Well, I -- I believe that that's the law,

15  and I didn't know that that was going to be the case.  I had no

16  idea until just now that he didn't read him the Implied Consent

17  Advisory.

18           THE COURT:  Well, I don't think he has to.  Just

19  because it's on the wall next to it doesn't mean he has to read

20  it, does it?

21           MS. REBSOM:  It's not on the wall, Judge.  It's a form

22  that each individual person has to be read and provided it to

23  because --

24           THE COURT:  Who says that it has to be read?

25           MS. REBSOM:  Well, I'm sure the federal government has

1   a rule, but I know that all states do as well, including

2   Wyoming and Montana.

3            THE COURT:  But that's not what the law says.

4            MS. REBSOM:  Well, then I'd like to research, you

5   know, other, you know, not just the code --

6            THE COURT:  All right.  I'll give you three days.

7            MS. REBSOM:  Thank you.

8            THE COURT:  I'll give you until next Monday, and then

9   I'll give Mr. Pico three days after that.

10           MS. REBSOM:  Thank you.

11           THE COURT:  Okay.  Where were we?  No redirect.

12   Recross?

13           MS. REBSOM:  No, Judge.  Since the Government has

14   rested, I'd like to call Ranger Shan (sic) back to the stand.

15           THE COURT:  Ranger Chan?

16           MS. REBSOM:  I'm sorry, it's Chan.

17           THE COURT:  And, Ranger Chan, you understand you're

18   still under oath?

19           THE WITNESS:  Yes, sir.

20                        BRIAN GEORGE CHAN,

21   called for examination by the Defendant, being previously

22   sworn, on his oath testified as follows:

23                        DIRECT EXAMINATION

24   Q.  (BY MS. REBSOM)  Okay.  Ranger Chan, you recall being back

25   at the scene where you guys approached the busses that were

1  already stopped, correct?

2  A.  Yes, I do.

3  Q.  Okay.  And do you recall before you took Mr. Parrent from

4  the scene that you had him get back into the Karst Stage bus

5  and start the engine, correct?

6  A.  That's correct.  I can explain that if you'd like.

7  Q.  And then Officer -- or, Ranger Chan, do you recall when you

8  had stopped then later and let -- and handcuffed Mr. Parrent,

9  and do you recall allowing him to consume some water at that

10  time?

11  A.  Yes, I did.

12  Q.  And where was it that you guys stopped to handcuff

13  Mr. Parrent?

14  A.  We call it the Fisherman's Pullout.  It's a paved pullout

15  just east of Lamar Canyon, west of where the busses were

16  parked.

17  Q.  Okay.  And how far is that from the Mammoth station where

18  the Intoxilyzer is?

19  A.  Approximately -- under 30 miles.

20  Q.  Could it be less than 20 minutes from the station here at

21  Mammoth?

22  A.  Drive time?

23  Q.  Mm-hmm.

24  A.  No.  No, not going the speed limit.

25          MS. REBSOM:  Okay.  Thank you.  Nothing further.

 1            THE COURT:  Mr. Pico.

 2                        CROSS-EXAMINATION

 3   Q.  (BY MR. PICO)  Why did you have him get back in the bus and

 4   start the bus?

 5   A.  The temperature was cold.  We were trying to make

 6   arrangements for the students to be transported with different

 7   drivers, and the bus was not running and did not have the

 8   heater, so they asked us if there was any way that we could get

 9   the bus started to heat it up.  No one else knew how to start

10   the bus, so I asked Mr. Parrent while we were getting his

11   personal effects if he would start the bus to turn the heater

12   on.  He tried to -- I had him try to explain to me how to do

13   it.  He said, "Oh, it would be easier if I, you know, do it,"

14   and I permitted him to start the bus to get the heater going

15   for the students.

16            THE COURT:  Anything else?

17            MS. REBSOM:  Nothing further.

18            THE COURT:  Defense rests?

19            MS. REBSOM:  The defense rests.

20            THE COURT:  All right.  Closing argument, Mr. Pico.

21            MR. PICO:  Thank you, Your Honor.  I believe the

22   United States has shown by proof beyond a reasonable doubt that

23   the defendant obviously had a detectable amount of alcohol in

24   his system at the time he was operating a bus within the

25   exterior boundaries of Yellowstone National Park; that the

1    defendant was above a .08 in terms of his either breath or

2    blood levels, breath level obviously in this case, for a

3    violation of the regulation charging him with driving while

4    under the influence of alcohol under 4.23(a)(2).

