1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF WYOMING

3    ------------------------------------------------------------

4    UNITED STATES OF AMERICA,

5                    Plaintiff,          Case No. 2:11MJ100

6          vs.                          Yellowstone National Park,
                                         Wyoming
7                                        January 31, 2012
     JACK KANE PARRENT JR.,

8                    Defendant.

9    ------------------------------------------------------------

10

11           TRANSCRIPT OF RECORDED SENTENCING PROCEEDINGS

12              BEFORE THE HONORABLE STEPHEN E. COLE
                      UNITED STATES MAGISTRATE

13

14   APPEARANCES:

15   For the Plaintiff:        MR. LELAND F. PICO
                               Assistant U. S. Attorney
16                             MR. SAM QIU
                               Intern
17                             Yellowstone Justice Center
                               P. O. Box 703
18                             Yellowstone National Park, WY  82190

19
     For the Defendant:        MS. JAMI REBSOM
20                             Attorney at Law
                               320 N. Main Street
21                             Livingston, MT  59047

22

23   Proceedings recorded by electronic sound recording

24   Transcript produced by New Life Transcription Service,
     5023 East Villa Circle, Cheyenne, Wyoming, (307) 214-3912
25

1

## I N D E X

2

STATEMENTS                                                    PAGE

3

Mr. Pico                                                         4
4       Ms. Rebsom                                                     21
Mr. Pico                                                        26

5


6

DEFENDANT'S WITNESSES:                                         PAGE

7

GARY MATHEW BROWN
8          Direct - Ms. Rebsom                                      7

9       LAWRENCE LANE KENNEDY
Direct - Ms. Rebsom                                     19

10

JACK KANE PARRENT JR.
11         Statement - Mr. Parrent                                 30

12


13      SENTENCING OF THE COURT                                    32

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          COURTROOM CLERK:  All rise.

3          THE COURT:  Please be seated.  Good morning.  This

4   case is the United States of America versus Jack Kane Parrent

5   Jr.  Mr. Parrent is present in court today with Jami Rebsom,

6   his counsel from Livingston, Montana.  The Government is

7   represented by Assistant United States Attorney Lee Pico.

8          Mr. Parrent entered a plea of guilty (sic) to three

9   charges which were brought before the Court on an Amended

10  Criminal Complaint.  They are all class B misdemeanors.  Count

11  I was knowingly operate a motor vehicle while under the

12  influence of alcohol to a degree that rendered the operator

13  incapable of safe operation.  Count II was knowingly operate a

14  motor vehicle with a blood alcohol content greater than 0.08

15  grams of alcohol per 210 liters of breath.  And Count III was

16  knowingly operate a commercial vehicle while on duty with a

17  detectable amount of alcohol.

18         Mr. Parrent pled not guilty to these charges, and a

19  trial was held on December the 14th of 2011.  Mr. Parrent was

20  subsequently found guilty of Count I and Count III, I believe.

21         MR. PICO:  That's correct.

22         THE COURT:  And Count II was -- I think it was -- it

23  was -- it was dismissed.  So today we are here to sentence

24  Mr. Parrent on Count I and Count III.

25         Mr. Pico, you may go first.

1           MR. PICO:   Thank you, Your Honor.  May it please the

2    Court, Counsel, and Mr. Parrent.

3           Your Honor, the facts in this case have been

4    thoroughly outlined in the Court's Memorandum Opinion.  It is a

5    case that can only be described as egregious.  In the world of

6    DUI cases, to have -- to be, in effect, under the influence of

7    alcohol as determined by Congress, state legislatures and the

8    Department of Interior, recognizing a .08 as being the standard

9    in determining whether one is under the influence of alcohol or

10   not and capable of driving, and then on top of that, to have,

11   in effect, 45 children under your direct responsibility for

12   driving safely, words almost seem to fail in what kind of

13   outrage this -- this sort of behavior brings to one when one

14   considers it, especially those who are parents and have

15   children for which they are responsible, recognizing that the

16   defendant himself had a child that was involved in this case as

17   well.

18          Mr. Parrent sent me a e-mail on June the 5th of last

19   year.  It was a Sunday, and in it not only did he apologize,

20   but he indicated to me that he expected us to hold him

21   accountable.  That day has come.

22          We would ask that the Court sentence Mr. Parrent to

23   jail and to a very, very stiff sentence.  We only -- I

24   recognize that the Court has only a year that it can impose.

25   Under the circumstances, we're asking that the Court also place

1   him on two years of un -- or, rather, supervised probation.  I

2   have spoken with the probation officers in -- federal probation

3   officers in Montana, and they are willing to -- to do so even

4   though these are class B misdemeanors.

5         In some ways I felt that, under the circumstances,

6   there was kind of a -- a lack of charges that I could've

7   brought against Mr. Parrent because this kind of behavior

8   really rises to a felony level rather than just a petty offense

9   or a class B misdemeanor level to go out and do that.

10         In addition, this is a day of reckoning in other

11   respects.  This is the fifth DUI charge that Mr. Parrent has

12   had filed against him.  He was convicted on two of those prior

13   charges, and on two others he simply left the state.  And

14   either because of the busyness of the State's court calendars

15   or whatever the reasons, extradite -- nonextraditable warrants

16   were eventually issued on him for the other two DUI charges,

17   one out of the state of Washington and one out of the state of

18   Colorado in El Paso County.  I think both of those happened in

19   the 1990s, mid-1990s and late 1990s.

20         Mr. Parrent never saw fit to address those, to take

21   responsibility for those, to be, as he put it to me, to be held

22   accountable for those.  He didn't want to.

23         The behavior that he has demonstrated in the past

24   indicates one who has a very, very serious addiction problem,

25   who is in denial about his very actions, who would indeed put

1    and jeopardize the safety of those who were placed in his

2    trust, denying that he was drunk, denying that he didn't get

3    enough sleep, denying that his behavior would in any way have

4    any impact on the students and getting on that bus and picking

5    up those students and driving them in the park while under the

6    influence of alcohol.  Outrageous.  Egregious.

7           And now, to cap it all off, we have a methamphetamine

8    positive test on January 24th.  This is a man who has no

9    control over himself.  He lacks self-mastery.  He is an addict.

10   It does not excuse his behavior.  It simply describes it.  He

11   has had multiple occasions on which to attempt to address those

12   problems, having been called to his attention with the four

13   prior DUI charges, and failed to do so.

14          And now, you know, he gets an evaluation, I'm sure

15   because his attorney encouraged him to get the evaluation, and

16   the fact of the matter is we have somebody who continuously

17   fails to address his problems.

18          On the one hand we recognize that people have problems

19   and diseases.  The alcoholism is, but to fail to address those

20   problems and to be in such profound denial about those

21   problems, that's when it becomes criminal.  And indeed, it was

22   criminal for him to get on that bus, to start it and to drive

23   these children.