5         With respect to the first count of driving -- his

6    inability to drive safely, we have presented the testimony of

7    Ranger Amanda Wilson, who saw him cross the center line as well

8    as the fog line.  We believe that that's sufficient evidence to

9    show that he could not operate safely.

10        It's obvious that the rangers did not, particularly

11   Ranger Wilson, did not make an immediate stop of the bus at the

12   time the information -- or with the information that she had.

13   I believe that was prudent police officer actions taken on her

14   part as well as by Ranger Chan.

15        The fact of the matter is that fortunately Mr. Parrent

16   was not driving the entire bus in the opposite lane of travel

17   based on her observations.  The children on the bus were not in

18   immediate danger, but there was an obvious concern about

19   getting this bus stopped so that they can conclude their

20   investigation.  They had some information obviously from

21   Mr. Newman, who fortunately did call in.  Were it not for

22   Mr. Newman, we would not even be here today.

23        But the fact of the matter is is that given the

24   information that the rangers had, I think if they had made a

25   stop, then there would be a whole bunch of challenges, you

U.S. v. PARRENT          CLOSING ARGUMENTS          2:11MJ100

133

1    know, based on, well, could they have stopped, et cetera,

2    et cetera.  But obviously there was no imminent danger as I've

3    described it with the bus running off the road.  But there were

4    indications that Mr. Parrent could not safely operate this bus

5    at that time, particularly with respect to his blood alcohol

6    content, the observations of Ranger Amanda Wilson showing that

7    he did cross the center line three times and did go beyond the

8    fog line as well.

9            Given all of the facts and circumstances and the

10   evidence that the United States has presented, we believe that

11   a finding of guilty is appropriate on all three of the charges

12   contained in the Amended Criminal Complaint, Your Honor.  And

13   for that reason, we would ask the Court to so find.  Thank you.

14           THE COURT:  Thank you, Mr. Pico.

15           Ms. Rebsom.

16           MS. REBSOM:  Thank you, Judge.  Your Honor, as to

17   Count I, driving under the influence of alcohol, the Government

18   has failed to meet its burden beyond a reasonable doubt to find

19   Mr. Parrent guilty of that offense.

20           Starting with Mr. Stark that morning at 5:45 a.m. when

21   he approached Mr. Parrent in his room, he testified that he did

22   not detect or smell any alcoholic beverage on Mr. Parrent.

23   Mr. Stark said that there was no alcohol or alcoholic beverage

24   in Mr. Parrent's hotel room.

25           Mr. Newman, who was the desk clerk, testified that he

1    did not see Mr. Parrent after the deputies had taken him up to

2    his room, and he did not see him leave the building, and in

3    fact, while he testified he had some concerns, he didn't

4    contact law enforcement right away.

5          Second of all and probably more importantly is the

6    ranger that got the call and went out looking for the busses

7    didn't stop the busses immediately.  If she had a report that

8    somebody was under the influence of alcohol, she should've

9    stopped the bus immediately.  If we're talking about a

10   60-foot-long, 13-foot-wide bus full of junior high children,

11   that that stop should've been made immediately.  She followed

12   the busses for over 10 miles and approached the driver,

13   Mr. Parrent, after he had stopped the bus.

14         At no time did any of the rangers testify that when

15   they were interacting with Mr. Parrent on the scene that he was

16   under the influence, drunk, or unable to communicate with them

17   in any way.  In fact, they testified that he was very

18   cooperative with them.

19         It's only Ranger Chan that says that he detected a

20   very faint odor of a fruity smell that he says is from prior

21   consuming of alcoholic beverages.  The rangers only testified

22   as to what their actions were, but not one of them said that in

23   their opinion Mr. Parrent was under the influence of alcohol.

24         The ranger that followed the busses didn't detect any

25   bad driving.  She did testify that the bus went over the center

1   line and touched the fog line, which is right there on the

2   shoulder of the road, as we know driving through the park, it's

3   a narrow two-lane highway.  And, Judge, I would submit that

4   driving a big old 6-foot-long -- 60-foot-long bus that's 13

5   feet wide, it's almost impossible to travel on those narrow

6   two-lane highways without touching or crossing the center line

7   or fog line at some point because that would be the safe thing

8   to do in certain circumstances on that highway.