24          Accordingly, Your Honor, we ask that you place

25   Mr. Parrent in jail for a significant amount of time.  In the

1   memorandum that I had filed I asked for a year in jail and,

2   again, two years of supervised probation.  We would ask that

3   you ban him from the park as well during that period of time.

4            That's what the United States has, Your Honor.  Thank

5   you.

6            THE COURT:  Thank you, Mr. Pico.

7            Ms. Rebsom.

8            MS. REBSOM:  Thank you, Judge.  Judge, before I argue

9   to the Court, I'd like to call a witness, Gary Brown.

10           THE COURT:  Mr. Brown, would you stand right here and

11   raise your right hand.

12           COURTROOM CLERK:  Do you swear that the testimony

13   you're about to give in the case now before the Court will be

14   the truth, the whole truth and nothing but the truth, so help

15   you God?

16           THE WITNESS:  So help me God, yes.

17           COURTROOM CLERK:  Thank you.

18           MS. REBSOM:  Gary, do you want to take a seat at the

19   witness stand here.

20           THE WITNESS:  Oh, okay.

21                         GARY MATHEW BROWN,

22   called for examination by the Defendant, being first duly

23   sworn, on his oath testified as follows:

24                         DIRECT EXAMINATION

25   Q.  (BY MS. REBSOM)  Gary, can you state and spell your name

1   for the court record, please.

2   A.  My name is Gary Mathew Brown, G-a-r-y, capital M-a-t-h-e-w,

3   B-r-o-w-n.

4   Q.  And where do you live?

5   A.  I currently live in Browning, Montana.

6   Q.  And how do you know Jack Parrent?

7   A.  I am his oldest brother.

8   Q.  You're his oldest brother.  How much older than Jack are

9   you?

10  A.  I -- six years.  Six years.

11  Q.  And tell the Court about the relationship that you have

12  with your younger brother Jack.

13  A.  I have a very strong relationship with him, Your Honor,

14  this court.  Jackie being the youngest of our brothers, you

15  know, we've always encouraged him to be the best man that he

16  can be, and in my opinion, Jackie has done a lot of that.

17         He -- we're all a family of educated people.  I

18  currently have a master's in education, and I'm applying for

19  law school.  I have another brother who is currently at the

20  University of Montana who is also applying to law school, and I

21  know my brother Jack is planning on doing the same thing.

22         One of the things that I really wanted to talk about

23  to the Court today was that Jack has worked very hard all of

24  his life, and he has two grown children from other marriages,

25  and his current wife, Amy, they have three children.  And he

1  has been with her, I believe, for almost 17 years.  And in that

2  time Jackie has proven to the family, to himself and to his

3  wife and children that he's a hard worker.  He's had numerous

4  jobs, being the railroad system, bus driving jobs, he's been --

5  you know, looked for those purposes.  He's been in

6  construction, painting.  He worked with his stepfather for

7  years in carpentry and painting.  So, again, like I said, we've

8  really encouraged, you know, as a family, you know, that Jack

9  become the best man that he can.

10        I wish my grandmother was here today.  She died back

11  in April, and she instilled a lot of things with us children

12  and her grandchildren that honor God first, honor family

13  second, honor yourself third and honor everybody else fourth,

14  you know, and to take that into account in your life and be

15  held accountable.  And I really believe Jackie, myself,

16  everybody in our family, you know, hold to those truths.

17        And one of the other things that I think is real

18  important is that Jackie, out of all the children -- and I

19  refer to him as Jackie just in this family, so excuse me, but

20  one of the other things is that I'd like to share with this

21  Court is that Jackie and Amy were homeowners, and that to me

22  takes on a huge responsibility.

23        THE COURT:  I'm sorry, they were what?

24        THE WITNESS:  Homeowners, and they were living in Cut

25  Bank at that time, and very hard worker, both of them, and

1   raising their children the best way they could, you know.  And

2   they chose, because they like to work with children, they chose

3   to sell their home and attend Montana State University in

4   Bozeman and become teachers.  And I think that really says a

5   lot about the character of Jackie and Amy and the family, the

6   fact that they would walk away from what we all strive to get

7   there for, you know, that they wanted to go back into a school

8   system.  And he would be the last of all of our family members

9   to pursue a degree, which I think really to me is remarkable.

10  Q.  (BY MS. REBSOM)  And how long has Jack been attending

11  college at MSU in Billings?

12  A.  I believe it's been --

13  Q.  Or in Bozeman, sorry.

14  A.  It's been -- I believe it's been three years, and during

15  that whole time he has maintained a high GPA, and in those

16  times he did work, you know, bussing for the -- for the -- for

17  the City of Bozeman.  He was contracted through the Blackfeet

18  Community College in Browning to drive the children -- or I

19  mean the adults to American Indian Higher Education Consortiums

20  on many occasions.  And then he's actually turned down a lot of

21  bus jobs around the state because he's attending school now.

22       And so, you know, I -- I look at my brother, you know,

23  in a way that people are seeking him out, but he's choosing to

24  say no to a lot of things in his life, you know, so he can

25  succeed in school.

USA v. PARRENT                    BROWN - DIRECT                    2:11MJ100

11

1    Q.  And, Mr. Brown, you were with me when I met with Jack this

2    morning before court --

3    A.  Yes.

4    Q.  -- and provided him with a positive test result?

5    A.  Absolutely.

6    Q.  And based on what you know about Jack, how did you respond

7    to that?

8    A.  I'm sorry, I always forget your last name.  I'll call you

9    Jami.

10   Q.  That's fine.

11   A.  Jami, the court, prosecution, and Your Honor, I was

12   outraged.  I was absolutely outraged.  They were handed that

13   today.  My brother has never, ever been on amphetamines.  If

14   anything, it's always been alcohol, okay.

15        And the other thing that I -- that I need to say here

16   is there was a false positive test done back, I think, four or

17   five months ago, and Jackie and his wife Amy were so outraged

18   that they went immediately to the hospital to have the blood

19   taken.  And then they called the PO officer in Helena, and he

20   said, "Drive here and I'll test you."  And so Jack did that and

21   Amy, and so they took off time from school to do all of this

22   and found out that it was not positive.  It was an absolute

23   negative.

24   Q.  It was a false positive?

25   A.  Absolutely.

1          THE COURT:  What were they testing for, sir?

2          THE WITNESS:  Alcohol consumption.

3          THE DEFENDANT:  Everything.

4          THE WITNESS:  Everything, everything.

5          MS. REBSOM:  Everything, it was an eight-panel sub --

6          THE COURT:  What did he test positive for on, then?

7          MS. REBSOM:  I don't think we know because it came

8   back as negative through the lab.