9           I question the blood alcohol in this case, and I do so

10  for a couple of reasons.  First of all, the PBT.  Ranger Chan

11  testified that he had Mr. Parrent submit to that PBT just after

12  8:00 that morning, but he also testifies that he got to the

13  scene just before 8:00 that morning, so we know that the

14  20-minute deprivation period was not completed, and I would ask

15  the Court to not even consider the PBT result from Mr. Parrent.

16          I also have some concerns about the officer's ability

17  to correctly utilize the PBT as the deprivation period wasn't

18  maintained, and also having another individual blow directly

19  afterward gives me concerns about if the officer actually knows

20  how to operate the PBT appropriately.

21          The fact that Ranger Miller did not provide my client

22  with the Implied Consent Advisory, and I thank the Court for

23  allowing me a couple of days to find the federal rule and brief

24  this, I would ask the Court not to consider that alcohol

25  concentration level, which then does not meet the Government's

1  burden of proof in the per se violation operating a motor

2  vehicle with an alcohol concentration of 0.08 or a detectable

3  presence of a person operating a commercial vehicle.

4          Based on the Government's limited evidence here and

5  the fact that no officer stated that Mr. Parrent was under the

6  influence of alcohol when they saw him on June 3rd, 2011, I

7  would ask the Court to find him not guilty of all three charges

8  based on the testimony and based on the fact that my client

9  wasn't provided the Implied Consent Advisory.  And we don't

10 even know for sure if that deprivation time from the time that

11 Mr. Parrent had consumed some water till the time he got to the

12 Mammoth jail was the appropriate deprivation period.  Thank

13 you.

14          THE COURT:  Thank you, Ms. Rebsom.

15          Any rebuttal, Mr. Pico?

16          MR. PICO:  Just briefly.  I believe that Ranger Chan

17 last testified that the -- he gave him some water at the

18 time -- gave Mr. Parrent some water at the time that the cuffs

19 or just before the cuffs were put on, and Ranger Chan testified

20 that it was more than a 20-minute drive from that point to

21 Mammoth, and so the deprivation time for the Intoxilyzer was

22 met.

23          In addition, Ranger Chan, I believe, testified on

24 direct that the -- there was a deprivation time for the

25 portable breath test, and he thought that it had been met at

U.S. v. PARRENT                                                    2:11MJ100

137

1    that time.  I'm sure if the Court will check its notes it will

2    find that.  Thank you, Your Honor.  That's all I have.

3              THE COURT:  Mr. Pico, you're going to -- you're going

4    to be gone next week, as I understand it.  Will you have enough

5    time to respond to Ms. Rebsom's --

6              MR. PICO:  Yes, I'll make a point of responding.

7              THE COURT:  I don't expect a 20-page brief on this.  A

8    few pages ought to take care of it.

9              MS. REBSOM:  Of course, Judge.

10             MR. PICO:  That's fine.

11             THE COURT:  So it should be fairly brief.

12             MR. PICO:  Yes.  We'll do that.

13             THE COURT:  Okay.  Thank you.

14             MR. PICO:  Thank you, Your Honor.

15             THE COURT:  Anything else?

16             MS. REBSOM:  Nothing further.

17             THE COURT:  All right.  The Court will take this under

18   advisement subject to the briefs of the parties, and we will

19   render a decision as soon as possible.

20             MS. REBSOM:  Thank you.

21             THE COURT:  If there is nothing further, court is

22   adjourned.

23             COURTROOM CLERK:  All rise.

24

25                              --oOo--

138

1                                C E R T I F I C A T E

2

3

4            I, LORI ARNOLD, a Registered Merit Reporter, do hereby

5    certify that the foregoing is a correct transcript from the

6    official recording of the proceedings in the above-entitled

7    matter.

8            Dated this 29th day of March, 2012.

9

10

11

12                                      /s/ Lori Arnold

13                                  _____
                                         LORI ARNOLD
14                                  Registered Merit Reporter

15

16

17

18

19

20

21

22

23

24

25