9          UNIDENTIFIED SPEAKER:  (Inaudible) said it was

10  positive.

11         THE DEFENDANT:  It was a field test, ten -- or

12  eight-panel field test, and it -- the person reading it said it

13  was positive.

14         THE COURT:  For what?

15         THE DEFENDANT:  He didn't say.  He just said positive.

16         MS. REBSOM:  And -- okay.

17  Q.  (BY MS. REBSOM)  And so, Mr. Brown, at that point you knew

18  that Mr. Parrent was submitting to Breathalyzers and eight-

19  panel UAs in Bozeman at the prerelease center, correct?

20  A.  Absolutely.

21  Q.  Okay.  And you testified that when he found out, he went to

22  the hospital for a blood test and then also drove to Helena to

23  his probation officer to have another test?

24  A.  Yes.

25  Q.  And that test -- those two tests came out negative for any

1    kind of alcohol or drugs, correct?

2    A.   Absolutely.  And can I say something else?

3    Q.   Yes, what else would you like the Court to know?

4    A.   There's a few other things I'd like to address to the Court

5    about this positive that came through.  What I find alarming is

6    that had Jackie been told immediately on the 24th that when he

7    took this test, I know them, they would've went right to the

8    hospital and they would've went back to Helena, and I'm

9    absolutely positive for sure that it would've come back as a

10   false positive and it would've turned out negative.

11          Jackie has been put on probation seven months ago, and

12   he's complied with everything that the Court has asked, and he

13   attends AA, and he goes in and does his UAs, and he's been also

14   told that he can't go to certain things, but he was allowed to

15   go to Browning to attend his grandmother's funeral.  He was

16   allowed to go there and do the Indian celebration, and there

17   was other times that he was able to leave the county here.

18          You know, it is my opinion and the way I see things is

19   that if there was any opportunity for Jackie to use alcohol, it

20   would've been those times, but he didn't.  You know, he made a

21   conscious choice that he was not going to hurt himself in any

22   way, and he was gonna honor this Court and, you know, to comply

23   with that.

24          I find it absolutely horrible and I'm disgusted with

25   the fact that the day before, I mean, this immediate day that

1   this form comes back and we all know that it is a false

2   positive, but there's no way for us to rebut that because it's

3   on black and white.

4   Q.  And is there anything else, Mr. Brown, that you'd like the

5   Court to know?

6   A.  Yes, and this is not implied to hurt Jackie in any way.  I

7   sat here with my family during five and a half hours during

8   Jack's first appearance in front of you, Your Honor, and I

9   heard so many discrepancies.

10  Q.  Was this you mean the trial, December 14th?

11  A.  Yes, December 14th.  I heard so many discrepancies.

12  Prosecution brought a lot of people to the stand, and to me,

13  knowing what I do know and it's something about the law and

14  that I read a lot, is the discrepancies was the calibration,

15  and you proved that to me, Jami.  I really believe the

16  calibration thing was proven that there was a lot of

17  mishandling.

18       Also, the prosecution had mentioned about the children

19  being in danger, and it was brought out to the fact that why

20  did the female ranger continually go around and pass Jack, and

21  it was the lead bus driver, and, you know, why wasn't he

22  stopped right there at the very beginning if there was such a

23  fear, you know.

24       The other thing that I find alarming or puzzling, I

25  should say puzzling is there were chaperones on the bus and in

1    cars.  Why was not one of them brought to the stand against

2    Jackie?  You know, and that's a rhetorical question that I'm

3    throwing out to the Court, you know.  I believe that they

4    didn't see him as being impaired.

5              And I had also heard that the female ranger said that

6    she looked in her rearview fog mirror and saw that bus,

7    60-foot-long bus by 15 going 2 inches over the center line.  I

8    found that alarming because she was not looking where she was

9    driving.  And when I left here, and I'm in my car, I'm looking

10   in my rearview mirror, and you don't dare, you look straight

11   ahead because it's so narrow.  You know, and you're riding --

12   you're driving a huge bus, you know, who's not gonna go over a

13   center line?  You know, I've done it many a time, you know,

14   coming up -- even today coming up here, you know, taking in the

15   sights but being very careful.

16   Q.  And is that because the road is very narrow and windy?

17   A.  Very, very narrow and windy, and -- and a lot of traffic, a

18   lot of traffic, you know.

19             The other thing is that I needed to say, and I really

20   feel compelled to, is Jack was never pulled over.  He pulled

21   over to let the children get out of the bus and to view

22   buffalo, and then the rangers approached him then.

23             Another thing that I found puzzling is why did they

24   just approach Jack Parrent?  Why -- why did they not approach

25   Mr. Stark?  You know, and so for me there was a lot of pointing

1   fingers.  I thought you did a great job, and I read -- I also

2   read what you had written, Your Honor, and I questioned that,

3   too, because there's a lot of interpretation of the law.  I was

4   always under the impression that -- that it's black and white,

5   fact or not fact.  And I really felt that there was a lot of

6   stuff proven here that a lot of people did a lot of things

7   wrong.

8        I do know the supervisor of those rangers went back to

9   work, and they were told how to do things properly from this

10  case.  I really believe that's what happened.  I don't know,

11  but I would trust that they did because there was, in my

12  opinion, there was too many discrepancies.

13  Q.  And any final words for the Court?

14  A.  Your Honor, I know you have a real big job ahead of you

15  right now.  It's been a media frenzy, and there's a lot of

16  people looking at you right now, and there's a lot of people

17  that are waiting to see what you're gonna do.  And I hope and

18  pray that you can look -- look at that and keep that away from

19  the court system in your sentencing because I really believe

20  that every one of us in this court, and yourself included, we

21  have made mistakes.  As my grandmother would say, there's

22  skeletons in everybody's closet.

23       And so my hope is that, you know, given what I have

24  told you that Jackie is doing the best job that he can with his

25  family, that he's had seven months of sobriety, he's doing

1    everything that possibly that could please this Court, he has

2    chosen to switch his career because of the smearing of his name

3    throughout the state of Montana, that, you know, whatever this

4    Court finds is that he won't be able to work with kids.

5            The other thing, Your Honor, is that I believe in my

6    heart that Jackie is a good man.  You know, we've heard a lot

7    of bad things about Jack, a lot of smearing in the media.  You

8    know, it's on Facebook, it's everywhere.  And I think I've only

9    seen Mr. Stark's name once and his face in the paper.

10            And, you know, Jack, you know, the prosecution said

11    they wanted him to be banned from federal land.  You know,

12    Jackie is a Native American, and he has every right to be on

13    federal land.  And the only reason why I bring that up is that

14    we find a lot -- and this is why I'm going into law is that we

15    find a lot of the people that are incarcerated are Native

16    American, high rate, and I can't remember the percentage here

17    in the state of Montana, and I'm sure you're probably aware of

18    it, but you know, the injustice that's sitting there.  And a

19    lot of our people, including our family, don't have money to

20    hire, you know, high-profile lawyers.

21            But I was -- I felt very, very honored and thought

22    Ms. Jami here did a fantastic job, and I say that because I

23    believe that, you know, in walking out of this courtroom, I

24    thought the judge really has a lot on his plate today, and you

25    had a lot of stuff to read.  And I hope and pray that you took

1   those things into account, you know, that Jackie is a good guy,

2   he's a good man, he's a good father, he's an excellent student.

3   He's got a year to go.  He's planning on going into law, so

4   actually he's gotta be doing the regular school plus his last

5   year applying to law school, and so I really believe that he

6   has really abided by what you asked him for.

7            And I would ask you to please take in all that into

8   account and to give him a lenient sentence.  My hope is is that

9   you allow him to continue on with school so he can finish.  I

10  don't know if that's possible, but that's what I would like to

11  ask.

12           Also, the probation, I'm totally for that, you know,

13  give him probation.  I don't care how long, you know, just

14  allow him the opportunity to finish school.

15           I hope I haven't hurt Jackie in any way by sharing

16  what I've shared here.  You know, my hope is is that you'll

17  please take into account I'm his oldest brother, of course

18  you're gonna hear everything nice about Jack Parrent now, you

19  know, but I do know Jackie has made some mistakes in his past,

20  you know.  And we all eventually have to look at what we've

21  done.  But I also believe, too, that this Court needs to be

22  really truly fair with Jack.  And that's all I gotta say.

23           MS. REBSOM:  All right.  Thank you, Mr. Brown.

24           THE WITNESS:  You bet.

25           THE COURT:  Thank you, Mr. Brown.

19

1          MS. REBSOM:  If you'll just stay seated.

2          THE WITNESS:  Thank you.

3          MS. REBSOM:  You don't have any questions?

4          MR. PICO:  No.

5          MS. REBSOM:  Yeah, you'll be able to speak.  Would you

6    like to?

7          Your Honor, I have one more witness, Jack's father.

8          THE COURT:  Would you come forward, please.  Raise

9    your right hand.

10          COURTROOM CLERK:  Do you swear that the testimony

11   you're about to give in the case now before the Court will be

12   the truth, the whole truth and nothing but the truth, so help

13   you God?

14          THE WITNESS:  I do.

15          COURTROOM CLERK:  Thank you.

16          THE COURT:  Would you take the stand, please, over

17   here.

18                          LAWRENCE LANE KENNEDY,

19   called for examination by the Defendant, being first duly

20   sworn, on his oath testified as follows:

21                          DIRECT EXAMINATION

22   Q.  (BY MS. REBSOM)  Mr. Kennedy, can you state and spell your

23   name for the record, please.

24   A.  My name is Lawrence Lane Kennedy, L-a-w-r-e-n-c-e, L-a-n-e,

25   K-e-n-n-e-d-y.

1   Q.   And, Mr. Kennedy, where do you reside?

2   A.   In Browning, Montana.  I ranch between Browning and Cut

3   Bank.

4   Q.   And how do you know Jack Parrent?

5   A.   Jack Parrent is my stepson.  I -- I met Jack Parrent when

6   he was a little boy, and he's not only my stepson, he's one of

7   my best friends.  I raised Jackie to be a man of integrity.

8   And he did.  He meets those goals.

9           And it all began in school about his school work, for

10  instance.  From the kindergarten through his graduation out of

11  the -- the high school, he was an A student, never anything but

12  that except one time.  He come home crying because he had a B

13  plus, and I asked him what he's gonna do about it, and he said,

14  "I'm gonna work harder."  I knew then that he was gonna be the

15  person I expected, a man of integrity.  He proved it by the

16  work that he performed for different ones.  He worked for me

17  for about 15 years.  I never had a better employee.  Never

18  missed work.

19  Q.   What kind of work did he perform for you?

20  A.   Painting, carpentry, drywall and all of the construction --

21  construction work.  It was kind of hard to be a stepfather.  I

22  have three stepboys.  He's the youngest, and lo and behold,

23  they all love me, and I love all of them.  That doesn't happen

24  too often, but I do believe it's the way that his mother and I

25  raised him.

1          And I just wanted this Court to know that in my heart

2    that he is a man of integrity.  He did not do anything

3    intentionally.  How many times that people will go out to a

4    celebration, maybe a wedding, a funeral, I don't care what

5    kind, have a few drinks, go to bed, get up the next morning and

6    go to work?  And that's exactly what he did.

7          MS. REBSOM:  Thank you, Mr. Kennedy.

8          THE WITNESS:  You're welcome.

9          THE COURT:  Any questions?

10          MR. PICO:  No.

11          THE COURT:  You may step down.

12          THE WITNESS:  Thank you, sir.

13          MS. REBSOM:  And, Judge, before my client makes a

14    statement to the Court, I'd like to share with the Court a

15    couple of arguments that I have.  The Government tells you

16    today that this is an outrageous and egregious offense, and

17    that is what has been acknowledged in the newspapers from Day

18    One, which has completely affected my client's life, his

19    college career, how people have treated him.

20          But at trial, if you recall, Judge, on December 14th,

21    after all of the evidence was submitted and the Government's

22    closing argument, the Government acknowledged at that point

23    that this was not an imminent danger, and the Government at

24    that time was responding to why the ranger had followed the

25    Karst Stage busses for over 10 miles without pulling them over.

1   And the Government said this was not an imminent danger.

2          And I submit, Your Honor, that, based on the evidence

3   at trial, it was not an egregious, imminent danger even as the

4   Government would acknowledge.  There was no erratic driving.

5   The ranger did not pull over Mr. Parrent.  After they

6   approached him, Mr. Parrent was cooperative.  There was some

7   discrepancy about whether or not they asked him to do field

8   sobriety maneuvers, but anything they asked of him he did was

9   our testimony.

10         My client is a 45-year-old Native American, a member

11  of the Blackfoot tribe.  He is a senior at Montana State

12  University in Bozeman.  He has three young children, two grown

13  children and a wife.

14         Mr. Parrent had been on supervised probation from the

15  day that he appeared in court with me seven months ago, and as

16  you've heard, he has been submitting to random tests, at least

17  up to five random tests, breath tests and urine analysis in the

18  last seven months.

19         You heard his brother testify that the first test came

20  back positive, and we don't know what for because typically, in

21  my experience, Judge, when a person is submitting to a urine

22  analysis at the prerelease center in Bozeman, that person who

23  is doing the evaluation will use a dip stick tester to do like

24  a field test to determine if the urine is positive for any

25  alcohol or drug eight-panel test.  If it is, usually the person

1  being UAed or the person conducting the test would send it off

2  to the lab for further analysis, which is what was completed

3  with that first test that came back positive for whatever we

4  don't even know.  And when that came back from the lab as

5  negative, it was a false positive.

6          Mr. Parrent then submitted to several more UAs and

7  breath tests at the pretrial -- the prerelease center there in

8  Gallatin County in Bozeman, and none of them were positive.

9          My concern is on this last test that was submitted by

10  Mr. Parrent on January 24th that why wouldn't they have done

11  the standard field test to let my client know if that urine was

12  gonna test positive for anything.  I find it quite suspicious

13  because I've never known anybody not to do that initial field

14  test.  So apparently they didn't even do a field test.  They

15  sent it directly to the lab.  It wasn't analyzed, I believe,

16  until the 28th, and the report was just submitted yesterday,

17  and I got ahold of that report this morning when I got to the

18  courthouse.

19          My client disputes that test being positive for

20  methamphetamine.  As his brother even testified, Mr. Parrent

21  has had problems with alcohol but never with any kind of drug,

22  certainly not methamphetamine, and I believe my client will say

23  the same.

24          It's unfortunate at this time that the day of

25  sentencing that we get this report that he is apparently

1   positive for methamphetamine on January 24th when I, of course,

2   don't have time to have that reanalyzed.

3          I also know, Judge, that my client submitted to

4   another urine analysis on I believe it was January 27th, and of

5   course, we don't have any indication of what that lab result

6   would be.

7          I have submitted to the Court several letters in

8   support of my client from some reputable individuals letting

9   the Court know who my client actually is; that he is a good

10  person, a good man who was convicted of a DUI.

11         Now, his criminal record indicates that he,

12  Mr. Parrent, has not had a DUI conviction in over ten years,

13  and while the Government indicates that he has these priors out

14  of -- one out of Washington and one out of Colorado, I would

15  ask the Court not to consider those as I still believe that we

16  have a constitutional right that we are innocent until proven

17  guilty.  And so I want the Court to note that Mr. Parrent had

18  not been convicted of a DUI in over ten years.

19         In August of 2011 Mr. Parrent submitted to an alcohol

20  chemical dependency evaluation with Robert Clarkson out of

21  Livingston, Montana, and I have provided that to the Court.  On

22  page 1 of that evaluation it says Mr. Parrent has a prior

23  diagnosis from the treatment center at Browning, Montana.  He

24  had in the past attended both Level 3.5 care, which is

25  inpatient treatment, and Level 2 care, which is ten hours of

1   outpatient treatment for nine weeks.  It's important to know,

2   Judge, that my client was able to remain sober and alcohol free

3   for a period of seven years.

4          Mr. Clarkson indicated that my client was appropriate

5   and well groomed at the meeting for the evaluation and that he

6   was not under the influence at that time.  Mr. Clarkson

7   indicated that Mr. Parrent is aware of the consequences of the

8   behaviors that led up to the incident, and he was willing to

9   look at changes and ideas to focus on a clean and sober future.

10  Mr. Parrent has been attending AA, and he's in college full

11  time.

12         The evaluator believed that if Mr. Parrent continued

13  on with the AA and clean recovery that it would not be

14  necessary for him to have to do any kind of inpatient

15  treatment.

16         So I would ask the Court to look at Mr. Parrent's

17  behavior since the time that he's been on probation and

18  possibly even excluding this positive methamphetamine test that

19  we can no longer refute at this point because of the timing,

20  and I find it very suspicious, but I would like the Court to

21  take into account that Mr. Parrent is obtaining an education,

22  that he has three small children and a wife to take care of.  I

23  would ask for a very minimal amount of jail time.  Probation

24  should not be a problem for my client.  We do not disagree with

25  probation.  I would ask for any alternative that could punish

1    but yet provide my client with an opportunity to become a

2    productive citizen and continue to be a productive citizen.

3             I know that there are devices that my client can wear,

4    one of which is the SCRAM device.  It's an ankle monitoring

5    bracelet that would detect any alcohol in his system that would

6    ensure the safety of not only my client but anybody in the

7    community.  I'm not sure if the Court has ever considered house

8    arrest, which my client would have to pay for.  Community

9    service, fines, any other opportunity to punish my client but

10   yet give him the opportunity to be a productive citizen that he

11   has been and to take care of his family.

12            And so I would just ask for a minimal amount of jail

13   time, Judge, for my client to continue his educational

14   opportunities and to take care of his family, and there are

15   safeguards that we can use, probation, the SCRAM device, house

16   arrest, community service, fines.  I would just ask that the

17   jail time be minimal and appropriate concerning the fact that

18   this is a first offense DUI conviction in over ten years.

19   Thank you.

20            THE COURT:  Thank you, Ms. Rebsom.

21            Any rebuttal, Mr. Pico?

22            MR. PICO:  Thank you, Your Honor.  With respect to

23   the -- the comments made at trial, particularly my closing

24   argument, the point that I was attempting to make was this:

25   The rangers did not have sufficient probable cause to stop the

1    bus at the time when Ranger Amanda Wilson first spotted the

2    bus.  She had a report from the communications center at that

3    time of a night clerk who was reporting it, and she had called

4    her supervisor, Brian Chan.  As it turned out, Brian Chan

5    eventually contacted -- Ranger Brian Chan eventually contacted

6    the night clerk to confirm everything, and by the time

7    everything had been confirmed, the busses were pulled over.

8            As the Court is well aware, if -- if we had stopped

9    the bus prior to the busses stopping by themselves, there

10   would've been a significant challenge on the basis of probable

11   cause, et cetera, making the stop.  Enough said about that.

12           With respect to the drug test report that came in

13   today, I do not schedule those, and that is totally up to the

14   probation officer.  This is a test that is a confirmation test.

15   This is the final test.  This is not a false positive test as

16   was discussed earlier where something -- some sort of litmus

17   paper or something else is tested and it comes up and the

18   defendant has a chance or calls in or whatever.  This is a test

19   that is sent to the laboratory.

20           If the Court will look in the middle of the page, it

21   indicates "Screening method."  And in the middle it says,

22   "Confirmation method GCMS."  What that stands for is grass --

23   gas chromatograph and the -- I can't remember the -- the other

24   two initials, what they stand for right now, but I -- mass

25   spectrometry, that's what that stands for.  In effect, this

1    substance, the urine in this particular case, is put through a

2    machine called the gas chromatograph mass spectrometry, and it

3    reads out on a computer what substances are contained in that

4    urine.

5         When the probation officer called me this morning and

6    advised me that he had just received this yesterday, I asked

7    him point-blank, "Does it show amphetamines or does it show

8    positive for methamphetamine?"  He told me it shows positive

9    for methamphetamine.

10         If the Court will look down just above the signature

11    of the certifying scientist, it indicates clearly that there is

12    a 92 percent chance that this is, in fact, methamphetamine that

13    is in the urine or that was found in Mr. Parrent.  As to the

14    timing of all of this, it came in when it came in.  That's what

15    it shows, but it is the final timing.

16         The fact that the defendant did not exhibit driving

17    behavior at the time that would give the rangers probable cause

18    to stop him immediately does not in any way lessen the fact

19    that this individual, drinking by himself after his drinking

20    partner and coworker left him, continued to drink.  He blows a

21    .091 at approximately I think it was 9:30 in the morning.

22    Extrapolating backwards to 2:30 in the morning when he -- we

23    can't show that he had anything further to drink beyond 2:30 in

24    the morning, seven hours, that puts him close to a .2 alcohol

25    level.

1        Again, he may very well be a nice family man according

2   to his -- to his family members that you heard testify here,

3   but the fact of the matter is he has a significant alcohol

4   problem.  He continues to have a significant alcohol problem

5   and a substance abuse problem which he denies and does not want

6   to face.

7        Accordingly, it's time for him to face it.  We would

8   ask that you put him in jail, put him in jail for a significant

9   period of time that the Court has available to it and give him

10   supervised probation so that we can make sure that hopefully he

11   will address these issues, and if he doesn't, he will -- high

12   likelihood that he will be found again not addressing these

13   issues and causing further problems for himself and society,

14   and he may face the possibility of jail again.  Thank you, Your

15   Honor.

16        THE COURT:  Thank you, Mr. Pico.

17        MS. REBSOM:  Judge, before my client makes a

18   statement, I would like to point out to the Court on this

19   chemical dependency positive result for methamphetamine that we

20   received this morning --

21        THE COURT:  Excuse me, Ms. Rebsom, because we just did

22   receive it this morning, I'm not gonna pay any attention to it.

23        MS. REBSOM:  Okay.  Wonderful, because it doesn't have

24   a quantitative amount, which I've never seen ever for a chain

25   of custody.

1          THE COURT:  Well, since you didn't get a chance to

2   investigate it, I think it would be only fair for me not to

3   regard it in sentencing.

4          MS. REBSOM:  All right.  Thank you, Judge.  I believe

5   my client would like to make a statement to the Court.

6          THE COURT:  All right.  Mr. Parrent, would you please

7   come forward.  Would you raise your right hand, please.

8          COURTROOM CLERK:  Do you swear that the testimony

9   you're about to give in the case now before the Court will be

10  the truth, the whole truth and nothing but the truth, so help

11  you God?

12         THE DEFENDANT:  I do.

13         COURTROOM CLERK:  Thank you.

14         THE COURT:  Would you take the stand, please,

15  Mr. Parrent.

16                        JACK KANE PARRENT JR.,

17  called for examination by the Defendant, being first duly

18  sworn, on his oath testified as follows:

19                             STATEMENT

20         THE DEFENDANT:  I just want to address the Court and

21  Mr. Pico and -- and you, Your Honor.  Since I started this,

22  I've been put through a lot.  I've been called a drunk bus

23  driver, that's been all that I've heard, and I'm angry at it

24  because nobody's investigated who I am, and I am tired of it.

25         I've given my life to children working in the schools.

1   I've earned a retirement through the schools.  I passed over

2   four different background checks through four different school

3   districts and been able to drive for them, and yes, I've had a

4   drinking problem.  I admit that, I've drank in the past, but

5   I've been fighting that all my life, and I've cleaned that up.

6   And I know who I am.  And I'm just not gonna be called a drunk

7   bus driver again, and you can put me in jail for as long as you

8   want, and I'll never admit to doing wrong for that reason.

9        I was -- I'm educated.  I graduated third in my class

10  in 1985.  I followed the footprints of my father who was in the

11  Marine Corps.  I chose to give up seven scholarships so I could

12  go into the Army instead.  I gave them to my good friend, seven

13  scholarships.  He now has a degree in natural resources.  I

14  went and served this country because I was so proud of my

15  father and what he taught me.  He taught me construction,

16  building.  I know how to build homes.  I can do construction.

17  I can run any type of equipment.  I've also run farm equipment,

18  ranch equipment, and I'm not gonna have my integrity ripped

19  apart any more from you.  I know who I am.

20       And I did say I am sorry for what I did, but I can

21  tell you right now I was not impaired that morning.  Them kids

22  were in no danger.  The chaperones would've told you they were

23  in no danger if somebody would've just made a call to one of

24  them.  I made the mistake the night before.  I helped Mr. Stark

25  celebrate his birthday.  It was his birthday.  I didn't have

USA v. PARRENT                    SENTENCING                    2:11MJ100

32

1   any intentions of going out.  He said he would pay for

2   everything, "Come out with me, I don't want to be alone."

3          In America we have a social norm that we go through of

4   celebrating our birthdays sometimes, and for that I'm sorry and

5   I made a mistake.  I did.  I made a huge mistake.

6          But I'm not gonna let the media and everybody else

7   call me a drunk bus driver again.  I know who I am.  I am 15

8   credits shy of getting my degree in criminology.  I'm going on

9   to law school, and I am gonna be a lawyer.

10          And I really respect what you did for me.  You -- you

11   were outstanding.

12          And I do respect the law, and I do respect this Court,

13   and I respect this flag with all my heart, and I'm not gonna be

14   told that I'm a drunk and I'm in denial.  I'm not in denial.

15          I love you, Mom.  I love you, Dad.  I love you, Jim

16   and Grandma, Brother.  I love you, Amy, and we'll get through

17   this, and we'll be fine.  And you know my kids get up every day

18   and tell me they love me before they walk out that door to get

19   on the school bus, and I'm there for them.  And I thank you for

20   everything you've done, and I'm sorry I put you all through

21   this, I really am.

22          And I'm sorry I put this Court through this.  I really

23   am.  But I salute this flag, and I'm not gonna be called

24   something I'm not anymore.  Thank you, Your Honor.

25          THE COURT:  Thank you, Mr. Parrent.  I think it's

1   quite apparent to me that what we have here is a Jekyll and

2   Hyde situation.  People have got up on the stand and spoken

3   quite highly of you, Mr. Parrent.  I was impressed with the

4   letters that Ms. Rebsom provided me with this morning from good

5   and reputable people who think highly of you.

6          But on the second phase of that, the -- the Mr. Hyde

7   personality, you obviously are an alcoholic.  You say you've

8   been fighting it your whole life.  I can appreciate that.  But

9   I think the people who have testified for you have missed

10  something rather important, and that is that you are an active

11  alcoholic.  You -- you quit drinking for seven years.

12  That's -- that's pretty impressive, but whatever it was, you --

13  you relapsed.

14         You've got two convictions, although they are somewhat

15  in the past.  There's two other charges that Mr. Pico has said

16  the record seems to indicate that you -- you ran out on, that

17  you didn't appear in court like you were supposed to.  And

18  being that they were misdemeanors, there's no extradition for

19  misdemeanors in this country usually, so they just let 'em sit.

20  If you had been convicted on those two charges, that would've

21  been a felony.

22         Furthermore, the -- the charges that you were found

23  guilty of, driving a bus with all those children on board,

24  Count III is knowingly operate a commercial vehicle while on

25  duty with a detectable amount of alcohol, a detectable amount.

USA v. PARRENT                      SENTENCING                      2:11MJ100

34

1    You had more than just a detectable amount.

2            The testimony at the trial was by the deputy sheriff

3    that after the bars had closed you were walking down the street

4    and you threw an empty beer can into the street.  That's not

5    the usual behavior of a sober person.  He gave you a ride to

6    your motel.  You couldn't find a key.  You had all kinds of

7    problems.  The night clerk testified that at 3:30 he could

8    still hear the TV blaring in your room.  A wakeup call didn't

9    wake you up.  The other bus driver at the time you were

10   supposed to start driving your bus was pounding on the door,

11   that didn't wake you up.  They had to go get a key, open up the

12   door, go in and shake you to get you out of bed after about

13   three hours of sleep, after drinking who knows how much

14   alcohol, and you got into a bus with 42 children and several

15   chaperones and drove them into the park.  That is egregious

16   behavior.  Absolutely egregious behavior.

17           You get up here and you -- you're angry.  You're angry

18   because of something that's in the paper.  I don't read the

19   paper.  I don't know what was in the paper, and I don't care,

20   and I don't --

21           THE DEFENDANT:  May I speak, Your Honor?

22           THE COURT:  No, you can't.  You had your chance.

23           THE DEFENDANT:  My constitutional rights have been

24   constantly denied here, and you --

25           THE COURT:  I said -- I said you cannot speak.

1          THE DEFENDANT:  Does it matter?

2          THE COURT:  You want to keep digging yourself into a

3   deeper hole, Mr. Parrent, just keep up that behavior.  You're

4   an angry man.  You should not be angry.  You should be

5   remorseful, but you're not, not one bit, not one bit.

6          You say you're an alcoholic, and yet you say when you

7   drink all night, you get three hours of sleep, you get up in a

8   bus with 42 children in it that you were unimpaired?  Who are

9   you to judge that?  Who are you to judge whether or not you're

10  impaired?  On Count III a detectable amount of alcohol is

11  enough to convict you, but you don't care about that either.

12  You're an angry, angry man.

13         Now, what all these people have said about you I have

14  no doubt is true, but you're not approaching this in the proper

15  fashion at all, Mr. Parrent, not at all.  It indicates to me

16  that you don't care about the 42 children that were on that

17  bus, and your boy was on the other bus.

18         Now, you want to talk about your rights, go right

19  ahead.  You'll have a chance to appeal, and you can put

20  everything in there that you want, and I hope you do.  But

21  until you do that, this is your sentence:

22         I'm going to sentence you to three months, 180 days

23  each on each count.  Excuse me, that would be 90 days.  90 days

24  on each count, total of 180 days in jail.  I'm not going to

25  impose any fines, but there are mandatory special assessments

USA v. PARRENT                    SENTENCING                    2:11MJ100

36

1    for the Victims of Crime Fund of $10 on each count and a $25

2    court fee.

3            I'm going to place you on two years of unsupervised

4    probation with the following conditions.

5            MR. PICO:  Unsupervised or supervised?

6            THE COURT:  Supervised, I'm sorry.  Thank you.

7            I should also mention for your edification and the

8    edification of the other people in the -- in the gallery that

9    when a Court imposes a sentence, it's for several reasons.

10   It's not -- it's for punishment surely, but that's not the only

11   reason.  The Court has to consider the -- the offense, which,

12   as I said, is egregious, and the history and characteristics of

13   the defendant.  You have a -- you have a pretty bad record as

14   far as DUIs are concerned.  You've shown here today that you

15   have no remorse.  You're just mad.  You don't even think about

16   what you've done.  You're just angry.

17           Now, the probation is to hopefully you'll have -- with

18   the supervision of the U. S. Probation Office you'll have --

19   you'll have some assistance in staying sober and getting the

20   help you need so that you will not find yourself in this

21   position again.

22           I admire you for what you've done.  You've gone back

23   to school at what for a lot of people would be an advanced age.

24   You're 15 -- you say you're 15 hours short of a degree.  That

25   certainly can still be reached.  And I would hope that the

USA v. PARRENT                    SENTENCING                    2:11MJ100

37

1    probation officer would -- would also help you get back on line

2    to -- to accomplish that goal.

3           The conditions of your probation are that you will

4    submit to a test of your blood, breath, urine or saliva upon

5    the demand of any United States probation officer or any law

6    enforcement officer who does so at the request of the probation

7    officer.

8           Secondly, you will submit to a search of your person,

9    your residence, your motor vehicle or workplace for the

10   presence of alcohol or controlled substances or other evidence

11   of a violation of your probation.

12          You are not to use, possess alcohol or controlled

13   substances or be present at any place where alcohol or

14   controlled substances are being used or served, and that

15   includes bars, saloons and such like.  You can go into

16   restaurants where alcohol is served.  You can't drink, of

17   course, but you can go into places where alcohol is not the

18   prime source of revenue.

19          Do you own any firearms, Mr. Parrent?

20          THE DEFENDANT:  No, Your Honor.

21          THE COURT:  You are not to possess or have in any

22   residence, workplace or motor vehicle any firearms, destructive

23   devices or any other dangerous weapons.

24          Now, you've already undergone a substance abuse eval

25   in Livingston.  I don't see the sense in putting you at the

1   expense of doing that again so quickly, but I would like you to

2   go into some substance abuse program.  You've done it once, and

3   you did -- you did some inpatient treatment as well, didn't

4   you, Mr. Parrent?

5          THE DEFENDANT:  Yes, I did, Your Honor.

6          THE COURT:  Where was that?

7          THE DEFENDANT:  Browning, Montana.

8          THE COURT:  And how long was your inpatient treatment?

9          THE DEFENDANT:  30 days.

10          THE COURT:  Well, unfortunately, 30 days, in my

11   experience, isn't enough, and that's not set by anybody that

12   knows anything about alcoholism.  That's how much insurance

13   will pay, which is -- 30 days isn't long enough, but -- and I

14   wouldn't expect you to go into inpatient.

15          I'm going to give you one more job, Ms. Rebsom.  Would

16   you look around Bozeman, and I know there's programs over

17   there, and find something in the way of maybe a 90-day

18   treatment program.

19          MS. REBSOM:  Are you thinking inpatient or --

20          THE COURT:  No, no, I'm thinking outpatient.

21          MS. REBSOM:  Oh, yeah, Alcohol and Drug Services can

22   do that in Bozeman.

23          THE COURT:  Of Gallatin County?

24          MS. REBSOM:  Mm-hmm.

25          THE COURT:  Okay.  Would you -- would you see if you

USA v. PARRENT                     SENTENCING                    2:11MJ100

39

1    can't get him enrolled in something there, please.

2           And you've been going to AA?

3           THE DEFENDANT:  Yes, I have, Your Honor.

4           THE COURT:  How many meetings a week?

5           THE DEFENDANT:  I do the three a week.

6           THE COURT:  I'm not gonna order you to go to AA

7    because AA is voluntary, and I don't believe in compelling

8    people to go to AA.  If you want to go to AA, you'll go to AA.

9           THE DEFENDANT:  Okay.

10          THE COURT:  But I would highly recommend that you keep

11   that up.  I think it's a very beneficial program for people who

12   honestly and truly want to quit drinking, but you've got to

13   keep after it because you're gonna have this problem the rest

14   of your life.  And if you -- if you slack off at all, you'll

15   relapse.  That's just a fact.  But if you can keep going to AA,

16   you'll -- you'll get a lot of support there as you must well

17   know by now.

18          MS. REBSOM:  Judge, I have a question.  If -- if I can

19   get Mr. Parrent into an intensive outpatient program in

20   Bozeman, would the Court be willing to allow him to do that

21   immediately right away and possibly, if he successfully

22   completes it, reduce the amount of jail time of his sentence?

23          THE COURT:  No, I want him to do it when he's released

24   from -- from jail so we get him back on the -- on the right

25   track.

NEW LIFE TRANSCRIPTION SERVICE                          307.214.3912

1    And you're to notify your probation officer of any

2    proposed change of address, and this is before you move.  If

3    you find you have to move or you want to move somewhere else

4    other than your current address, you should notify your

5    probation officer beforehand, all right?

6            THE DEFENDANT:  Okay.

7            THE COURT:  And the final condition is that you have

8    no violations of any state, federal or local laws during the

9    term of your probation.  You'll get a copy of the judgment and

10   the conditions of your probation, Mr. Parrent.  Do you have any

11   questions about either one of those right now?

12           THE DEFENDANT:  No.

13           THE COURT:  Now, since you did enter a plea of not

14   guilty to the charges and you were found guilty, you do have

15   the right to appeal the judgment of this Court to the United

16   States District Court, and it is -- you don't get a new trial

17   before the district judge.  It is on the record that was made

18   at the trial and the record that was made here today.  You

19   would be -- you appeal under -- initially under Federal Rule of

20   Criminal Procedure 58, Subsection (g).  You have to file notice

21   with the clerk of court and with the U. S. Attorney's Office

22   within 14 days of today.  So you don't have a whole lot of

23   time.

24           Ms. Rebsom has indicated to the Court she'll help you

25   do that.  In all likelihood, you'll have to probably get a

USA v. PARRENT                    SENTENCING                    2:11MJ100

41

1    public defender out of the Public Defender's Office in Cheyenne

2    to represent you, but Ms. Rebsom can help you do that as well.

3            There is a filing fee, but I think, if you are shown

4    to be an indigent person, you won't have to pay that either.

5            Also, you're entitled to a copy of the proceedings,

6    and if you establish by affidavit that you have an inability to

7    pay for the record, then the Government will provide you with a

8    copy of that record.

9            Any questions, Mr. Parrent?

10           THE DEFENDANT:  No questions, Your Honor.

11           THE COURT:  All right.  I'm going to remand you to the

12   custody of the U. S. Marshal to begin your sentence.

13           Does the Government have anything else?

14           MR. PICO:  Just a point of clarification, Your Honor.

15   I wanted to make sure.  The total sentence is 180 days.  It's

16   90 days on each count that he was convicted of to be served

17   consecutively; is that correct?

18           THE COURT:  Correct.

19           MR. PICO:  Thank you.

20           MS. REBSOM:  And, Judge, at this time I would inform

21   the Court that I'd be filing a motion to stay sentence pending

22   appeal, and I'm not sure if the Court would like to entertain

23   that pursuant to Rule 38.

24           THE COURT:  I will give you -- I'll give you until the

25   1st of November to pay the $45 in special assessment and court

1    costs.  I'm going to deny your motion to stay, Ms. Rebsom,

2    pursuant to Title 18 United States Code Section 3148 and,

3    again, remand the defendant to the custody of the U. S. Marshal

4    for transfer to an appropriate detention facility.  And I

5    suspect, if he does appeal, he'll end up in Cheyenne so that he

6    can help with the preparation of his appeal.

7            Mr. Pico, anything else?

8            MR. PICO:  Just one thing, Your Honor.  I think you

9    mentioned 3148.  I think it's 3143.

10           THE COURT:  43, yeah.

11           MR. PICO:  Thank you.

12           THE COURT:  Thank you.

13           MR. QIU:  One other thing.  Hold on, Your Honor.

14           MR. PICO:  Is the Court imposing a ban from

15   Yellowstone?

16           THE COURT:  No.

17           MR. QIU:  Okay.  Thank you.

18           THE COURT:  Anything else, Ms. Rebsom?

19           MS. REBSOM:  Nothing further, Judge.

20           THE COURT:  Well, Mr. -- Mr. Parrent, I -- I don't

21   like doing this, but I really don't think I had a choice

22   because of your record, because of the egregiousness of what

23   happened the night before and what you did that day.  There's

24   no way in hell you should've been driving that bus.  There's

25   just -- there's just no getting around that.  And with all

1    those kids on there and the narrow roads in this park, it's

2    just a recipe for -- for a horrible, horrible disaster, and it

3    could be that the rangers by stopping you did you a big favor.

4    You might've had something way more serious on your hands than

5    being sent to jail.  We'll never know, thank God, but that

6    certainly was a possibility.  This matter is adjourned.

7              COURTROOM CLERK:  All rise.

8

9                            --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

44

1                              C E R T I F I C A T E

2

3

4          I, LORI ARNOLD, a Registered Merit Reporter, do hereby

5     certify that the foregoing is a correct transcript from the

6     official recording of the proceedings in the above-entitled

7     matter.

8               Dated this 5th day of April, 2012.

9

10

11

12                              /s/ Lori Arnold

13                              _____
                                     LORI ARNOLD
14                              Registered Merit Reporter

15

16

17

18

19

20

21

22

23

24

25